**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION**

| | |
|---|---|
| FOREST GLEN, L.L.C. and TIMBER CREEK, L.L.C., | ) Case No.: 2:07-CV-836 |
| | ) |
| | ) **CITY OF MONTGOMERY'S** |
| Plaintiff, | ) **BRIEF IN SUPPORT OF MOTION FOR** |
| vs. | ) **SUMMARY JUDGMENT** |
| | ) |
| CITY OF MONTGOMERY, and THE WATER WORKS AND SANITARY SEWER BOARD FOR THE CITY OF MONTGOMERY, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants | ) |
| | ) |

COMES NOW the City of Montgomery, by and through undersigned counsel, and in support of its Motion for Summary Judgment says as follows:

**FACTS**

The City of Montgomery's Planning Commission adopted the Access Management Plan for Taylor Road and Chantilly Parkway on June 26, 2003. (Exhibit A, Access Management Plan). The plan is a supplement to and a part of the City of Montgomery's subdivision regulations which are adopted and governed by §11-52-2 *et. seq.* of the Alabama Code, and was passed as part of the city's municipal plan to regulate traffic. More specifically, the plan was passed to accomplish certain goals, to wit: to "move people and goods safely, quickly and efficiently." (Exhibit A, p. 1). To accomplish this, the plan seeks to (1) limit the number of (traffic) conflict points; (2) separate conflict points; (3) separate turning volumes and through movements; (4) locate traffic signals to facilitate traffic movement; (5) maintain a hierarchy of roadways; and (6) limit direct access on higher speed roads. (Exhibit A, p. 9).

On August 22, 2003, Plaintiffs subdivided a portion of land which they owned on Chantilly Parkway by selling a lot to Alan and Ann Bush. (Exhibit B, Purchase and Sale Agreement, Settlement Statement, and Deed). While the deed transferring the said property contained a metes and bounds property description, the Purchase and Sale Agreement referred to the property as "Lot 1." (Exhibit B, Purchase and Sale Agreement). Also, the property description contained in the deed substantially matches the lot portrayed as "Lot 1" on what would eventually be approved and filed as the final plat Chantilly Place East Plat No. 1.

Less than three months after that sale, and more than five months after the passage of the Access Management Plan, on November 10, 2003, Plaintiff's, through their engineer, submitted a request to the Montgomery Planning Commission for *preliminary* approval of Chantilly Place East Plat No. 1. (Exhibit D, Affidavit of Thomas M. Tyson, Jr., p.16). The plat submitted on that date included the portion of land which had previously been sold to Alan and Ann Bush. Plaintiffs received conditional preliminary plat approval in accordance with Montgomery's subdivision regulations on December 11, 2003. (Exhibit D, p. 25).

Montgomery's subdivision regulations, found in Appendix B of the Montgomery City Code, state that,

> Conditional approval of the preliminary plat shall not constitute approval of the final plat. However, it shall be deemed an expression of approval of the layout submitted on the preliminary plat as a guide to the preparation of the final plat which will be submitted for the approval of the planning commission, and for recording upon the fulfillment of the requirements of these regulations and the conditions of the conditional approval, if any.

Appendix B, §II (C), Montgomery Municipal Code (Exhibit E).

In preparation for the submission of the final plat, Plaintiffs submitted more detailed construction drawings independently to the Engineering

Department, the Traffic Engineering Department, Fire Department, and to the

Water Works and Sanitary Sewer Board.

On January 20, 2004 Stuart Manson, the Assistant Director of the City's Traffic

Engineering Department, sent a letter to Plaintiffs' engineer, Gregory Gillian, notifying him that

the plat which was submitted contained several deficiencies, one of which required the extension

of the service road to the boundary of the subdivision (Exhibit F, Letter from Stuart Manson to

Gregory Gillian).

That extension was and is required by the Access Management Plan for Taylor Road and

Chantilly Parkway.  (Exhibit A ).  More specifically, the Access Management Plan required "[a]

continuous cross-access or service drive with sufficient width to accommodate two-way travel

aisles for automobiles . . ." (Exhibit A, p. 20).  The purpose for such cross-access drives is to

"allow vehicles to circulate between adjacent businesses without having to re-enter public

streets." (Exhibit A, p. 19).

The needed access road would have to be constructed over what was shown on the

construction drawings as Lot 1.  Given that Plaintiffs had previously sold Lot 1 of their

development to Allan and Ann Bush, [in violation of §11-52-33 Ala. Code (1975)], they elected

to re-purchase the said Lot 1.  They did so on February 5, 2004, the closing occurring on

February 25, 2004. (Exhibit G, Purchase and Sale Agreement and Settlement Statement).

A corrected plat was submitted by Plaintiffs for final approval by the Montgomery

Planning Commission on December 21, 2004. (Exhibit D, p. 26).  That plat was approved by the

Commission, and it was recorded in the office of the Judge of Probate for Montgomery County

on February 11, 2005. (Exhibit C, Final Plat of Chantilly Place East Plat No. 1).

The property adjoining Plaintiffs' subject development immediately to the east was annexed into the Town of Pike Road on July 2, 2007. (Exhibit H, Pike Road Annexation Ordinance & Minutes). That property was, at the time of annexation, and remains at the writing hereof, undeveloped.

As to the claims regarding the requirement of extending the sanitary sewer line to the end of the subject property, the City of Montgomery has no authority or control over the management and placement of sanitary sewer lines. Nor did the City of Montgomery require Plaintiffs to make the alleged changes. It seems that the plaintiffs' complaint focuses such alleged conduct on the Water Works and Sanitary Sewer Board for the City of Montgomery, an entity separate and apart from the City.

## ARGUMENT

### I.    Statute of Limitations

Both the reckless fraud claim and the due process/equal protection claim asserted by Plaintiffs against the City of Montgomery revolve around the allegation that "Defendants required Plaintiffs to build and construct, at Plaintiff's expense, an access or service road along Plaintiffs' property boundaries and Chantilly Parkway." (Exhibit J, Complaint, p. 1). The Complaint goes on to allege that "Defendants, through Stuart Manson, Assistant Director/ City of Montgomery traffic Engineering Department . . . and others, repeatedly informed Plaintiffs that the service road was required." (Exhibit J, Complaint, p.2).

Plaintiffs were notified of the complained-of requirement by way of letter dated January 20, 2004. (Exhibit F). In that letter, Stuart Manson first notified Plaintiff Forest Glen that the "access agreement parallel to Chantilly Pkwy. (Al. Highway 110) must be extended along the entire length of lot one." (Exhibit F, item 2). That notification occurred well beyond two years

prior to the filing of the case at bar; the case having been first filed in the Circuit Court of Montgomery County Alabama on August 8, 2007. (Exhibit J).

A.    **Reckless Fraud**

"In Alabama, any fraud claim must be brought within two years of the accrual of the claim." <u>Jones v. Kanouf & Co., P.C.</u>, 949 So.2d 136, 149 (Ala.2006) *citing* <u>Auto-Owners Insurance Co. v. Abston</u>, 822 So.2d 1187, 1194 (Ala.2001); §6-2-38(*l*) Ala. Code (1975). If there were a misrepresentation, as required as the central element of any fraud, it occurred on or about January 20, 2004, when Stuart Manson notified Plaintiffs of the requirement that the service road be extended.[1] The limitation period within which the claim for fraud must have been filed, therefore, ran approximately seven months prior to the filing of the instant lawsuit.

B.    **Due Process/Equal Protection**

"All constitutional claims brought under §1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the §1983 action has been brought. <u>Mcnair v. Allen</u>, 515 F.3d 1168, 1173 (11th Cir.2008) *citing* <u>Wilson v. Garcia</u>, 471 U.S. 261, 275-76, 105 S.Ct. 1938, 1946-47 (1985). The statute of limitation for personal injury actions in Alabama is two years. §6-2-38(*l*) Ala. Code (1975). The time for filing the due process and equal protection claims, therefore, also expired prior to the filing of the instant case.

C.    **Violation of Access Management Plan**

Depending upon how the Court interprets which claim, if any, is presented by Count III, that claim may also be outside of the applicable statute of limitations. If the plaintiffs' claim is that requiring the service road to be extended violated the Access Management Plan, the limitations period for that, too, must have begun when the letter from Stuart Manson informed them of the necessity to extend the road: January 20, 2004. (Exhibit F).

_____

[1] See 6-5-101 Ala. Code (1975) for proposition that fraud requires the "misrepresentation of a material fact."

## II.     Reckless Fraud – No Misrepresentation

In Count I of the Complaint, Plaintiffs alleged that the City committed a reckless fraud, either in requiring the plaintiff to build the subject access road or, alternatively, not requiring his neighbor to the east to continue the access road.

Fraud, a state law cause of action, requires, among other things, the "[m]isrepresentation of a material fact." §6-5-101 Ala. Code (1975).  As to the requirement of building an access road, the Access Management Plan clearly establishes that "[a] continuous cross-access or service drive with sufficient width to accommodate two-way travel aisles for automobiles . . ." is required. (Exhibit A, p. 20).  The representation that Plaintiffs had to carry the road to the end of the property to connect to his neighbor is not a misrepresentation.

As to the alleged representation that the neighbor would have to connect to and carry the road further, the same requirement would have applied had the neighbor not annexed into the corporate limits of another municipality.  By annexing into the Town of Pike Road, the neighbor removed his property from the jurisdiction of the Montgomery Planning Commission and submitted to the jurisdiction of the Town of Pike Road—which does not have a comparable traffic access requirement. *See* §11-52-30 (a) ("The territorial jurisdiction of any municipal planning commission over the subdivision of land shall include all land located in the municipality and all land lying within five miles of the corporate limits of the municipality . . . ).

While the City of Montgomery had jurisdiction over the subdivision of the neighboring property prior to the annexation, the subdivision requirement that the development be connected to Plaintiffs' service road cannot be enforced unless and until the owner of that property applies for approval of a plat (i.e. a subdivision plan).  The platting process itself is the enforcement

mechanism, and no such application for subdivision was made while the City of Montgomery had jurisdiction. In fact, there is no indication that any such development has begun on the said property.

The representation made by the City of Montgomery that the neighbor was subject to the same access management requirements, therefore, was no misrepresentation at all. It was a statement of fact which was and is true. While it cannot be discerned from the facts when the alleged representation was made, it certainly must have been made sometime during the platting process, which ended with the recording of the final plat on February 11, 2005. (Exhibit C). The annexation occurred more than two years later, on July 2, 2007. (Exhibit H). The Montgomery Planning Commission, therefore, did have jurisdiction over the neighboring property at the time of the alleged representation, but lost it in July of 2007 when the annexation occurred—all of which occurred prior to the initiation of the enforcement mechanism. The City of Montgomery, therefore, never had an opportunity to require the neighbor to connect to the road.


## II.    Due Process & Equal Protection

Count II of the Complaint alleges that the actions of the City of Montgomery violated Plaintiffs' rights of due process and equal protection. It is impossible to determine, however, whether the plaintiffs are attempting to make a substantive due process claim and an equal protection claim based upon the Access Management Plan, or whether they are making separate claims for procedural due process and equal protection under 42 U.S.C. §1983 for the manner in which the Access Management Plan was applied. In either event, the plaintiffs can maintain no genuine issue of material fact upon which the City of Montgomery is not entitled to a judgment as a matter of law.

A.    **Substantive Due Process & Equal Protection**

1.    **Equal Protection**

In a similar Eleventh Circuit case in which a landowner brought a facial challenge of a zoning regulation, the court said that, "a plaintiff may claim that the zoning denies him equal protection of the laws, either because it treats a suspect class differently from others, because it affects a fundamental right, or because it treats a non-suspect class differently and is not rationally related to a legitimate government purpose." Executive 100, Inc. v. Martin County, 922 F.2d 1536, 1540 (11th Cir.1991); s*ee also* Eide v. Sarasota County, 908 F.2d 716, 722 (11th Cir.1990).

While the regulations involved in this case are not, technically, zoning regulations, they are sufficiently similar in that they regulate the way in which a landowner may develop his land. Zoning regulations may be seen as the governing of the use to which a property may be put, and subdivision regulations as the governing of the way in which the property may be put to that use—the regulation of street placement and layout, public spaces, and fire and police accessibility and safety. Roberson v. City of Montgomery, 285 Ala. 421, 425, 233 So.2d 69, 72 (Ala.1970).

The plaintiffs in this case have made no allegation that they are members of a suspect class, or that the actions by the City of Montgomery treat a *suspect class* differently from others. Nor do they allege that the actions affect a fundamental right.  Rather, they allege that they—a non-suspect class—have been treated differently than their neighboring landowner.  The allegations should, therefore, be scrutinized under the rational basis test.  In the Executive 100 case (where the landowner challenged zoning regulation) the court noted that "[i]n cases involving economic regulation, the courts apply the rational basis test to regulations challenged

under the Equal Protection Clause. <u>Executive 100, Inc. v. Martin County</u>, 922 F.2d at 1541; *citing to* <u>Williamson v. Lee Optical</u>, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

"Legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." <u>Executive 100</u>, supra; <u>Cleburne v. Cleburne Living Center</u>, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). The legitimate state interest expressed by the City's Access Management Plan for Taylor Road and Chantilly Parkway is to "move people and goods safely, quickly and efficiently," and to "maintain livable communities, improve safety, preserve roadway capacity and the useful life of roads, decrease travel time and congestion, improve access to properties, [and] improve air quality." (Exhibit A, p. 1-2). In so doing, the plan seeks to: (1) limit the number of (traffic) conflict points; (2) separate conflict points; (3) separate turning volumes and through movements; (4) locate traffic signals to facilitate traffic movement; (5) maintain a hierarchy of roadways; and (6) limit direct access on higher speed roads. (Exhibit A, p. 9). There can be little argument that traffic safety, the easing of traffic congestion, and the facilitating of the movement of higher volumes of traffic are all legitimate state interests.

Requiring the landowner in this case to construct "[a] continuous cross-access or service drive with sufficient width to accommodate two-way travel aisles for automobiles," is rationally related to the legitimate state interest of increasing traffic safety (reducing the number of traffic signals) and reducing traffic congestion. (Exhibit A, p. 20).

### 2.    Substantive Due Process

The same rational basis test is used to determine whether the legislation violates substantive due process. "[A] deprivation of a property interest is of constitutional stature if it is undertaken 'for an improper motive and by means that were pretextual, arbitrary and capricious,

and ... without any rational basis.'" <u>Greenbriar, Ltd. V. City of Alabaster</u>, 881 F.2d 1570, 1577 (11th Cir.1989) *citing* <u>Spence v. Zimmerman</u>, 873 F.2d 256, 258 (11th Cir.1989); *see also* <u>Grant v. Seminole County, Fla</u>, 817 F.2d 731, 735-36 (11th Cir.1987) (applying rational basis standard to substantive due process and equal protection challenges to zoning regulation). For the reasons argued above, the Access Management Plan at issue is rationally related to a legitimate state interest. It cannot be said with any credibility to be pretextual, arbitrary and capricious, or that it has been passed for an improper motive, or at least the plaintiffs have failed to allege as much.

**B.      Procedural Due Process and Equal Protection under 42 U.S.C. §1983**

If the claims alleged by Plaintiff's are for procedural due process and equal protection violations under 42 U.S.C. §1983, there is, again, no genuine issue of fact upon which the City of Montgomery is not entitled to a judgment as a matter of law.

**1.      Procedural Due Process**

The due process clause of the Fourteenth Amendment guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law.'" U.S. Const. amend XIV, §1. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." <u>Arrington v. Helms</u>, 438 F.3d 1336, 1346 (11th Cir.2006). "In this circuit, a §1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." <u>Arrington</u>, 438 F.3d at 1347; *citing* <u>Grayden v. Rhodes</u>, 345 F.3d 1225, 1232 (11th Cir.2003).

While it is not specifically set out in the Complaint, it is clear that the constitutionally protected interest allegedly violated here is a property interest. It is equally clear that the actions

of the City of Montgomery constitute state action. The issue, then, is whether the process afforded Plaintiffs was constitutionally adequate.

### (a). Notice and Hearing

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" <u>Cleveland Board of Education v. Loudermill</u>, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493 (1985); *citing* <u>Mullane v. Central Hanover Bank & trust Co.</u>, 339 U.S. 306, 313, 70 S.Ct. 652, 656 (1950). Plaintiff Forest Glen, by and through its engineer, Wesley Fulmer, applied for final plat approval by letter dated December 21, 2004 (Exhibit D, p. 26). On January 13, 2005, the Montgomery Planning Commission held a hearing on the proposed plat. (Exhibit D, p.1-2). Mr. Wesley Fulmer presented himself before the Commission in a representative capacity for Forest Glen, L.L.C. (Exhibit A, p. 1-2). At that hearing, Mr. Fulmer fielded two questions from members of the Commission and the floor was opened to anybody wishing to discuss the project. No discussion was initiated by Mr. Fulmer or anyone else regarding the required construction of the subject service road. (Exhibit A, p. 1-2). The Planning Commission approved Chantilly Place East Plat No. 1 in the form in which it was submitted for final platting by Plaintiffs—showing the fully constructed service road running the full length of the property as required by the Access Management Plan. (Exhibit C). The plaintiffs, therefore, had notice and an opportunity to be heard on the issue, and had an agent present at the hearing.

### (b). No "Taking"

Moreover, the letter from Stuart Manson advising Plaintiffs' engineer that the submitted construction drawings were deficient in that the "access agreement . . . must be extended along the entire length of lot 1," was not a taking of the plaintiffs' property. (Exhibit F). The Planning

Commission is the ultimate authority on whether to approve or disapprove a plat. §11-52-03 *et. seq.* The review of construction drawings by the various departments is performed in order to alert the developer to any potential deviations from the subdivision regulations in their plat prior to their application for final approval. Any discrepancies found by those departments, if not corrected and re-submitted prior to application for final plat approval, are noted and presented to the Commission at the final approval stage. The plaintiffs had the option of submitting their original drawings to the Commission for approval or disapproval. Had they done so, and had the Planning Commission refused to approve the plat, the hearing before the commission would have provided Plaintiffs with sufficient notice and opportunity to be heard. They did not, however, apply to the Planning Commission for approval of the road plan they wanted.

The plaintiff, Forest Glen, L.L.C., elected instead to re-draw their plat in conformity with the Access Management Plan. No "taking," therefore, occurred at the hands of either the Montgomery Planning Commission or the Assistant Director of the Traffic Engineering Department.

If the claim presented herein is a challenge of the Access Management Plan itself, it must be analyzed under the substantive due process framework discussed above.

### 2.    Equal Protection

In general, "[i]n order to prevail on an equal protection claim based upon the application of a facially neutral statute, it must be establish that: (1) the plaintiff was treated differently than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff." Strickland v. Alderman, 74 F.3d 260, 264 (11th Cir.1996). This case, however, merely presents the threshold issue of whether some individual was treated differently than the plaintiff. They were not.

Plaintiffs' construction drawings were not in compliance with the Access Management Plan for Taylor Road and Chantilly Parkway—part of the regulations which govern the subdivision of land and are invoked at the point at which an applicant requests final plat approval from the Planning Commission. Those regulations did not require their neighbor to build a road because their neighbor had not yet sought to subdivide his property. There is, in fact, no evidence that any attempt has yet been made by the neighboring landowner to subdivide the said property. Not only was there no individual who was treated differently, the neighbor is not a similarly situated person because the City of Montgomery has not had the opportunity to enforce its regulations against the neighbor.

The neighboring property was annexed by the Town of Pike Road on July 2, 2007, and it was, thereby, removed from the jurisdiction of the Montgomery Planning Commission. There has been, therefore, no application whatsoever of the facially neutral statute at issue against a similarly situated person, much less an unequal application.

### III.    Violation of Access Management Plan

Count II of Plaintiffs' Complaint alleges that the City of Montgomery violated the Access Management Plan by (1) changing the median cross-overs in Alabama Highway 110 and (2) not requiring the neighboring landowner to continue the service road. As explained above, the City of Montgomery lacked jurisdiction to require the neighboring landowner to extend the service road, because the neighbor has not sought to subdivide the subject property and because the neighboring parcel was annexed by the Town of Pike Road, thus removing it completely from the jurisdiction of the City of Montgomery.

As to the changing of medians, Alabama Highway 110 is a state highway. The Alabama Department of Transportation alone dictates the quantity and location of median cross-overs. (Exhibit I, Affidavit of Stuart Manson). The City of Montgomery has no jurisdiction whatsoever to make such decisions. The City of Montgomery's powers begin at the point where the state right-of-way ends, and the Montgomery Planning Commission must plan for entrances and exits into and out of the state right-of-way based upon the Department of Transportation's placement of intersections, cross-overs, and traffic signals. (Exhibit I).

IV.     **Summary Judgment Standard**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323. The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing, or pointing out to, the district court that the non-moving party has failed to present evidence in support of some elements of its case on which it bears the ultimate burden of proof. Id at 322-324.

Once the moving party has met its burden, Rule 56(e) "requires a non-moving party to go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to

interrogatories, or admissions on file, designate specific facts showing there is a genuine issue for trial." <u>Id.</u> at 324. To avoid summary judgment, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986). Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. 56(c) Fed.R.Civ.P.

After the non-moving party has responded to a motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. <u>Yannella v. City of Dothan</u>, 66 F. Supp. 2d 1233 (M.D. Ala. 1999).

**CONCLUSION**

Plaintiffs' allegations, if taken in the light most favorable to them, do not create a genuine issue of material fact. And the City of Montgomery is entitled to a judgment on those claims as a matter of law. There cannot have been a fraud because there has been no misrepresentation. There has been no substantive due process violation because the state actions in this case are rationally related to a legitimate state interest. Given that a hearing was had before the Planning Commission and the plaintiffs' agent was present and heard, there can be no real argument that there was a defect in the procedural due process. Any equal protection claim must also fail either because the statute at issue was not applied to the neighboring landowner for lack of jurisdiction to do so, or because the neighboring landowner is not a similarly situated person. Finally, the plaintiffs have failed to allege a set of circumstances which show that the City of Montgomery

violated the Access Management Plan.  The City of Montgomery, therefore, is entitled to a

judgment as a matter of law on all claims alleged in the Complaint.

       Respectfully submitted,


                        /s/ Wallace D. Mills_____
                        WALLACE D. MILLS (MIL090)
                        Assistant City Attorney


CITY OF MONTGOMERY
Legal Department
Post Office Box 1111
Montgomery, Alabama  36101-1111
(334) 241-2050
(334) 241-2310 – facsimile


## CERTIFICATE OF SERVICE

       I hereby certify that on the 10th day of June, 2008, I electronically filed the foregoing
with the Clerk of the court using the CM/ECF system which will send notification of such filing
to the following parties or counsel:

                Harold Dean Mooty, Jr, Esq.
                Mooty & Associates PC
                600 Clay Street
                Montgomery, AL 36104

                Randall C. Morgan, Esq.
                Hill Hill Carter Franco Cole & Black
                PO Box 116
                Montgomery, AL 36101-0116

and I hereby certify that I have also mailed by United States Postal Service the document to the
above-named non-CM/ECF participants:

                        /s/ Wallace D. Mills
                        OF COUNSEL



EXHIBIT

_A_

# ACCESS MANAGEMENT PLAN

## TAYLOR ROAD AND CHANTILLY PARKWAY

## MONTGOMERY, ALABAMA

ADOPTED BY :

## CITY OF MONTGOMERY PLANNING COMMISSION
### June 26, 2003

# ACCESS MANAGEMENT PLAN
# TAYLOR ROAD AND CHANTILLY PARKWAY

Adopted by:

City of Montgomery Planning Commission

June 26, 2003

# TABLE OF CONTENTS

**INTRODUCTION** .................................................................................... **1**
**DEFINING ACCESS MANAGEMENT** .......................................................... **1**
   Benefits of Access Management ......................................................... 2
   Goal of Access Management ............................................................... 9
   Basic Principles of Access Management ............................................... 9

**ACCESS MANAGEMENT STRATEGIES** ..................................................... **12**
   Driveway Location and Design ........................................................... 12
   Minimum Distances Between Driveways .............................................. 14
   Median and Signalized Intersection Spacing ....................................... 15
   Left and Right Turn Lanes................................................................. 16
   Corner Clearance............................................................................. 18
   Joint and Cross Access ..................................................................... 19
   Maximum Number of Driveways ........................................................ 20
   Outparcels Requirements (Internal Access)......................................... 21
   Frontage, Reverse Frontage and Alternate Access ............................... 21
   Throat Length/ Minimum Stacking..................................................... 22
   Residential access through neighborhood streets ............................... 23
   Interconnected street system............................................................ 24
   Coordination with Alabama Department of Transportation ................... 25
   Other Access Management Strategies ................................................ 26

**TAYLOR ROAD AND CHANTILLY ACCESS MANAGEMENT PLAN** ...................... **28**
   Taylor Road Access Management Plan................................................. 28
   Chantilly Parkway Access Management Plan......................................... 30
   Regional Connectivity Recommendations ............................................ 30

# LIST OF FIGURES

Figure 1:  Street With/Without Access Management.......................................................3
Figure 2:  36 Conflict Points ............................................................................9
Figure 3:  6 Conflict Points .............................................................................9
Figure 4:  2 Conflict Points ............................................................................10
Figure 5:  Roadway Hierarchy............................................................................11
Figure 6:  Driveway Location and Design.................................................................13
Figure 7:  Turn Radius .................................................................................13
Figure 8:  Driveway Spacing ...........................................................................14
Figure 9:  Access Spacing (Minimum)....................................................................15
Figure 10: Driveway Spacing (Median and Intersection) .................................................16
Figure 11: Turn Lanes..................................................................................17
Figure 12: Right Turns ................................................................................17
Figure 13: Corner Clearance ...........................................................................18
Figure 14: Joint and Cross Access .....................................................................19
Figure 15: Frontage Road...............................................................................21
Figure 16: Reverse Frontage Road ......................................................................22
Figure 17: Driveway Throat Length .....................................................................23
Figure 18: Insufficient Throat Length .................................................................23
Figure 19: Residential Access .........................................................................23
Figure 20: Interconnected Street System ...............................................................24
Figure 21: Driveway Turn-Around .......................................................................27
Figure 22: Taylor Road Access Management Plan .........................................................29
Figure 23: Chantilly Parkway Access Management Plan ...................................................31
Figure 24: Regional Connectivity Recommendations......................................................33

## INTRODUCTION

The City of Montgomery as well as communities throughout the country is increasingly concerned about the effects of development on service costs, community character and overall quality of life. Substantial resources have been and continue to be invested into the arterial roadways in and around the City of Montgomery. These arterial roadways serve as vital links between various parts of the City and serve as essential access for commerce, trade, tourism and recreational travel.

The City of Montgomery has identified two of its corridors that contain substantial undeveloped adjacent lands that are currently undergoing development pressures. The two corridors are identified as follows:

- ❑ Taylor Road (Alabama Highway 271) from Vaughn Road to U.S. Highway 231 and
- ❑ Chantilly Parkway (Alabama Highway 110) from East Chase Parkway to Vaughn Road.

By identifying these corridors, the City of Montgomery, in conjunction with the Alabama Department of Transportation, intends to establish access guidelines for use by property owners in planning for development of their properties in such a manner the full capacities of these roadways can be realized and protected.

## DEFINING ACCESS MANAGEMENT

The number of curb cuts and associated turning movements along any roadway conflicts with the intended function of an arterial—to move people and goods safely, quickly and efficiently. Poorly coordinated access systems can force more trips onto the arterial, traffic conflicts multiply and congestion increases. As development intensifies and the level of service declines, additional lanes, controlled medians and other expensive retrofitting measures are needed to maintain the capacity of the corridor. Businesses also suffer as accessibility deteriorates. Heavy traffic, difficult turns and corresponding increases in traffic accidents deter customers. Businesses may relocate to areas where accessibility is less impaired, vacancies increase and property values decline. Eventually a corridor can be transformed into an unattractive and confusing jumble of signs, curb cuts, utility lines and asphalt continuing the cycle of "throw-away" development. These are not inevitable results of development and growth, but rather, the results of poor stewardship.

The need for better access management is most obvious in strip commercial areas where driveways frequently occur. Too many driveways can confuse drivers, who become uncertain as to when turns into or out of driveways will be made. Too many driveways result in a large number of turning movements and conflict points, increasing the potential for traffic accidents. In addition, when there are no turn lanes, each turning vehicle slows traffic and reduces the carrying capacity of the road. Unfortunately, once an access management problem is obvious, it is often too late or too expensive to correct. By managing access to the roadway system during project planning stages, safe access can be provided while preserving traffic flow.

Access management:

- ❑ A process of balancing the competing needs of traffic movement and land access.
- ❑ Evaluates the suitability of providing access to a given road, as well as the suitability of a site for land development.
- ❑ Addresses the basic questions – when and where access should be located, how it should be designed, and the procedures needed to implement the program.
- ❑ A way to anticipate and prevent safety problems and traffic congestion.
- ❑ Focuses on mitigating traffic problems arising from development and increased traffic volume attempting to utilize these developments.
- ❑ Requires control of driveways and intersections to maintain safety at a roadway's full traffic carrying capacity.
- ❑ Provides reasonable access to land development while simultaneously preserving the safe and efficient flow of traffic on the roadway system.
- ❑ Calls upon local planning and zoning to address overall patterns of growth and the aesthetic issues arising from development.

The key to effective access management is linking appropriate access design to roadway function.  Successful access management protects and enhances property values while preserving the public investment in our roads.


**Benefits of Access Management**

Transportation officials and planners are showing more interest in access management because of increasing traffic congestion, traffic safety issues, and the rising costs of road improvements.  An effective, local access management program can play an important role in preserving highway capacity, reducing crashes, and avoiding or minimizing costly remedial roadway improvements.  Motorists will benefit from faster and safer travel, and reduced traffic crashes and congestion.  Businesses and landowners will benefit from increased business vitality and decreased travel time to their business.  Developers will benefit by establishing access design criteria in advance, thereby preventing the high cost of delay and redesign.  Taxpayers will benefit from more efficient use and prolonged functional life of existing facilities.  Public agencies will benefit from the relatively low cost of access management, allowing them to use their resources for other needs.  By maintaining or increasing a road's design capacity, funds that might otherwise be spent for expensive road widening, can be spent on road maintenance, operations or enhancement projects.

Good access management can:

- ❑ Maintain Livable Communities
- ❑ Improve Safety
- ❑ Preserve Roadway Capacity and the Useful Life of Roads
- ❑ Decrease Travel Time and Congestion
- ❑ Improve Access to Properties
- ❑ Improve Air Quality

❑   Maintain Travel Efficiency and Related Economic Prosperity
❑   Coordinate Land Use and Transportation Decisions

*Maintain Livable Communities*

Access management can maintain and enhance community livability by preserving neighborhood integrity, preserving private investment in abutting properties, lowering vehicular emissions, and enhancing community character.   Community character is enhanced, both visually and functionally by a comprehensively designed street system. Land use patterns and land values are preserved.   Cut-through traffic is eliminated or greatly reduced.   The resulting lower traffic volumes and slower speeds contribute to safer and more tranquil residential areas.   Arterial streets can be designed to carry high traffic volumes safely and efficiently.   Investment in commercial office and retail development does not become obsolete due to deterioration in the quality of service on arterial streets and a shrinking market value as travel times and delays increase until the point where bypass roadways are built and traffic volumes drop on the original arterial street.



*Improve Safety*

The most significant benefit associated with access management involves traffic safety.   For more than two decades, various studies have documented how good access management can significantly reduce the number and severity of traffic crashes, including fatal, injury and property damage crashes.

Figure 1

Studies in Colorado and Florida have shown that the crash rate can be 50 percent less on good access management roads.   In Georgia, installing medians with protected left turn lanes decreased crashes by 25 percent, while similar measures reduced crashes by 45 percent in New Jersey.   In a 1988 Michigan study, there were half as many crashes on four- or six- lane divided highways as there were on undivided four and six-lane roads.   Other studies typically have found 30 percent to 45 percent fewer crashes on roads with access management improvements (Source: *Improving Driveway and Access Management in Michigan, MDOT*).

---

*Preserve Roadway Capacity and Useful Life of Roads*

Congestion angers motorists, prevents roads from functioning as they were designed, and is a source of air pollution. One major contributor to congestion is unnecessary or uncontrolled points of conflict caused by too many opportunities to turn onto or off the road. As cars slow to turn, the capacity of the road to move cars at the posted speed is diminished. Stated another way, poor access management and too many driveways contribute to the functional deterioration of a road. Figure 1 illustrates a technique to reduce direct access from residential properties onto an arterial while minimizing the number of access points.

Good access management preserves a roads capacity to move vehicles at the posted speed and extends the useful life of the road. Each new driveway that is located on an arterial reduces its traffic carrying capacity. After several new driveways have been installed it often becomes clear that turning traffic has a negative impact on traffic speeds on the arterial. A Florida Department of Transportation study found that the typical four-lane arterial road with good access management can handle almost 10,000 more vehicles per day than the same four-lane road with poor access management (Source: *Improving Driveway and Access Management in Michigan, MDOT*).

*Decrease Travel Time and Congestion*

Good access management helps motorists get to their destinations with fewer delays. Vehicles tend to travel closer to posted speeds on roads where access is managed. A Florida study found that travel delays decreased between eight percent and seventy-six percent during peak travel hours after half the median openings were closed (Source: *Improving Driveway and Access Management in Michigan, MDOT*).

*Improve Access to Property*

Good access management programs provide uniform standards and procedures, and promote their fair and equal application. The quality of site access and the protection of private investments are more than a function of the number of driveways. They also depend on the design and spacing of driveways, the ease and safety of pulling off or onto a road, distance from intersections, and traffic signal sequencing. Highly managed site access results in a carefully designed and safe means of access to each property. In some cases this may not be direct access from a major arterial, but controlled access from a side street or frontage road. Businesses with safe and easy access are more inviting to shoppers and visitors, and are the scenes of fewer traffic crashes.

*Improve Air Quality*

When traffic moves smoothly, vehicles burn fuel efficiently and generate less air pollution. Since the bulk of air pollutants in most urban areas are auto and truck related, efficient road systems can significantly reduce air pollution. Frequent slowdowns and

stops greatly increase fuel consumption and, hence, air pollution. Roads with poor access management often cause frequent slowdowns and stops, while a steady traffic flow occurs on roads with good access management.

*Maintain Travel Efficiency and Related Economic Prosperity*

Economic prosperity depends on a safe and efficient transportation system.  A well designed access management program can greatly contribute to a safe and efficient transportation system, which is key to the City's economic base.  Traffic delays and well as travel times are reduced because of less stops for entering or existing vehicles. There is less "stop-and-go" traffic.  Roadway capacity is increased; every time a vehicle stops in a through lane, all of the vehicles behind it must also stop, effectively removing one or more lanes from service.  Fuel consumption is reduced, and smoother traffic flows and reduced delays result.  The public investment in the roadway system is preserved since the traffic capacity of the roadway is maintained.  The need for costly and disruptive arterial widening or the construction of bypasses is greatly reduced or entirely eliminated.   Business owners often express the concern that access management changes will have temporary or permanent impacts on their sales.  Case studies indicate that businesses located within access management corridors generally performed better in terms of sales activities than their surrounding communities (Source:  *Access Management Handbook, Balancing the Demand on Our Roadways*. Center for Transportation Research and Education (CTRE), Iowa State University).

*Coordinate Land Use and Transportation Decisions*

Approving new developments without adequately managing access guarantees future conflicts and reduced road capacity.  In contrast, land use decisions that are coordinated with access management usually assure quality developments that protect the public's investment in roads and streets.  These benefits occur only if a coordinated review takes place between the transportation and local land use approving authorities.  Too often, land development approval is given without coordinating with the responsible transportation agency.

The foundation for access management should be laid out in Montgomery's Comprehensive Plan, which should include goals, objectives and policies that assist access management in the plan.  These policies at a minimum should include:

❑   Focus Development and Set Development Boundaries Along Corridors.

Avoid zoning that allows for a commercial strip along the length of the roadway. Existing strip development corridors may be defined in order to focus attention on remedies to existing conditions.  However, these areas should not be designated to enable a continuation of bad practices that are causing congestion and decline in the character of the area.  Look for areas that can be zoned to serve as compact centers for development and prepare a plan for the corridor.

❑ Define Appropriate Land Uses, Allowing for Mixed Uses and Higher Densities Surrounding Growth Centers.

In compact centers, provide for a balance of jobs, housing and civic activities. Limit the scale of development to what is appropriate to the area.  Do not plan narrow commercial strips along highways.  Redesign existing strip development areas.  Limit development along arterial highways in rural settings.  Along undeveloped corridors, limit the scale and density of buildings.  Isolated, large-scale and dense projects can create safety and congestion problems along otherwise smoothly functioning arterial highways.  Along rural stretches of road, limit uses to agriculture, forestry, outdoor recreation, conservation and low density housing or compatible activities.  Allow and encourage cluster residential development.

❑ View the Whole Area and the Whole Parcel.

Require master planning for large tracts of land.  In reviewing site development plans, look at the surrounding area and the entire parcel rather than simply the particular project.  If the parcel has frontage on a secondary road, access points should occur there and not on a major arterial or heavily traveled collector.

The layout of parking and loading areas, and vehicular, bike and pedestrian circulation patterns should be undertaken with the corridor plan in mind.  Service roads, pedestrian links, shared parking areas and other inter-parcel site components identified in the corridor plan should be implemented during site plan or subdivision review.

❑ Define Standards for Development.

Again, look at the entire parcel.  Lot layout should minimize linear development along a highway except in planned centers.  Compact centers along a highway should have smaller lots and higher density than surrounding areas.  In existing and developing centers buildings should be set close to each other and to pedestrian ways and main streets to encourage walking and shared parking.  Subdivide parcels into lots that do not require direct access to the road.

❑ Plan for a Community Street Network.

Map new secondary streets on which driveways can be relocated.  Place proposed streets on an official map and plan for construction in a capital budget and program. Plan and design transportation improvements that fit with community character. Access to properties along arterial or collector highways should be restricted to secondary roads or one access point on the highway if there are no secondary roads. Provide access through a shared driveway or new street.  Dead end streets, cul-de-

sacs, and large "walled" developments should generally be avoided because they reduce access and contribute to congestion.

❑ Plan for Parking.

The capacity and safety of an arterial can be compromised by the lack of off-street parking or by poorly designed parking facilities. Require shared access and parking for new developments, expansions or redevelopments wherever possible. Site commercial buildings close to the road with parking areas in the rear. Make provisions at the back of lots for secondary roads or parking areas that connect to other parcels. Consolidate parking lots and driveways to minimize paved areas. Plan for shared parking by requiring reserved rights of way and reciprocal easements. Develop shared parking standards to reduce the amount of parking required for individual developments.

Prohibit direct parking access from a parking space to an arterial or collector. Prohibit parking that requires backing out onto the road except in downtowns and village centers where speeds are low.

Use landscaping to establish visual and physical boundaries between parking lots and roads.

Truck loading/unloading operations can have a negative impact on traffic flow if any portion of the arterial is blocked, if backing movements take place on the arterial, or if the truck blocks or impedes the entrance to a commercial business

❑ Require Pedestrian and Bicycle Connections.

Almost all access management designs and operational strategies impact pedestrians and bicyclists. In general, pedestrians and bicyclists need to be well protected where they cross major streets. Where vehicles cross pedestrian or bicycle facilities, the design should accommodate vehicles only at low speeds.

Minimize pedestrian - vehicular conflict points in the orientation and configuration of parking areas and the location of driveways. Require sidewalks in new developments and sidewalk connections between parking lots and building entrances and between sites. Install crosswalks at intersections. In locations or between destinations where pedestrian activity is heavy, provide safe crossing opportunities through bump-outs or median refuges. Set sidewalks back from the road. Require on-street parking or landscaping to create a buffer between sidewalks and moving traffic.

Service roads and driveways should have limited widths and curb radii to contribute to a low-speed environment.

Provide bike racks and storage areas near entrances to all civic, commercial and industrial buildings.

**Goal of Access Management**

Safe and efficient flow of traffic along a roadway while preserving reasonable access to abutting properties.

**Basic Principles of Access Management**

Six basic principles are used to achieve the benefits of access management:

❑ Limit the Number of Conflict Points
❑ Separate Conflict Points
❑ Separate Turning Volumes from Through Movements
❑ Locate Traffic Signals to Facilitate Traffic Movement
❑ Maintain a Hierarchy of Roadways
❑ Limit Direct Access on Higher Speed Roads

*Limit the Number of Conflict Points.*

As the number of potential conflict points between turning vehicles increases, so do the opportunities for traffic crashes. Intersections typically have the most points of potential conflict. For example, there are 36 conflict points (22 if signalized) where a four-lane road intersects with a two-lane road (Figure 2). A driveway that provides access across a median as well as to the abutting road has six points of potential conflict (Figure 3), while a driveway with only right-turn-in and right-turn-out has just two points of potential conflict (Figure 4).



FULL MOVEMENT

36 Traffic Conflict Points

Figure 2

A business with three driveways on a typical four lane road (without a median) produces numerous conflict points. Reducing three driveways to one achieves a 66% reduction in conflict points. Fewer driveways also means there is more space for good design for the remaining driveway.



RIGHT-IN, RIGHT-OUT, LEFT-IN

6 Conflict Points

Figure 3

Good access management techniques can reduce the number of conflict points. Medians eliminate many conflict points

---

by limiting opportunities for left turns. Directional median openings can also safely provide for controlled access with few conflict points. When medians are used, nearly every driveway becomes right-in and right-out only with just two conflict points.



Figure 4

*Separate Conflict Points.*

Traffic conflicts can also be reduced by separating conflict points. Effective ways include establishing minimum distances between intersections and driveways and establishing corner clearance standards that separate driveways from the critical approach areas of intersections. Each of these techniques permits a longer, less cluttered sight distance for the traveling motorist, which increases traffic safety. More separation distance also gives motorists a longer reaction time. Higher traffic speed requires greater driveway separation.

*Separate Turning Movements from Through Traffic.*

Vehicles typically slow before turning. When turning vehicles are removed from the main flow of traffic, traffic speed is better maintained. In addition to maintaining speed, roadway capacity is preserved and accident potential is reduced. The differences in speed between through vehicles and turning vehicles is also reduced, which also creates safer driving conditions. Separate right and left turn lanes, carefully spaced median openings, and frontage roads are access management design tools that serve this purpose.

*Locate Traffic Signals to Facilitate Traffic Movement.*

When an arterial road has poorly spaced and uncoordinated signals, traffic safety, road capacity and traffic speed can be severely hampered. Distances of 2000 ft. to 2500 ft. between signals are desirable. Good access management includes evaluating signal spacing and developing a program to maintain or change spacing or signal progression to achieve safety, travel speed and capacity objectives.

*Maintain a Hierarchy of Roadways.*

Montgomery has a variety of roads designed to function in different ways. Typically, almost all roadways fall into one of three classifications: arterial streets, collector streets, or local streets. The difference between the classifications depends on the trade-off between providing mobility to through traffic with higher speeds and traffic

volumes and the level of land access that is permitted. However, the significance and value of preserving the investment in a particular roadway function is often not recognized.



Figure 5

Access should be most limited when the principal function of the road is high speed, high volume or long distance travel. In contrast, the primary function of local roads (such as in residential neighborhoods) is to provide access to abutting properties. Arterial and collector roads are traditional roadways between these two extremes. When a road combines high traffic volumes with too many conflict points, roadway function and quality decline, along with the ability to safely access abutting properties. Access management standards should be consistent with roadway function to protect investments in existing roads, businesses and residential areas.

*Limit Direct Access on Higher Speed Roads.*

The greatest benefit of access management is preserving the functional integrity of high speed, high capacity roads. This benefit is achieved, of course, by limiting direct access to these roads. By permitting access only at signalized intersections, public streets along the road, or at other appropriately spaced access point, the public investment in the road is best preserved. Fewer road widenings will be needed in the future, traffic speeds will be maintained, and crashes will be reduced.

Providing direct access from adjacent properties to major roadways essentially confers a private benefit at public cost. Only where no other reasonable alternative exists should such a benefit be conferred. In Alabama, reasonable access does not mean that access has to be provided directly from a main street or highway. In some cases, reasonable access may be provided from side streets or roads. Freeways are the best example of this principle.

## ACCESS MANAGEMENT STRATEGIES

The sections that follow describe access management strategies that can be used to plan development on land abutting Montgomery's arterials. Specific strategies are illustrated to show how they work and why they are important.

Encouraging substantial spacing between driveways is the single most important step that Montgomery can take to ensure safety and maintain the traffic carrying capacity of its arterials. When local officials review a development proposal that is adjacent to an arterial, a primary consideration should be for the safety of people traveling on the arterial, and a secondary consideration should be for people entering and leaving the proposed development.

The following strategies are aimed at encouraging safe conditions. They have the added benefit of preserving traffic carrying capacity. These concepts should be considered for inclusion in the City's zoning ordinance, site plan review, traffic standards and subdivision regulations.

General Access Provisions:
❏ In general, all properties abutting public streets are permitted at least one safe access to the public street system.
❏ On properties with multiple public street frontages, the City reserves the right to restrict vehicular access solely to the public street having the lower roadway classification, and/or to the safest access location.
❏ Development proponents requesting more than one driveway access to a public street will be required to justify the second driveway on the basis of development generated trips.
❏ Where the driveway location does not meet minimum City separation criteria, or where a safe driveway location can't be found, the City requires appropriate mitigation measures to provide for as safe a driveway as is feasible.

### *Driveway Location and Design*

Driveway spacing standards establish the minimum distance between access points along major thoroughfares. These standards help to reduce the potential for collisions, as travelers enter or exit the roadway. They also encourage the sharing of access for smaller parcels, and can improve community character by reducing the number of driveways and providing more area for pedestrians and landscaping. The location of driveways affects the ability of drivers to safely enter and exit a site. If driveways do not provide adequate sight distance, exiting vehicles may be unable to see oncoming traffic. In turn, motorists on the roadway may not have adequate time to avoid a crash. Driveway design standards assure driveways have an adequate design so vehicles can easily turn onto the site. Standards should also address the depth of the driveway area. Where driveways are too shallow, vehicles are sometimes obstructed from entering the site causing others behind them to wait in through lanes. This blocks traffic and increases the potential for rear-end collisions.

Considerations in establishing separation standards include street function and classification, driving speeds, location of adjacent streets and driveways, the volume of trucks, driver expectancy, and the separation and reduction of motorist, bicyclist and pedestrian conflicts. Figure 6 illustrates techniques to access adjacent properties and reduce conflict points on an arterial roadway.



Figure 6

Guidelines for a minimum turn radius, driveway width, and driveway slope are important because they help slower, turning traffic move off the arterial more quickly, and help the traffic leaving a driveway turn and enter the stream of traffic more efficiently. Requirements for turn radius, driveway width, and driveway slope are generally applied to non-residential developments and subdivisions.

Turn Radius. The turn radius (or return radius) refers to the extent that the edge of the commercial driveway is "rounded" to permit easier entry and exit by turning vehicles.

As shown in the diagram, a larger radius results in an "easier" entrance or exit movement for vehicles. The driveway movement can be performed at a greater speed and with less encroachment into oncoming through traffic (Figure 7).

The preferred turn radii will depend on the type of vehicles to be accommodated, the number of pedestrians and cyclist crossing the driveway, and the operating speeds of the accessed roadway.



Figure 7

Driveway Width. It is important to regulate the maximum width of non-residential driveways. If the driveway is too wide, as is often the case, there is virtually unrestricted access. The result may be a wide driveway, which is unsafe to drivers, who may have a hard time deciding where to position themselves, and to pedestrians, who

will have a greater distance of pavement to cross. In the worst case, uncontrolled access across the entire frontage leads to a severe deterioration in the level of service of the arterial and to costly road improvements. On the other hand, if the driveway is too narrow, the access speed to and from the driveway will be slow, impinging on through traffic.

General Driveway Design Standards:

❑ Construction of driveways along acceleration or deceleration lanes, left turn storage lanes and tapers should be avoided, unless no other reasonable access to the property is available.

❑ Driveways on undivided roadways shall be aligned directly opposite driveways on the opposite side of the road, or offset from each other in accordance with applicable City or State Standards, due to the potential for conflicting left turns or jog maneuvers and resulting safety or operational problems.

❑ Driveway width and return radius or flare be adequate to serve the volume of traffic and provide for efficient movement of vehicles onto and off of the major thoroughfare. However, the width of driveways not be so excessive as to pose safety hazards for pedestrians and bicycles.

❑ Driveways with more than two lanes should incorporate channelization features.

❑ Restrict the number of curb cuts to one entrance and exit drive. Where excessive access exists, install curbing to limit access to one location upon applications for expansions, redevelopments or change of use. Require shared driveways between two parcels at the property line, where practical.

## Minimum Distance between Driveways

Maintaining a minimum distance between driveways along an arterial minimizes the number of access points that a driver must keep an eye on (see Figure 8). This simplifies driving and reduces the opportunities for conflicts and crashes.



Shorter access spacing can be permitted on lower classification roadways. Longer spacing is desirable on roadways in areas where speeds are higher. These guidelines can be used for both residential and non-residential development.

Figure 8

Driveway Spacing Standards:

❑ There should be at least 600 feet between each access point, either public or private, on an arterial roadway.



Figure 9

Mitigation measures for developments that cannot meet the minimum driveway spacing criteria:

❑ Move the proposed driveway as far from the closest driveway, or intersection, as possible. This is the minimum mitigation measure that will be accepted by the City, and in some instances is not an adequate mitigation by itself.
❑ Acquire a cross-easement for ingress and egress from an adjoining property, and use an existing driveway for the new development.
❑ Acquire a binding agreement from an adjoining property to remove an existing adjacent driveway in order to meet the minimum driveway to driveway separation criteria; and remove that extra driveway. Depending upon the trip generation characteristics of the subject development and the traffic volumes on the subject street, removal of an existing driveway may be considered adequate mitigation even when the full driveway-to-driveway separation distance does not fully meet the minimum driveway separation criteria.

**Median and Signalized Intersection Spacing**

Wide non-traversable medians provide shelter for vehicles making left turns to and from the street. They also provide refuge for pedestrians attempting to cross wide streets.

Consequently, collision rates on major streets with wide non-traversable medians have been found to be substantially lower than undivided streets or streets having a continuous two way left turn lane. Medians can also be landscaped as part of a corridor beautification program. As with driveways, the spacing and design of median openings is important to the safe and efficient operation of the street. Safety benefits are reduced when median openings have inadequate storage for left turns, or when the openings are too close together.

Narrow non-traversable medians provide shelter for vehicles making left turns to and from the street and prevent unsafe left turns onto the street.  Narrow non-traversable medians do not provide all of the benefits of wide non-traversable medians, but require only very minor physical changes in the street to accommodate their construction. Narrow non-traversable medians also require less right-of-way and may be used more often where rights-of-way are limited.

Long uniform intersection spacing on arterial streets facilitate the use of traffic signal timing plans to respond to peak and off-peak traffic flow conditions.  Long and uniform spacing improves traffic flow and increases the number of vehicles that may flow through the traffic signal on a given green cycle.  Capacity of the intersection and the arterial street is thereby increased, fuel consumption and traffic emissions are decreased and traffic safety is improved.

Median and Intersection Spacing Standards:

❑   There should be at least 2000 ft. to 2500 ft.  between each median opening.
❑   There should be at least 2000 ft. to 2500 ft.  between each signalized intersection.



Figure 10

**Left and Right Turn Lanes**

Left-turn and right-turn lanes minimize the conflict between turning vehicles and vehicles attempting to continue in through-traffic lanes.  They also provide storage space where vehicles can safely wait to perform the turn maneuver.  This results in smoother traffic flow, increased capacity and greatly increased safety.

*Left Turn Lanes.*  The construction of a left turn lane on a heavily traveled arterial can reduce the conflict and delay that occur when through vehicles turn left across traffic.  A left turn lane can also reduce conflicts that occur when cars behind the turning vehicle have to slow down, stop or pass on the right of the turning vehicle.  The left turn lane separates the turning vehicle from through traffic and provides a storage area where a

number of left turning vehicles can wait to make a turn. Left turns can also be controlled through median strips that allow left turns only at certain controlled points. Left turn lanes should be provided at all median openings on arterial roadways and meet City and/or Alabama Department of Transportation (ALDOT) standards.



TURN LANES    NOT TO SCALE

Figure 11

When medians extend the full length of a road, the spacing of intersections and median breaks are crucial to providing access to properties on both sides of the road. The median prevents vehicles from crossing the arterial and making left turns from side streets onto the arterial. Median breaks should generally only be provided at public road intersections or at driveways shared by several businesses. They should generally not be provided for access to individual businesses or residences. The number of median breaks should be kept to a minimum since they add conflict points and detract from safety.

Raised medians fully separate opposing traffic, define where turns and crossings are allowed, and provide a safe refuge for pedestrians. Raised medians are most desirable at major activity centers where relatively few high volume driveways provide access to adjacent properties.

*Right Turn Deceleration Lane.* Right turn lanes and tapers help to get turning vehicles out of the through traffic lanes. Right turn lanes or tapers reduce traffic delays that would otherwise occur as through traffic slows to permit turning traffic to exit the arterial. A deceleration lane should be used when a specific threshold of turning traffic is reached or when a traffic impact study indicates that a right turn lane is needed.

Level-of-service criteria, volume warrants, crash experience, existing traffic operations, or engineering judgment that indicates a safety concern to right turning vehicles can justify the need for right turn deceleration lanes. The length of the deceleration lane will also vary according to the speed of traffic on the arterial. However, the turn lane should be sufficient length to allow the turning vehicle to leave the through lane at the posted speed limit, decelerate, and negotiate the turn. Right turn lanes should be required at any access point to an arterial roadway.



RIGHT TURNS

TURN LANE    RIGHT TAPER

Figure 12

Turn Lane Standards for Arterial Roadways:

❑ Left turn lanes shall be required at all median openings.
❑ Deceleration lanes shall be required at all access points.

## Corner Clearance

Corner clearance is the distance from an intersection of a public or private street to the nearest access connection or driveway.   Providing adequate corner clearance can decrease the likelihood of crashes and minimize the interruptions to the flow of traffic. Inadequate clearance between driveways and intersections creates many conflict points



Figure 13

within too small an area.   Corner clearance guidelines preserve good traffic operations at intersections, as well as the safety and convenience of access to corner properties.

Setting driveways and connections back from intersections reduces the number of conflicts and provides more time and space for vehicles to turn or merge safely across lanes.   Adequate corner clearance be assured by establishing a larger minimum lot

size for corner lots.  Conditional use limitations may be imposed where adequate corner clearance cannot be obtained.   This helps assure that corner properties do not experience access problems as traffic volumes grow.

Factors affecting safe corner clearances include the posted speed limit, whether the driveway is "upstream" or "downstream" from the intersection, and whether or not the intersection is signalized.

Corner Clearance Standards for Arterial Roadways:

❑ Locate new driveways outside the functional area of an intersection.
❑ No driveway shall be allowed onto an arterial roadway within 600 feet of an intersection.

Mitigation measures for developments that cannot meet the minimum corner clearance criteria:

❑ If no other reasonable access to the property is available, including joint and cross access with adjacent properties;

&#x20;&#x20;&#x20;❑&#x20;&#x20;&#x20;The connection does not create a safety or operational problem, upon review of a site-specific study of the proposed connection prepared by a qualified professional, AND

&#x20;&#x20;&#x20;❑&#x20;&#x20;&#x20;The proposed driveway location meets AASHTO standards and accepted engineering practice; then

&#x20;&#x20;&#x20;❑&#x20;&#x20;&#x20;Provided appropriate sight distance standards are met, a driveway within the functional area of the intersection may be constructed. It shall be located as close to the property line and as far from the intersection as site conditions allow.

**Joint and Cross Access**

Joint and cross access requirements consolidate driveways serving more than one parcel and provide circulation between adjacent parcels. This allows vehicles to circulate between adjacent businesses without having to re-entering public streets. Joint access requirements are used to connect major developments and to reduce the number of driveways that would otherwise be required to serve abutting parcels. Joint driveways are also used to improve driveway spacing or separation, and sometimes permit more than one driveway to serve a single parcel where separation standards would not otherwise permit more than one driveway. This may allow intensive development along a corridor while maintaining traffic operations and safe and convenient access to businesses.



JOINT AND CROSS ACCESS

Figure 14

Property owners unable to meet minimum driveway separation standards are typically required to provide for joint and cross access easements whenever feasible. Abutting properties under different ownership are encouraged to comply, but are generally not required to comply until they develop or redevelop property.

Joint and Cross Access Standards:

&#x20;&#x20;&#x20;❑&#x20;&#x20;&#x20;Shared driveways and cross access easements shall be required when possible and to meet driveway spacing criteria.

&#x20;&#x20;&#x20;❑&#x20;&#x20;&#x20;Properties located on arterial or collector roadways should provide a cross access drive and pedestrian access to allow circulation between adjacent sites. Such connection is generally required in retail commercial use adjacent to other commercial, office, industrial or multi-family development.

&#x20;&#x20;&#x20;❑&#x20;&#x20;&#x20;Required cross-access corridors shall be shown on any subdivision or site plan. A system of joint use driveways and cross access easements shall be required to provide unified access and circulation among parcels and assist in local traffic movement. In such cases, the building site shall incorporate the following:

1. A continuous cross-access or service drive with sufficient width to accommodate two-way travel aisles for automobiles, service vehicles and loading vehicles.
2. Stub-outs and other design features to make it visually obvious that abutting vacant properties shall be interconnected to provide cross access at the time they are developed.
3. Building sites shall be designed to ensure parking, access and circulation may be easily interconnected to future adjacent development.

❑ Where joint- and cross-access is provided pursuant to this section, property owners shall:

1. Record an easement allowing cross access to and from other properties served by the joint use driveways or service drive, which shall be a covenant running with the land;
2. Record an agreement that any pre-existing curbcuts providing for access in the interim shall be closed and eliminated after construction of the joint-use driveway, which shall be a covenant running with the land; and
3. Record a joint maintenance agreement defining maintenance responsibilities of property owners that share the joint use driveway and cross access system, which shall be a covenant running with the land.

❑ Where abutting properties are in different ownership and not part of an overall development plan, cooperation between the various owners to create a unified access and circulation system shall be strongly encouraged. Abutting properties shall provide unified access and circulation at the time they are developed or redeveloped.

## Maximum Number of Driveways

Every driveway or intersecting street along an arterial has the potential to reduce the ability of the arterial to move traffic. While it is essential to allow access to property, the City can limit the number of driveways permitted on any lot. Regulating the maximum number of driveways per property frontage limits the number of conflict points and provides drivers more time and distance to execute their maneuvers. A basic requirement should be established that limits the number of driveways to one per parcel, with special conditions for additional driveways. Commercial properties should be limited to a single driveway unless they have larger frontages or they can demonstrate that their development generates more than 4,000 vehicles per day.

Driveway Number Standards:

❑ The maximum number of direct access driveways allowed per parcel is one when no alternative for cross or joint access is possible.
❑ Shared driveways and cross access easements shall be required when possible and to meet driveway spacing criteria.

❏   When a parcel has frontages on two (or more) public streets with different street classifications and function, then the parcel should be limited to access on the lower classification of street.

## Outparcel Requirements (Internal Access)

Shopping center developments often include separate lots or "outparcels" fronting on the major roadway. The outparcels are leased or sold to businesses looking for highly valued corridor locations. Access to these outparcels should be incorporated into the access and circulation system of the principal development and should not be allowed direct vehicular access to the arterial street. This approach reduces the need for separate driveways on the major road, while maintaining overall accessibility. To accomplish this, development sites under the same ownership or those consolidated for development will be treated as one site for the purposes of access management. A unified traffic circulation and access plan for the overall development site shall be required.

Outparcel Standards:

❏   Outparcels shall be accessed via the shared circulation system of the principal development or retail center.
❏   Access to outparcels shall be designed to avoid excessive movement across parking aisles and queuing across surrounding parking and driving aisles.

## Frontage, Reverse Frontage and Alternative Access

When land is subdivided for small commercial or residential uses, the lots abutting arterial streets should not be allowed direct vehicular access to the arterial street. Instead, an interior street, which provides access to the arterial street, should be required. The interior street may be a common service or minor road. This eliminates the conflicts between high-speed traffic and traffic entering and exiting at closely spaced driveways. Access to the arterial street should be provided at a location able to meet separation and corner clearance standards, and designed to safely handle the traffic generated by the development. Figures 15 & 16 illustrate the application of frontage roads for access to properties on arterial roadways.





REVERSE FRONTAGE ROAD

Figure 16

When a parcel has frontage on more than one public street, and one of those streets has a higher street classification and function than the other street, then the property should be required to obtain access solely from the street having the lower (or lowest) classification and function, where possible.

If there is more than one developer, or if development proceeds piecemeal over time, the City shall allow smaller sites to be served by an individual entrance only until such time as adjacent lots are developed. When a service road or interior street is constructed, the temporary commercial driveways shall be closed or consolidated.

Frontage, Reverse Frontage and Alternative Access Standards:

❑ Frontage, Reverse Frontage and Alternative Access drives shall be required as an alternative to joint and cross access drives in larger developments when possible.
❑ Properties located on arterial or collector roadways shall provide a frontage or reverse frontage roads and pedestrian access to allow circulation between adjacent sites. Such connection is generally required in retail commercial use adjacent to other commercial, office, industrial or multi-family development.
❑ Required roads shall be shown on any subdivision or site plan.

**Throat Length/ Minimum Stacking**

The depth of the formal entranceway is referred to as the "throat length". In designing driveways, adequate driveway queue length must be provided on commercial sites to prevent entering vehicles from having to stop in the public streets, and to prevent exiting vehicles from blocking internal circulation aisles. This problem is most evident with drive-in service developments that generate high traffic volumes and require motorists to wait in their vehicles while being served, or until service begins. Such developments shall be carefully analyzed to assure that the site plan provides adequate storage. Specific storage areas shall be determined on an individual basis; however minimum storage lengths are required to be provided before any crossing or turning conflicts can be permitted. Driveways should be long enough to allow adequate space for vehicles pulling off the road and stacking to enter the road.

Throat Length Standards:

❑ The minimum driveway throat length at major intersections and/or median openings shall be 250 feet.

❑ The minimum driveway throat length at minor access points, including right-in, right-out is 150 feet.



Figure 17



Figure 18

## Residential Access Through Neighborhood Streets

Residential driveways on major roadways result in dangerous conflicts between high-speed traffic and residents entering and exiting their driveway. As the number of driveways increase, the roadway is gradually transformed into a high speed version of a local residential street. Subdivisions should always be designed so that lots fronting on major roadways have internal access from a residential street or lane (also known as "reverse frontage". Minor land division activity can be managed by establishing a restriction on new access points and allowing land to be further subdivided, provided all new lots obtain access via the permitted access point.



Figure 19

Another step is to prohibit "flag lots" along major thoroughfares. Some property owners subdivide their land into lots shaped like flags to avoid the cost of platting and providing a road. Instead, the flag lots are stacked on top of each other, with the "flag poles" serving as driveways to major roads. This results in closely spaced driveways that undermine the safety and efficiency of the highway. Although it might be easier and cheaper for a land developer to subdivide the frontage rather than construct interior roads, the public loses when the result is unsafe conditions, congestion, lower speed limits, and eventually a need for costly road improvements. It is better to construct interior roads that provide access to lots. This reduces the number of access points and preserves the capacity of the arterial to carry large volumes of traffic.

Residential Access Standards:

❑  When a residential subdivision is proposed that abuts an arterial or major collector roadway, it shall be designed to provide lots abutting the roadway with access only from an interior local road or frontage road.
❑  Direct driveway access to individual one and two family dwellings on arterial and collector roadways is prohibited unless the City determines there is no acceptable access alternative.

## Interconnected Street Systems

Requiring developers to provide interior roads on property they subdivide along arterials is an important step in maintaining safety and preserving capacity, but it may not be sufficient.  When subdivisions are built adjacent to one another, each with its own access to the arterial, drivers may use the arterial to travel from one subdivision to another, thus contributing to highway congestion.  A simple remedy is to require that a subdivision contain connecting points to adjacent, undeveloped land, where feasible,



Figure 20

and that adjacent subdivisions inter-connect.  This can reduce traffic on the arterial and help create a sense of community continuity, rather than isolation.

As communities grow and land is subdivided for development, it is essential to assure continuation and extension of the existing local street system.  Requiring internal vehicle connections will limit the number of times a driver has to enter the arterial when traveling between adjacent businesses.  Dead end streets, cul-de-sacs and gated communities force more traffic onto collectors and arterials.  Fragmented street systems also impede emergency access and increase the number and length of automobile trips.  A connected road network advances the following objectives:

❑  Fewer vehicle miles traveled
❑  Decreased congestion
❑  Alternative routes for short, local trips
❑  Improved accessibility of developed areas
❑  Facilitation of walking, bicycling, and use of transit
❑  Reduced demand on major thoroughfares
❑  More environmentally sensitive layout of streets and lots

❑ Interconnected neighborhoods foster a sense of community
❑ Safer and less costly school bus routes

Connectivity can be enhanced by a) allowing shorter blocks and excluding cul-de-sacs from the definition of intersection; b) requiring stub streets to serve adjacent undeveloped properties; c) requiring street connections to nearby activity centers; d) requiring connections to or continuation of existing or approved public streets; and e) requiring bicycle/pedestrian access-ways at the end of cul-de-sacs or between residential areas and parks, schools, shopping areas or other activity centers. It is also important to allow for a greater variety of street types.

Interconnected Street System Standards:

❑ Developments shall be interconnected when possible; a variance may be granted only in extreme physical or environmental circumstances.
❑ All streets shall not exceed 1500' in length without intersecting along each side at least one through street.

## Coordination with Alabama Department of Transportation

The Alabama Department of Transportation is responsible for access permits along state and federal routes. The City of Montgomery oversees land use, subdivision and site design decisions that affect access needs. Therefore, State and local coordination is essential to effective access management. Lack of coordination can undermine the effectiveness of regulatory programs and cause unnecessary frustration for permit applicants.

Timely communication is key to an effective review procedure, and that begins with a coordinated process for review of access permits along state routes. Applicants should send copies of the complete permit application to the designated local reviewing official and the state permitting official. Prior to any decision or recommendation, the local reviewing official and the state permitting official should discuss the application.

Property owners will be required to submit the necessary certificates of approval from other affected regulatory agencies, before a building permit is issued. An effective method of coordinating review and approval between developers and various government agencies is through a tiered process. The first stage is an informal meeting and "concept review" period, which allows officials to advise the developer about information needed to process a development application. This includes information on required state and local permits, and any special considerations for the development site.

The concept review provides the developer with early feedback on a proposal, before the preliminary plat or site plan has been drafted. Once the preliminary plan is drafted, it can be checked to determine if additional conditions are required for approval. The final plan that is formally submitted should then require only an administrative review.

The City of Montgomery should also request a response from the ALDOT prior to approval of plats on the state highway system. Applicants should be required to send a copy of the subdivision application to the state access permitting official. This shall occur early in the plat review process, preferably during conceptual review. Early monitoring of platting activity would allow the Department of Transportation an opportunity to identify problems and work on acceptable alternatives.

Intergovernmental agreements or resolutions can facilitate coordination between the state and local governments on access management. These tools can be used to clarify the purpose and intent of managing access along major thoroughfares, roadways that will receive special attention, and state and local responsibilities for advancing access management objectives.

**Other Access Management Strategies**

Corridor Access Management Overlay Zones

❑ Segments of an existing roadway corridor may be designated as corridor access management zones for the purpose of applying special access management controls that exceed the requirements and standards. The purpose of this designation is to avoid significant traffic congestion problems, reduce vehicular and pedestrian conflict areas, and to ensure appropriate development within the designated area in accordance a comprehensive corridor plan.
❑ The controls in such districts are not intended to be substituted for other general zoning district provisions but can be superimposed over such district provisions and should be considered additional requirements.
❑ Corridor access management zones shall be designated and approved in accordance with the public involvement and public hearing requirements of the City of Montgomery that govern the creation of all land use designations and zoning districts.

Traffic Impact Study

A traffic impact study is a report that analyzes how traffic generated by a proposed project will change existing traffic conditions on the arterial. Depending on the type and size of development, the impact study may range from a cursory examination of the site, the projected traffic volumes, and the impact on adjacent streets, to a detailed report that analyzes the estimated impacts of the development on a wide area and recommends a number of mitigation measures. A traffic impact study shall be an integral part of the City's development review process. There are a number of reasons for preparing a traffic impact study:

❑ It ensures that the driveway and on-site circulation plan will be safe before it is built, thus avoiding or minimizing costly corrective action.
❑ It can result in better access management.
❑ It places the responsibility for congestion mitigation on the developer.

❑ It saves the City/County/State future costly highway improvements.
❑ It offers an opportunity for the City, State and developer to work together jointly to improve traffic conditions.

A traffic impact study should be required when a new development or change of use is proposed unless waived by the Planning Controls Department. Based on the results of the traffic impact study, a developer may be required to undertake on-site or off-site improvements (turning lanes, traffic signal improvements) to mitigate the negative impacts that the development may create. The requirements for a traffic impact analysis should be included in a local ordinance.

Landscaped Buffers

Landscaped buffers can be an important access management tool because they can define commercial driveway points and help make them safer. The width of the buffer can vary, depending upon the building setback and the function the buffer serves. It is important that buffers not interfere with sight distances from the exit.

Redevelopment

Access connections to roadways in place that do not conform with the standards herein are considered nonconforming. Properties with nonconforming connections shall be brought into compliance as changes to roadway design allow or when an existing development is changed in any of the following ways:

❑ Existing structure is replaced by new structure or improvements; or
❑ Existing structure or parking lot is, in aggregate, expanded by 20% or more beyond the size existing at the effective date of implementing regulation.

Driveway Turn-Around Area

Private driveways on arterials should have a turn-around area, as shown in Figure 21. A driveway turn-around eliminates the need to back out onto an arterial, which is a potentially hazardous maneuver.



DRIVEWAY TURN-AROUND

Figure 21

## TAYLOR ROAD AND CHANTILLY PARKWAY ACCESS MANAGEMENT PLAN

As previously stated, the City of Montgomery has identifies two of its corridors that contain substantial undeveloped adjacent lands that are currently undergoing development pressures. The two corridors are identified as follows:

- ❑ Taylor Road (Alabama Highway 271) from Vaughn Road to U.S. Highway 231 and
- ❑ Chantilly Parkway (Alabama Highway 110) from East Chase Parkway to Vaughn Road.

By identifying these corridors, the City of Montgomery, in conjunction with the Alabama Department of transportation, intends to establish access guidelines for use by property owners in planning for development of their properties in such a manner the full capacities of these roadways can be realized and protected.

Utilizing the principles and guidelines outlined in this report, a recommended Access Management Plan for the two corridors outlined above has been developed. The subsequent sections present a brief summary of the recommendation for each of the corridors.

### Taylor Road Access Management Plan

Figure 22 presents a graphic summary of the recommendations for the Taylor Road corridor which encompasses the segment from the Vaughn Road intersection south to U.S. Highway 231. The current roadway segment is a four-lane median divided facility that is for the most part undeveloped with the exception of some residential and commercial development on the northern end. The posted speed limit is 55 mph and the current daily traffic volumes have been recorded at 18,000 vehicles.

As shown in Figure 22, the following recommendations are presented:

- ❑ Access to the corridor should be concentrated at seven (7) full direction major intersections where traffic signalization could be installed in the future once minimum conditions for their installation are met;
- ❑ Additional access to the corridor should be limited to right-in/right-out access points located no closer than 600 feet form other access points;
- ❑ Properties proposed for development should be designed in such a manner to provide an internal circulation system;
- ❑ Interconnectivity between adjacent development shall be required and internal development streets shall be stubbed at adjacent property lines where possible;
- ❑ Left turn lanes shall be constructed at all median openings;
- ❑ Right turn lanes shall be construction at all access points to Taylor Road; and
- ❑ Minimum throat lengths for development access points as outlined in Figure 22 shall be provided.

In addition to the access guidelines outlined in Figure 22 and as presented in this report, access along U.S. Highway 231 should be carefully managed to protect its intersection



## Taylor Road
### Access Management Plan
*Figure 22*

 

*SKIPPER* Consulting, Inc.
KIPIS

**Standards:**
» The minimum distance between median openings shall be 2000 - 2500 feet.
» The minimum distance between driveways shall be 600 feet.
» Left turn lanes shall be required at all median openings.
» Right turn deceleration lanes shall be required at all access points.
» Driveways shall not be located within 600 feet of an intersection.
» The minimum throat length for drives at median openings
  and signalized intersections is 250 feet.
» The minimum throat length for all other drives is 150 feet.
» Additional residential driveway access is prohibited.  All residential access
  shall come from a roadway with access only from an interior local road.
» Interconnection is required to other areas as generally shown.

**Legend:**
 MEDIAN OPENING
INTERCONNECTED ROAD (LINE OF DESIRE)
EXISTING ROADWAY
PROPOSED ROADWAY (ALDOT IMPROVEMENT)
PROPOSED ROADWAY (PRIVATE DEVELOPMENT)
OUTER LOOP
VACATED ROADWAY
WATER BODY
CREEKS & STREAMS
FLOODPLAIN BOUNDARY

with Taylor Road. As illustrated on Figure 22, a major access is proposed on U.S. Highway 231 approximately 2000 feet from the Taylor Road intersection. All other locations between this proposed intersection on U.S. Highway 231 should be right-in/right-out only (this requirement should be applied to both sides of U.S. Highway 231).

## Chantilly Parkway Access Management Plan

The portion of Chantilly Parkway in this study effort included the segment from the East Chase Parkway intersection to Vaughn Road. This portion of roadway has recently been reconstructed by the Alabama Department of Transportation to a four-lane median divided facility. The posted speed limit is 55 mph and the daily traffic volumes vary from approximately 3,100 vehicles south of East Chase Parkway to 7,500 vehicles north of East Chase Parkway.

Figure 23 presents a graphic summary of the access management recommendations for Chantilly Parkway. The following summarizes those recommendations:

- ❑  Access to the corridor should be concentrated at five (5) full direction major intersections where traffic signalization could be installed in the future once minimum conditions for their installation is met;
- ❑  Additional access to the corridor should be limited to right-in/right-out access points located no closer than 600 feet form other access points;
- ❑  Properties proposed for development should be designed in such a manner to provide an internal circulation system;
- ❑  Interconnectivity between adjacent development shall be required and internal development streets shall be stubbed at adjacent property lines where possible;
- ❑  Left turn lanes shall be constructed at all median openings;
- ❑  Right turn lanes shall be construction at all access points to Taylor Road; and
- ❑  Minimum throat lengths for development access points as outlined in Figure 23 shall be provided.

As illustrated in Figure 23, a realignment of U.S. Highway 80 to the south to align with East Chase Parkway is planned by the Alabama Department of Transportation. A portion of the Old Ryan Road exists between Chantilly Parkway and the railroad. The roadway currently terminates on its northern end at the railroad. It is recommended this roadway be realigned to intersection the realigned U.S. Highway 80 approximately 800 feet east of Chantilly Parkway.

## Regional Connectivity Recommendations

In developing the access management plans for both Taylor Road and Chantilly Parkway, recommendations were made related to interconnectivity of adjacent developments to surrounding areas. The basis for such a recommendation was to encourage a disbursement of development generated traffic onto the entire area roadway system versus concentrating traffic to a limited number of roadways.



# Chantilly Parkway
## Access Management Plan
### Figure 23

**Standards:**

- The minimum distance between median openings shall be 2000 - 2500 feet.
- The minimum distance between driveways shall be 600 feet.
- Left turn lanes shall be required at all median openings.
- Right turn deceleration lanes shall be required at all access points.
- Driveways shall not be located within 600 feet of an intersection.
- A joint or cross access drive, frontage or reverse frontage road is required for the existing small parcels along the parkway.
- The minimum throat length for drives at median openings and signalized intersections is 250 feet.
- Residential driveway access is prohibited. All residential access shall come from a roadway with access only from an interior local road.
- Interconnection is required to other areas as generally shown.

**Legend:**

- MEDIAN OPENING
- INTERCONNECTED ROAD (EXTENT OF FINISHED)
- EXISTING ROADWAY
- PROPOSED ROADWAY (CURRENT IMPROVEMENT)
- PROPOSED ROADWAY (FUTURE DEVELOPMENT)
- OUTER LOOP
- VACATED ROADWAY
- WATER BODY
- CREEKS & STREAMS
- FLOODPLAIN BOUNDARY

SKIPPER Consulting, Inc.
KIPS

Interstate 85

Vaughn Road

The benefits of such a policy can be substantial as have been discussed in previous sections of this report

The City of Montgomery, through its Metropolitan Planning Organization, prepares a Long Range Transportation Plan (LRTP) for the City as well as the region where new and improved roadways are examined on a routine basis. As part of this study process, the City identified new roadways in the immediate vicinity that should be considered as part of the LRTP update process.  The routes outlined in Figure 24 illustrate roadway extensions and new routes that should be considered as part of the LRTP's new update.



Regional Connectivity
Recommendations
*Figure 24*

Legend:

- MEDIAN OPENING
- INTERCONNECTED ROAD (LINE OF DESIRE)
- EXISTING ROADWAY
- PROPOSED ROADWAY (ALIGNT IMPROVEMENT)
- PROPOSED ROADWAY (PROFILE DEVELOPMENT)
- OUTER LOOP
- VACATED ROADWAY
- WATER BODY
- CREEKS & STREAMS
- FLOODPLAIN BOUNDARY

SKIPPER Consulting, Inc.
KIPS



EXHIBIT
B

STATE OF ALABAMA
COUNTY OF MONTGOMERY

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement ("Agreement") is made and entered into by and between:

_Alan (OR) Ann J. Bush_____ (hereinafter referred to as "Purchaser"),

and

Forest Glen, L.L.C._____ (hereinafter referred to as "Seller"). – 8/15/03 pr 1:00 pm

### WITNESSETH:    Lot 1 pr

1. _Property_. Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase and take from Seller, under and subject to the terms, conditions 235 pr 8/ and provisions hereof, that certain real property consisting of ~~Lot attached exhibit~~ lying 2.69 acr in___Montgomery County___, Alabama and which for ad valorem tax purposes is *more* described as Parcel No.___**(to be provided)**___ and more particularly described or shown *or* on Exhibit "A" attached hereto and made a part hereof by reference as if set out in full *less* (hereinafter the "Property"), together with all appurtenances, rights of way, privileges, easements, appurtenances and other rights benefiting or pertaining to the Property and all right, title and interest of the Seller in and to any and lying in the right-of-way in front or adjoining the Property to the centerline thereof. An exact legal description of the Property shall be based on the survey to be obtained or furnished pursuant to Paragraph 6 hereof.

2. _Purchase Price_. The purchase price for the Property shall be _2.50 per sq. foot_ $ The purchase price shall be payable as follows: square foot calculation of lot 235 shall not include
   a. The sum of _$1,000.00_____ as the *property required for public access road imp* "Earnest Money", is to be deposited with _Ingram Real Estate Development_ pr within __2__ days after Purchaser's receipt fully executed copy of this agreement; and

   b. The balance of the purchase price, after deductions for credits and prorations as herein provided, shall be paid in full at the Closing herein provided by check or cash on the day of Closing. The Earnest Money shall be paid to Seller at Closing and credited against the purchase price.

   c. The seller agrees to pay a __10%__ commission fee of the total Sales Price to ___Ingram Real Estate and Development, L.L.C.___ in full at the time of Closing.

3. _Governmental Approvals_. Purchaser is hereby authorized to seek and obtain any and all permits, licenses, site and development plan approvals, permits and authorizations, zoning approvals, curb-cut approvals, and any and all other approvals or consents as Purchaser may deem necessary in connection with its proposed acquisition, development and use of the Property and Seller agrees to cooperate with Purchaser in such endeavor. If any such applications, approvals or permits are required to be sought in Seller's name, seller shall upon Purchaser's request seek same without cost to Seller. As part of the consideration for Purchaser's payment of the purchase price, Seller shall assign, transfer and convey to Purchaser at Closing all permits, approvals, licenses, site and development plans affecting the Property which Purchaser requests Seller to assign to Purchaser and Seller shall deliver such originals to Purchaser at Closing.

4. _Entry Upon Property_. Upon execution of this Agreement, Purchaser, its agents, employees and all other persons authorized by it, or any of them, are permitted to enter upon the Property and to obtain and perform such tests, studies and maps as Purchaser may deem necessary or advisable including, but not limited to, percolation, soils, hazardous waste, environmental, and geological tests and studies

1



DEFENDANT'S
EXHIBIT
4
Bush

5. <u>Survey</u>. Seller shall at Sellers expense procure within thirty (30) days after the Effective Date of this Agreement a current on-site survey and topographical report on the Property prepared by Sellers engineer (the "Surveyor"). The Surveyor and their respective agents, employees and contractors, shall have the right to enter upon the Property for the purposes thereof and also may perform thereon such topographical and soil studies and related engineering tests as Purchaser deems necessary to evaluate its proposed use of the Property. The Surveyor shall also determine the extent and scope of any easements that now affect or benefit the Property. Notwithstanding anything herein stated to the contrary, in the event that Purchaser elects to purchase the property, Purchaser shall be entitled to a credit against the Purchase Price for the reasonable cost of the boundary survey of the Property prepared pursuant to paragraph 6 of the Contract.

6. <u>Abstract of Title</u>. Seller agrees at its cost to furnish to Purchaser within thirty (30) days after the Effective Date of this Agreement, an up-to-date abstract of title of the Property extending back at least sixty (60) years and disclosing good and merchantable fee simple title thereon vested in Seller. Purchaser shall have its attorney examine the abstract of title; provided, however, is Purchaser's requirement that the abstract of title disclose Seller as present owner of fee simple title to the Property without exception except for ad valorem taxes not yet due and payable, any existing mortgage (from which the property shall be released at closing) and such other easements and exceptions as Purchaser may, in its sole and absolute discretion, waive in writing (the "Permitted Exceptions"). If the abstract of title discloses a defect or defects in title to either the Property or discloses easements or other exceptions that Purchaser is unwilling to waive, then Purchaser agrees to notify Seller of such matters and Seller shall proceed to cure such matters at Seller's expense.      If said matters are not cured within twenty (20) days after notice, then Purchaser may grant Seller additional time to cure the defects and, further Purchaser may, at any time thereafter, at is option in writing waive such defect or unacceptable easements or other exceptions or cancel this Agreement, in which case of the latter event, Seller shall immediately refund to Purchaser the Earnest Money paid hereunder. Seller represents that it presently owns fee simple title to the Property, except for any existing mortgage which Seller covenants to have released with respect to the Property at the time of closing, and will not permit any change in the status of the title to the Property until this Agreement has been consummated or otherwise terminated in accordance with the terms hereof. Risk of loss prior to closing shall be borne by Seller.

7. <u>Closing</u>. Subject to the satisfaction of all the conditions hereof or the waiver in writing thereof by Purchaser, the date of Closing shall be _20 days - September_ 2003 unless such date is a Saturday, Sunday or legal holiday, in which event the date shall be extended to the next business day. The sale shall be closed in Montgomery County, Alabama at the office of Sellers' attorney. At Closing Seller shall deliver to Purchaser a Warranty Deed containing the usual and customary full covenants utilized in general warranty deeds in Montgomery County, Alabama, conveying a good and merchantable, indefeasible fee simple title in and to the Property subject only to Permitted Exceptions, and Purchaser shall be surrogate to all rights and actions of Seller against all former owners and vendors. The description used in the Deed shall be one and the same and shall coincide with the survey. Seller shall pay at closing, by deduction from the purchase price, any and all expenses herein provided to be paid by Seller and the cost of preparing the Deed. Purchaser shall pay to record its Deed. Ad Valorem taxes and utilities, if may, shall be prorated as of Closing.

Any assessments whether due or not, levied against the Property shall be paid in full by Seller at Closing. At Closing, Purchaser shall pay the balance of the purchase price, subject to adjustments and credits as herein provided, and the Earnest Money shall be applied and credited to the purchase price. Each party shall bear its own attorney's fees. Seller shall also execute and deliver at Closing such affidavits of title, lien and possession as may be required by Purchaser, a FIRPTA Affidavit, and appropriate 1099 forms. Except for the right of entry granted herein, possession shall be given to Purchaser on the Closing Date, free and clear of all tenancies and parties in possession.

8. <u>Assignment.</u> This Agreement may be assigned by Purchaser, with Sellers'approval, and all powers, rights, and privileges herein reserved and given to Purchaser or the Seller shall inure to the benefit of and be held by the respective successors and assigns of the parties, and all liabilities or obligations imposed on each

2

shall be binding upon the respective heirs, successors and assigns of the parties. The Purchaser will notify the Seller in writing of any Assignment of this contract.

9. Environmental Concerns. Notwithstanding anything contained in this Agreement to the contrary in the event that, as a result of Purchaser's investigation, "hazardous substances(s)", hazardous waste (s)" or hazardous material(s)", as defined under applicable federal or state law, or both, are found on the Property, then Purchaser shall have the right, at its option and election at any time, to terminate this Agreement and to receive a return of the Earnest Money; it being a condition precedent to Purchaser's obligation to purchase the Property that the results of Purchaser's environmental studies, reveal that the Property is free from any and all `hazardous substance(s)", "hazardous waste(s)" or "hazardous material (s)", as defined under applicable federal or state law, or both, provided such environmental studies are performed during the Feasibility Period. Purchaser, its agents and representatives, are hereby authorized to perform any and all studies, tests and inquiries as it may deem appropriate or necessary in furtherance of the foregoing, including entering upon the Property and performing tests and studies thereon. Seller agrees that Purchaser may make inquiry of pertinent governmental and administrative bodies and agencies concerning environmental violations or citations regarding the Property.

10. Condemnation. Seller covenants and agrees there is no pending or threatened condemnation or similar proceeding affecting the Property or any portion thereof, nor has Seller acknowledged that any such action is presently contemplated. Should any entity having the power of condemnation decide prior to the time of Closing to acquire any portion of or interest in the Property, Purchaser, at Purchaser's sole option, may elect to (a) terminate Purchaser's obligation to purchase the Property, by giving written notice to Seller at any time prior to the time of Closing and receive back all sums paid hereunder, or (b) complete the purchase of the Property with Seller immediately appointing Purchaser its attorney in fact to negotiate with said condemning entity and assigning to Purchaser all sums to be awarded.

11. Notices. Any notice permitted or required to be given hereunder shall be made in writing and sent to receiving party at the address set forth below by Certified Mail, return receipt requested, and shall be deemed given by either party to the other when the same is deposited in the United States Mail as certified, return receipt requested with postage prepaid sufficient to deliver to its addressed destination whether or not the receiving party receives the same. The address of the parties is as follows:

**SELLER:**
Forest Glen, L.L.C.
104 Timberlane Rd.
Pike Rd., Al. 36604

**PURCHASER:**
Alan + Ann J. Bush
281 Misko Road
mathews AL 36052

12. Agency Disclosure.

AGENCY DISCLOSURE (Required per Code of Alabama 34-27-8c)

Print Name of Listing Company: **Ingram Real Estate and Development, L.L.C.**

The Listing Company is:                    **(Two blocks may be checked)**
- ● An agent of the Seller
- o An agent of Purchaser
- o An agent of both the Seller and The Purchaser as is acting as a limited consensual dual agent
- o Assisting the Purchaser Seller as a transaction broker

Print Name of Selling Company: **Ingram Real Estate and Development, L.L.C.**

The Selling Company is:                    **(Two blocks may be checked)**
- ● An agent of the Seller
- o An agent of Purchaser
- o An agent of both the Seller and The Purchaser as is acting as a limited consensual dual agent

WITNESS:                          PURCHASER:

_____          By: _____

                                  Its: _____

WITNESS:                          SELLER:
                                  **Forest Glen, L.L.C.**

_____          By: _____

                                  Its: _Manager_____

(K) Seller shall provide and install access road within one year after closing said contract.

(L) The west most boundary of lot 2 shall exclude the drainage ditch.

~~(M) Exclude Article II Sections 2.B, 2.C, 2.D, 2.E~~

(N) Article VI Section 6.1
Semi-annual dues not to exceed $500.00 (Five hundred doll or $1000.00 (One thousand dollars) per year.

(O) Seller shall provide all utilities to the property within 18 months after closing.

(P) Siding — exposed metal siding or metal panels any kind will only be permitted on back side of buildings.

(Q) If there are disagreements arising out of Article II, Sections 2.B, 2.C, 2.D, 2.E, the Purchaser and Review Committee (Sellers) will engage jointly an arbitrator with costs being split 50/50.

5

A. **Settlement Statement**

Parnell & Crum, P.A.

U.S. Department of Housing
and Urban Development



OMB No. 2502-0265

| B. Type of Loan | | |
|---|---|---|
| 1. ☐ FHA    2. ☐ FmHA  3. ☐ Conv. Unins. | 6. File Number W-34757 | 7. Loan Number    8. Mortgage Insurance Case Number |
| 4. ☐ VA    5. ☐ Conv. Ins. | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| Alan Bush<br>Ann J. Bush | Forest Glen, L.L.C. | |

| G. Property Location | H. Settlement Agent   G. Barton Crum | |
|---|---|---|
| 2.25 acres in Montgomery County<br>Montgomery, Alabama<br>Montgomery County, Alabama<br>Metes and Bounds | TIN-63-0761852 | I. Settlement Date |
| | Place of Settlement    Phone: 832-4200<br>641 South Lawrence Street<br>Montgomery, Alabama  36104 | 8/22/03 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | 400. Gross Amount Due To Seller | |
| 101. Contract sales price | 245,025.00 | 401. Contract sales price | 245,025.00 |
| 102. Personal property | 295.00 | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes         to | | 406. City/town taxes        to | |
| 107. County taxes            to | | 407. County taxes           to | |
| 108. Assessments             to | | 408. Assessments            to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross Amount Due From Borrower | 245,320.00 | 420. Gross Amount Due To Seller | 245,025.00 |
| 200. Amounts Paid By Or In Behalf Of Borrower | | 500. Reductions In Amount Due To Seller | |
| 201. Deposit or earnest money | 1,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 25,027.50 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan  Compass Bank | 74,999.25 |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes         to | | 510. City/town taxes        to | |
| 211. County taxes            to | | 511. County taxes           to | |
| 212. Assessments             to | | 512. Assessments            to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | 1,000.00 | 520. Total Reduction Amount Due Seller | 100,026.75 |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross amount due from borrower (line 120) | 245,320.00 | 601. Gross amount due to seller (line 420) | 245,025.00 |
| 302. Less amounts paid by/for borrower (line 220) | ( 1,000.00 ) | 602. Less reductions in amt. due seller (line 520) | 100,026.75 |
| 303. Cash  ☒ From  ☐ To Borrower | 244,320.00 | 603. Cash  ☐ To  ☒ From Seller | 144,998.25 |

SUBSTITUTE FORM 1099 SELLER STATEMENT. The information contained in Blocks E, G, H and I, lines 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

Alan Bush

Ann J. Bush

Forest Glen, L.L.C.
By:
Phyllis B. Ingram, Member


DEFENDANT'S EXHIBIT

Previous Edition is Obsolete
CA&JO88  Inhibit(s)

FIRST DATA SYSTEMS, INC.
FDB (Rev. 12/92)

RESPA, HB 4305.2; HUD-1 REV. (8/
1-81-8-561-84

| Settlement Charges | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| 0. Total Sales/Broker's Commission based on price $  245,025.00 @10.0000 % = $24,502.50 | | | |
| Division of Commission (line 700) as follows: | | | |
| 1. $    24,502.50  to    Ingram Real Estate and Development | | | |
| 2. $                        to | | | 24,502.50 |
| 3. Commission paid at Settlement | | | |
| 4. | | | |
| 00. Items Payable In Connection With Loan | | | |
| 01. Loan Origination Fee                      % | | | |
| 02. Loan Discount                                 % | | | |
| 03. Appraisal Fee to | | | |
| 04. Credit Report to | | | |
| 05. Lender's Inspection Fee to | | | |
| 06. Mortgage Insurance Application Fee to | | | |
| 07. Assumption Fee to | | | |
| 08. | | | |
| 09. | | | |
| 10. | | | |
| 11. | | | |
| 00. Items Required By Lender To Be Paid In Advance | | | |
| 01. Interest from          to           @ $           /day | | | |
| 02. Mortgage Insurance Premium for           months to | | | |
| 03. Hazard Insurance Premium for             years to | | | |
| 04. Flood Insurance Premium for              years to | | | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | | |
| 1001. Hazard Insurance            months @ $           per month | | | |
| 1002. Mortgage Insurance          months @ $           per month | | | |
| 1003. City property taxes         months @ $           per month | | | |
| 1004. County property taxes       months @ $           per month | | | |
| 1005. Annual Assessments          months @ $           per month | | | |
| 1006. Flood Insurance             months @ $           per month | | | |
| 1007.                             months @ $           per month | | | |
| 1008.                             months @ $           per month | | | |
| 1009.                             months @ $           per month | | | |
| 1010. | | | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee to | | | 175.00 |
| 1102. Abstract or title search   to   State Abstract | | | 300.00 |
| 1103. Title examination           to   Parnell & Crum | | | |
| 1104. Title insurance binder      to | | | |
| 1105. Document preparation        to | | | |
| 1106. Notary fees                 to | | | |
| 1107. Attorney's fees             to                             ) | | | |
| (includes above item numbers: | | | |
| 1108. Title Insurance            to   Mississippi Valley / PCA   ) | | | |
| (includes above item numbers: | | | |
| 1109. Lender's coverage           $ | | | |
| 1110. Owner's coverage            $ | | | |
| 1111. | | 30.00 | |
| 1112.  Doc Prep to Parnell & Crum | | | 50.00 |
| 1113.  Deed Prep to Parnell & Crum | | | |
| 1200. Government Recording and Transfer Charges | | 11.00 | |
| 1201. Recording fees: Deed $   11.00    ; Mortgage $          ; Releases $ | | 245.50 | |
| 1202. City/county tax/stamps: Deed $  245.50    ; Mortgage $ | | | |
| 1203. State tax/stamps: Deed $                  ; Mortgage $ | | 8.50 | |
| 1204.  Record Release to Judge of Probate | | | |
| 1205. | | | |
| 1300. Additional Settlement Charges | | | |
| 1301. Survey           to   Alabama Land Surveying | | | |
| 1302. Pest inspection to | | | |
| 1303. | | | |
| 1304. | | | |
| 1305. | | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | 295.00 | 25,027.50 |

SELLER INSTRUCTIONS:  If this real estate was your main home, file Form 2119, even if you had a loss or did not replace it.  If not your main home, use the applicable parts of Forms 4797, 6252 and/or 1040 (Schedule D).  You may have to recapture all or part of a Federal mortgage subsidy, if you sold a Federally-subsidized home.  This may increase your tax.  See Form 8828, Recapture of Federal Mortgage Subsidy and Pub. 523, Selling Your Home.

_Alan Bush_
Alan Bush

_Ann J. Bush_
Ann J. Bush

Forest Island L.L.P.
By: _Phyllis B. Ingram_
Phyllis B. Ingram, Member

HUD-1, REV. 8
1-816-361-4

Initial(s) _____  10-34757

WARRANTY DEED, JOINTLY FOR LIFE WITH REMAINDER TO SURVIVOR

## WARRANTY DEED

THE STATE OF ALABAMA }
MONTGOMERY ———— COUNTY }

KNOW ALL MEN BY THESE PRESENTS that in consideration of  ONE HUNDRED AND NO/100--------------------
-----------------------------------------------DOLLARS and other valuable considerations
to the undersigned GRANTOR or GRANTORS in hand paid by the GRANTEES herein, the  receipt of which is hereby acknowledged, we,

Forest Glen, L.L.C., an Alabama Limited Liability Company
(herein referred to as GRANTOR(S)), do, hereby GRANT, BARGAIN, SELL and CONVEY unto  Alan Bush and Ann J. Bush,
husband and wife
(herein referred to as GRANTEES) for and during their joint lives and upon the death of either of them, then to the survivor of them
in fee simple, together with every contingent remainder and right of reversion, the following described real estate, situated in the County of
Montgomery                        , and the State of Alabama, to-wit:

See attached Exhibit "A"

This conveyance is made subject to all restrictions, reservations, easements
and/or rights-of-way which appear of record affecting title to the above
described property.

For ad valorem tax appraisal purposes only, the mailing address of the above
described property is 2.25 acres in Montgomery County, Montgomery, Alabama,
which is the mailing address of the Grantee.

TO HAVE AND TO HOLD, to the said GRANTEES for and during their joint lives and upon the death of either of them, then to the survivor
of them in fee simple, and to their heirs and assigns of such survivor forever, together with every contingent remainder and right reversion.

And I (we) do for myself (ourselves) and for my (our) heirs, executors, and administrators covenant with the said GRANTEES, their heirs
and assigns, that I am (we are) lawfully seized in fee simple of said premises; that they are free from all encumbrances, unless otherwise
noted above; that I (we) have a good right to sell and convey the same as aforesaid; that I (we) will and my (our) heirs, executors, and
administrators shall warrant and defend the same to the said GRANTEES, their heirs and assigns forever, against the lawful claims of all persons.

IN WITNESS WHEREOF   he   has   hereunto set   his   hand   and seal , this   22nd   day of
August, 2003.

WITNESS:                                                    Forest Glen, L.L.C.

_____         By: _____ (L.S.)
                                                           Phyllis S. Ingram,
                                                           Its: Managing Member

_____                 _____ (L.S.)

                                                           _____ (L.S.)

                                                           _____ (L.S.)

THE STATE OF ALABAMA, }
Montgomery ———— COUNTY. }

I,  G. Barton Crum                                  , a Notary Public, in and for said State of  Alabama
hereby certify that  Phyllis S. Ingram, Managing Member of Forest Glen, L.L.C.

whose name  is  signed to the foregoing conveyance, and who  is  known to me acknowledged before me on this day, that,
being informed of the contents of the conveyance s he  executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this  22nd  day of  August, 2003

Commission Expires:12-20-04               _____
                                                           G. Barton Crum    Notary Public

This instrument was prepared by:  Parnell & Crum, P.A.                    FOR RECORDING ONLY
                                  641 S. Lawrence St.
                                  Montgomery, AL 36104


DEFENDANT'S
EXHIBIT
6

WD104.J

RLPY 2721 PAGE 0085

Exhibit "A"

Commence at an iron pin known as the NW Corner of the SW 1/4 of Section 24, T-16-N, R-19-E, Montgomery County, Alabama; thence East 1993.62' to a point; thence South 638.57' to an iron pin; thence S 59 deg. 24' 33" E 318.24' to the POINT OF BEGINNING for the herein described parcel of land; thence S 59 deg. 24' 33" E 117.15' to an iron pin; thence S 58 deg. 08' 43" E 147.78' to an iron pin; thence S 00 deg. 02' 18" W 261.69' to an iron pin located in a curve; thence along said curve Chord Bearing N 70 deg. 59' 00" W, Chord Distance 189.00', Radius 5918.58 to an iron pin; thence N 18 deg. 06' 06" E 50.00' to an iron pin located at the beginning of a curve; thence along said curve the following two (2) courses: (1) Chord Bearing N 72 deg. 57' 17" W, Chord Distance 220.11', Radius 5968.58' to an iron pin; thence N 11 deg. 13' 52" W 52.75' to an iron pin; thence N 20 deg. 03' 38" E 155.84' to an iron pin; thence N 78 deg. 42' 50" E 120.46' to the point of beginning. Containing 2.25 acres more or less. Lying in and being a part of the NW 1/4 of the SW 1/4 of Section 24, T-16-N, R-19-E, Montgomery County, Alabama.

500
100
5.00
245.50
256.50

STATE OF ALABAMA
MONTGOMERY CO.
I CERTIFY THIS INSTRUMENT
WAS FILED ON

2003 AUG 26 AM 9: 31

REESE MCKINNEY, JR.
JUDGE OF PROBATE

| INDEX | 5.00 |
| RECORD FEE | 1.00 |
| RECORD FEE | 5.00 |
| MORTGAGE TAX | 245.50 |
| CASH | 256.50 |

08-26-2003 #1    1CL    ITEM 4    1511 09:33TM





EXHIBIT

C

CHANTILLY PLACE EAST
PLAT NO. 1
Montgomery County, Alabama
LOCATED IN THE SE QUARTER OF SECTION 24
T-16-N, R-19-E MONTGOMERY COUNTY, AL

US HIGHWAY 110
CHANTILLY PARKWAY
(100' ROW)

LINE TABLE

| LINE | LENGTH | BEARING |
|------|--------|---------|
| L7 | 9.76 | S15°35'00"W |
| L8 | 27.45 | S27°44'45"E |
| L9 | 45.92 | N11°13'36"W |

CURVE TABLE

| CURVE | LENGTH | RADIUS |
|-------|--------|--------|
| C4 | 39.37 | 363.26 |
| C6 | 98.92 | 50.00 |
| C7 | 24.74 | 50.00 |
| C8 | 49.88 | 423.26 |
| C10 | 25.28 | 50.00 |
| C11 | 63.40 | 50.00 |

**EXHIBIT**

_D_

1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA,
# NORTHERN DIVISION

FOREST GLEN, L.L.C. and TIMBER )  Case No.: 2:07-CV-836
CREEK, L.L.C.,                  )
                                )  **AFFIDAVIT OF THOMAS M. TYSON**
            Plaintiff,          )
    vs.                         )
                                )
CITY OF MONTGOMERY, and THE     )
WATER WORKS AND SANITARY SEWER  )
BOARD FOR THE CITY OF           )
MONTGOMERY,                     )
            Defendant           )
                                )
_____ )

STATE OF ALABAMA

COUNTY OF MONTGOMERY

      In person appeared before the undersigned officer, duly authorized to administer

oaths, Thomas M. Tyson, who, after being duly sworn, states under oath as follows:

      1.     I am the Land Use Controls Administrator for the Planning and

Development Division of the City of Montgomery and the Executive Secretary to the

Montgomery Planning Commission, and I have personal knowledge of the facts set forth

in this affidavit.  I am an adult resident citizen of the State of Alabama and am competent

to testify to the matters set forth herein.

      2.     Forest Glen, L.L.C., by and through its engineer, Wesley Fulmer, applied

for final plat approval by letter dated December 21, 2004.  The Montgomery Planning

Commission held a hearing for final approval of the proposed plat on January 13, 2005.

At that hearing, Mr. Wesley Fulmer presented himself before the Commission in a

representative capacity for Forest Glen, L.L.C.  Mr. Fulmer fielded two questions from

members of the Commission, and the floor was opened to anybody wishing to discuss the project. No discussion was initiated by Mr. Fulmer or anyone else regarding the required construction of the subject service road.

3.      Attached hereto are records from my departmental file for the Chantilly Place East Plat No. 1 preliminary and final plat approvals. Each of these documents was either made by me or under my supervision at or near the time of the events set out therein and in the ordinary course of business, or received by my office in the ordinary course of the plat application and approval process. They have been kept in the ordinary course of business.

5.      Further, the affiant saith not.

Thomas M. Tyson, Jr.

STATE OF ALABAMA

COUNTY OF MONTGOMERY

I, the undersigned notary public in and for said county in said state, hereby certify that Thomas M. Tyson, whose name is signed to the foregoing affidavit, and who is known to me, after being fully informed of the contents of the instrument, signed and executed the same voluntarily after first being duly sworn by me on the date set forth below.

GIVEN under my hand and official seal, this __3rd__ day of __June__, 2008.

NOTARY PUBLIC

My Commission Expires: NOTARY PUBLIC STATE OF ALABAMA AT LARG
MY COMMISSION EXPIRES: Mar 28, 20
BONDED THRU NOTARY PUBLIC UNDERWRITR

000003

*paid 50⁰⁰*



## LARRY E. SPEAKS & ASSOCIATES, INC.

CONSULTING ENGINEERS & LAND SURVEYORS
544 Martha Street
MONTGOMERY, ALABAMA 36104
Telephone: 334/262-1091
FAX Number: 334/262-2211

AIRPORTS
BRIDGE DESIGN
CONSTRUCTION MANAGEMENT
ENVIRONMENTAL PERMITS
HIGHWAY DESIGN
LAND DEVELOPMENT PLANNING & DESIGN
LAND USE STUDIES
MUNICIPAL WORKS
PARKS & RECREATION FACILITIES

SEWAGE COLLECTION, TREATMENT & DISPOSAL
SOLID WASTE LANDFILLS
STORM DRAINAGE STUDIES & DESIGN
SUBDIVISIONS
SURVEYING:   LAND SURVEYS
                     CONSTRUCTION SURVEYS
                     TOPOGRAPHIC MAPS
WATER SUPPLY TREATMENT & DISTRIBUTION

Thursday, October 24, 2002

City of Montgomery
Planning Controls
P.O. Box 1111
Montgomery, AL  36192

**ATTN: Ms. Helen Millican**

**RE:    Preliminary Plat**
          **Chantilly Place**

Dear Ms. Millican:

Enclosed for your review and approval are six (6) copies of the above referenced project. Also enclosed is check no.  1254  in the amount of $50.00.  The number of lots in this development could increase or decrease.

Please schedule this project before the Planning Commission at the earliest possible date.

Should you have any questions or comments, please do not hesitate to call.

Sincerely,

Russell D. Ware, jr.

RDWjr/km
Enclosures
Cc:    Mr. Merrill Ingram
         file

000004





# ALABAMA
# DEPARTMENT OF TRANSPORTATION

SIXTH DIVISION - DISTRICT THREE
OFFICE OF DISTRICT ENGINEER
P.O. BOX 3097
MONTGOMERY, ALABAMA 36109
Telephone: (334) 242-6572
Fax: (334) 834-7941

DON SIEGELMAN
GOVERNOR

PAUL BOWLIN
TRANSPORTATION DIRECTOR

October 28, 2002

Mr. Russell D. Ware
Larry E. Speaks and Associates
544 Martha Street
Montgomery, AL. 36104

Dear Sir:

Re:  Chantilly Place
     Montgomery County
     Al 110

This office has reviewed the preliminary plat for the above-mentioned proposed development along AL 110, commonly known as The Chantilly Parkway. The following are comments/ recommendations, for access to the ROW, are based upon this review.

1. Due to the growth of East Montgomery and the projected traffic increase along this roadway, the Department and City of Montgomery officials are currently conducting a corridor study, for the new highway.

2. The recommendations from the preliminary meetings, for this study, indicate that in order to properly facilitate the future traffic only designated access points, such as potential signalized intersections, be allowed to the mainline roadway. These access points will be determined by the Department, based upon the recommendations of the study.

3. The preliminary plat that you submitted is not compatible with the preliminary recommendations of the study, since it indicates approximately eight (8) access points to the mainline roadway. The preliminary study recommends two (2) points of access to the mainline roadway, for the roadway frontage of your proposed development as indicated by the submitted plat map.

I

000005

4.  The preliminary study recommends that access to these predetermined points be designed internally, within the development, or possibly by service/frontage roads if the geometric and physical characteristics of the ROW will facilitate the construction of such roads.

If you have any questions or need additional information pertaining to this matter please feel free to contact me at 242-6572.

Sincerely,

**Mark T. Waits**
**District Engineer**

**MTW:mtw**

cc:   Mr. Howard Mann
      Mr. Steward Manson
      Mr. Tommy Tyson
      Mr. Daryl Skipper
      File

2



000006



# LARRY E. SPEAKS & ASSOCIATES, INC.

CONSULTING ENGINEERS & LAND SURVEYORS
544 Martha Street
MONTGOMERY, ALABAMA 36104
Telephone: 334/262-1091
FAX Number 334/262-2211

AIRPORTS
BRIDGE DESIGN
CONSTRUCTION MANAGEMENT
ENVIRONMENTAL PERMITS
HIGHWAY DESIGN
LAND DEVELOPMENT PLANNING & DESIGN
LAND USE STUDIES
MUNICIPAL WORKS
PARKS & RECREATION FACILITIES

SEWAGE COLLECTION, TREATMENT & DISPOSAL
SOLID WASTE LANDFILLS
STORM DRAINAGE STUDIES & DESIGN
SUBDIVISIONS
SURVEYING:   LAND SURVEYS
                      CONSTRUCTION SURVEYS
                      TOPOGRAPHIC MAPS
WATER SUPPLY TREATMENT & DISTRIBUTION

Friday, November 22, 2002

City of Montgomery
Land Use Department
P.O. Box 1111
Montgomery, AL 36192

**ATTN: Ms. Helen Millican**

**RE:    Preliminary Plat**
           **Chantilly Place**

Enclosed you will find the adjacent property owners for the above referenced project. Also, included is check no. __1381__ in the amount of $81.00 to be combined with check no. __1254__ for $50.00 that you have already received for this project.

Should you have any questions, please do not hesitate to call.

Very truly yours,

Gregory M. Gillian

GMG/km
Enclosures
Cc:     Mr. Merrill Ingram
           file

*000007*

# STATUS OF PLAT REVIEW

**PLAT NAME:**  Chantilly Place 1

**LOCATION OF PLAT:**  Chantilly Pkwy

**ENGINEER:**  Larry Speaks & Associates

**ADDRESS:**  544 Martha Street

**CITY:**  Montgomery     **STATE:**  AL     **ZIP:**  36104     **PHONE:**  262-1091 (O)  262-2211 (F)

**FILE NO.:**  7566     **PC AGENDA:**  12-12-2002

## PLAT DEPARTMENTAL APPROVAL

**DEPARTMENT:**  *Engineering*                    **YES**     **NO**

**CONTACT PERSON:**  *Cecil Cork*

**PHONE NO.:**  *241-2655*          **DATE OF REVIEW:**  *12/2/02*

**COMMENTS:**  *Check for wetland soils along creek. Submit construction plans for review and approval*

**\*NOTE TO DEPARTMENT:**
Plat applications being reviewed for comment review process <u>also</u> need a copy sent to the applicant.  Approved circulation plats need to be returned to Planning Controls with comments on the review sheet.  <u>If plat cannot be approved, please submit comment and return copy of plat to Planning Controls and copy to the applicant.</u>  If additional information is needed, please contact us at 241-2722.

**NOTE TO ENGINEER:**
If plat has not been approved by applicable Department, please revise according to comments and resubmit to Planning Controls for circulation.

Revised April 2002

# STATUS OF PLAT REVIEW

000008

**PLAT NAME:**   Chantilly Place 1

**LOCATION OF PLAT:**   Chantilly Pkwy

**ENGINEER:**   Larry Speaks & Associates

**ADDRESS:**   544 Martha Street

**CITY:**   Montgomery    **STATE:**   AL    **ZIP:**   36104    **PHONE:**   262-1091 (O)   262-2211 (F)

**FILE NO.:**   7566    **PC AGENDA:**   01-09-2003

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## PLAT DEPARTMENTAL APPROVAL

**DEPARTMENT:** _____    **YES**    (NO)

**CONTACT PERSON:** Stuart Madson

**PHONE NO.:** 241-5910    **DATE OF REVIEW:** 12/24/02

**COMMENTS:** Plat is under review

_____

_____

_____

_____

_____

_____

_____

**<u>*NOTE TO DEPARTMENT:</u>**
Plat applications being reviewed for comment review process <u>also</u> need a copy sent to the applicant.  Approved circulation plats need to be returned to Planning Controls with comments on the review sheet.  <u>If plat cannot be approved, please submit comment and return copy of plat to Planning Controls and copy to the applicant.</u>  If additional information is needed, please contact us at 241-2722.

**<u>NOTE TO ENGINEER:</u>**
If plat has not been approved by applicable Department, please revise according to comments and resubmit to Planning Controls for circulation.

Revised April 2002

## STATUS OF PLAT REVIEW

PLAT NAME:   Chantilly Place 1

LOCATION OF PLAT:   Chantilly Pkwy


ENGINEER:   Larry Speaks & Associates

ADDRESS:   544 Martha Street

| CITY: Montgomery | STATE: AL | ZIP: 36104 | PHONE: | 262-1091 (O) 262-2211 (F) |

FILE NO.:   7566                               PC AGENDA:   01-09-2003

## PLAT DEPARTMENTAL APPROVAL

DEPARTMENT:   _Jua_                                    YES        NO

CONTACT PERSON:   _M.E. Robinson_

PHONE NO.:   _241-2916_                    DATE OF REVIEW:   _12-24-02_

COMMENTS:   _For platting only_

**\*NOTE TO DEPARTMENT:**
Plat applications being reviewed for comment review process also need a copy sent to the applicant. Approved circulation plats need to be returned to Planning Controls with comments on the review sheet. If plat cannot be approved, please submit comment and return copy of plat to Planning Controls and copy to the applicant. If additional information is needed, please contact us at 241-2722.


NOTE TO ENGINEER:
If plat has not been approved by applicable Department, please revise according to comments and resubmit to Planning Controls for circulation.

000010

**City of
Montgomery, Alabama**

BOBBY N. BRIGHT
Mayor

MONTGOMERY CITY COUNCIL
MRS. ALICE D. REYNOLDS-Pres.
JAMES A. NUCKLES-Pres. Pro tem
WILLIE COOK
TERANCE D. DAWSON
CHARLES W. JINRIGHT

TRACY LARKIN
B. J. (BEN) MCNEILL
P. E. (PEP) PILGREEN
CHARLES W. SMITH

January 10, 2003

TO:         Larry Speaks & Associates

FROM:       Planning Controls Division

SUBJECT:    Planning Commission Agenda – January 9, 2003

RE:         Plat

File No.   7566    Chantilly Place Preliminary          APPROVED
                   (Preliminary approval)

File No.   7571    MARC Plat No. 6                       APPROVED
                   (Final approval)

TMT/tri

cc: Engineering Department

NOTE: All plats are approved subject to compliance with the Subdivision Regulations and
Engineering Department requirements.

000011

# STATUS OF PLAT REVIEW

**PLAT NAME:**  Chantilly Place 1

**LOCATION OF PLAT:**  Chantilly Pkwy

**ENGINEER:**  Larry Speaks & Associates

**ADDRESS:**  544 Martha Street

**CITY:**  Montgomery          **STATE:**  AL     **ZIP:**  36104          **PHONE:** 262-1091 (O)  262-2211 (F)

**FILE NO.:**  7566                              **PC AGENDA:**  01-09-2003

## PLAT DEPARTMENTAL APPROVAL

**DEPARTMENT:** _____     YES      NO

**CONTACT PERSON:** _____

**PHONE NO.:** _____     **DATE OF REVIEW:** _____

**COMMENTS:** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**\*NOTE TO DEPARTMENT:**
Plat applications being reviewed for comment review process <u>also</u> need a copy sent to the applicant.  Approved circulation plats need to be returned to Planning Controls with comments on the review sheet.  <u>If plat cannot be approved, please submit comment and return copy of plat to Planning Controls and copy to the applicant.</u>  If additional information is needed, please contact us at 241-2722.

**NOTE TO ENGINEER:**
If plat has not been approved by applicable Department, please revise according to comments and resubmit to Planning Controls for circulation.

Revised April 2002

000012

# STATUS OF PLAT REVIEW

PLAT NAME:   Chantilly Place 1

LOCATION OF PLAT:   Chantilly Pkwy

ENGINEER:   Larry Speaks & Associates

ADDRESS:   544 Martha Street

CITY:   Montgomery      STATE:   AL      ZIP:   36104      PHONE:   262-1091 (O)  262-2211 (F)

FILE NO.:   7566                PC AGENDA:   01-09-2003

## PLAT DEPARTMENTAL APPROVAL

DEPARTMENT:   Water                                YES      NO

CONTACT PERSON:   Michael Hora (Daniel)

PHONE NO.:   206-3430            DATE OF REVIEW:   1/7/03

COMMENTS:   See attached comments

**\*NOTE TO DEPARTMENT:**
Plat applications being reviewed for comment review process also need a copy sent to the applicant. Approved circulation plats need to be returned to Planning Controls with comments on the review sheet. If plat cannot be approved, please submit comment and return copy of plat to Planning Controls and copy to the applicant. If additional information is needed, please contact us at 241-2722.

**NOTE TO ENGINEER:**
If plat has not been approved by applicable Department, please revise according to comments and resubmit to Planning Controls for circulation.

Revised April 2002

000013

FOR

# CHANTILLY PLACE

## Montgomery County, Alabama



PLAT WILL NOT BE SIGNED UNTIL PROJECTS HAVE BEEN FIELD FINALED OR CONSTRUCTION SECURITY IS RECEIVED.



LARRY E. SPEAKS
&
ASSOCIATES

CONSULTING ENGINEERS
&
LAND SURVEYORS

544 MARTHA STREET
MONTGOMERY, AL. 36104
TEL.-334/262-1091

SHEET 1 OF 1

000014



000015

**GENERAL NOTES:**

1. Streets shown hereon, if not previously dedicated, are hereby tendered for dedication to public use.

2. All easements or rights-of-ways, except utility, private easements, or easements for sanitary sewers or water mains shown on the plat are hereby dedicated to the municipality of Montgomery, Alabama, and/or the County of Montgomery, Alabama for public use. Easements include the rights of ingress and egress by City and/or County employees for maintenance of the property included in the easements. No permanent structures may be placed on any easement shown.

3. Easements for sanitary sewers and water mains, if not previously dedicated, are hereby dedicated to The Water Works and Sanitary Sewer Board of the City of Montgomery, Alabama, its successors or assigns for ingress and egress in the installation and maintenance of sanitary sewers and water mains and their appurtenances. No permanent structures may be erected over any part of these easements.

4. A ten-foot easement for utilities is herewith reserved on that portion of each lot abutting a dedicated street. Easements for utilities, private drainage or private access are for the use of any utility which may require them, for surface drainage or access as needed. Installation and maintenance of property in these easements are not the responsibility of the City or County of Montgomery, Alabama.

Correct General #4 willread

EXCEPT WHERE ESMT FOR WATER/SEWER EXISTS.

L3

L2

NOT A

Jan. 8. 2003 12:29PM    2813448



000016



## LARRY E. SPEAKS & ASSOCIATES, INC.
CONSULTING ENGINEERS & LAND SURVEYORS
544 Martha Street
MONTGOMERY, ALABAMA 36104
Telephone: 334/262-1091
FAX Number 334/262-2211

AIRPORTS
BRIDGE DESIGN
CONSTRUCTION MANAGEMENT
ENVIRONMENTAL PERMITS
HIGHWAY DESIGN
LAND DEVELOPMENT PLANNING & DESIGN
LAND USE STUDIES
MUNICIPAL WORKS
PARKS & RECREATION FACILITIES



SEWAGE COLLECTION, TREATMENT & DISPOSAL
SOLID WASTE LANDFILLS
STORM DRAINAGE STUDIES & DESIGN
SUBDIVISIONS
SURVEYING:   LAND SURVEYS
                      CONSTRUCTION SURVEYS
                      TOPOGRAPHIC MAPS
WATER SUPPLY TREATMENT & DISTRIBUTION

November 10, 2003

City of Montgomery
Planning Controls
P.O. Box 1111
Montgomery, AL 36192

**ATTN: Ms. Helen Millican**

**RE:    Preliminary Plat**
**        Chantilly Place East Plat No. 1**

Dear Ms. Millican:

Enclosed for your review and approval are six (6) copies of the above referenced project. Also enclosed is check no. _2414_ in the amount of $50.00. The number of lots in this development could increase or decrease.

Please schedule this project before the Planning Commission at the earliest possible date.

Should you have any questions or comments, please do not hesitate to call.

Very truly yours,

Wesley H. Fulmer

WHF/km
Enclosures
Cc:    Mr. Merrill Ingram
          file

# LARRY E. SPEAKS & ASSOCIATES

000017

## CONSULTING ENGINEERS - LAND SURVEYORS
### 544 MARTHA STREET
### MONTGOMERY, AL 36104
### (334) 262-1091
### EMAIL:

lspeaks@lespeaks.com      sspeaks@lespeaks.com

ggillian@lespeaks.com     rware@lespeaks.com

---

## *LETTER OF TRANSMMITTAL*

**TO:** *City of Montgomery*
*Planning Controls*
*P.O. Box 1111*
*Montgomery, AL 36192*

**RE:** *Chantilly Place East Plat No. 1*
*Montgomery, Alabama*

**ATTENTION:** *Ms. Helen Millican*

**DATE:** *December 3, 2003*

**TRANSMITTED:**  √ Herewith   ☐ Hand Delivery   ☐ Under Separate Cover Via:

**FOR YOUR:**   ☐ Approval   ☐ Review & Comment   √ Use   ☐ Record/File

**THE FOLLOWING:**

| COPIES | DATE | DESCRIPTION |
|--------|------|-------------|
| 1 | 02/28/03 | *Chantilly Place East Plat No. 1; Contour and Storm Drainage Layout (sheet 5 of 24)* |
|  |  |  |

**REMARKS:** *Should you have any questions, please do not hesitate to call.*

**BY:**  *Gregory M. Gillian  / km*

**Cc:**  *file*

FOR FURTHER ASSISTANCE
CALL 334/262-1091 OR
FAX 334/262-2211

000018

# STATUS OF PLAT REVIEW

PLAT NAME:   Chantilly Place East 1

LOCATION OF PLAT:   Hwy 110

ENGINEER:   Larry Speaks & Associates

ADDRESS:   544 Martha Street

CITY:   Montgomery     STATE:   AL     ZIP:   36104     PHONE:   262-1091 (O)  262-2211 (F)

FILE NO.:   7566     PC AGENDA:   12-11-2003

## PLAT DEPARTMENTAL APPROVAL

DEPARTMENT:   _City_                                    YES     NO

CONTACT PERSON:   _Cecil M. Cork_

PHONE NO.:   _241-2659_     DATE OF REVIEW:   _12/8/03_

COMMENTS:   _Please submit construction plans for review & comment Adequately address any wetland issues on the plans and identify any flood elevations._

**\*NOTE TO DEPARTMENT:**
Plat applications being reviewed for comment review process <u>also</u> need a copy sent to the applicant.  Approved circulation plats need to be returned to Planning Controls with comments on the review sheet.  <u>If plat cannot be approved, please submit comment and return copy of plat to Planning Controls and copy to the applicant.</u>  If additional information is needed, please contact us at 241-2722.

<u>NOTE TO ENGINEER:</u>
If plat has not been approved by applicable Department, please revise according to comments and resubmit to Planning Controls for circulation.

Revised April 2002

000019

# STATUS OF PLAT REVIEW

**PLAT NAME:**   Chantilly Place East 1

**LOCATION OF PLAT:**   Hwy 110


**ENGINEER:**   Larry Speaks & Associates

**ADDRESS:**   544 Martha Street

**CITY:**   Montgomery          **STATE:**   AL     **ZIP:**   36104     **PHONE:** 262-1091 (O)
262-2211 (F)

**FILE NO.:**   7566                               **PC AGENDA:**   12-11-2003

## PLAT DEPARTMENTAL APPROVAL

**DEPARTMENT:** Traffic Engineering          YES    (NO)

**CONTACT PERSON:** Stuart Manson

**PHONE NO.:** 241-2910          **DATE OF REVIEW:** 12/5/03

**COMMENTS:** Approval of plat subject to approval of construction plans and approval of ALDOT permit

**\*NOTE TO DEPARTMENT:**
Plat applications being reviewed for comment review process <u>also</u> need a copy sent to the applicant.  Approved circulation plats need to be returned to Planning Controls with comments on the review sheet.  <u>If plat cannot be approved, please submit comment and return copy of plat to Planning Controls and copy to the applicant.</u>  If additional information is needed, please contact us at 241-2722.

<u>NOTE TO ENGINEER:</u>
If plat has not been approved by applicable Department, please revise according to comments and resubmit to Planning Controls for circulation.

Revised April 2002



000020

# STATUS OF PLAT REVIEW

PLAT NAME:  Chantilly Place East 1

LOCATION OF PLAT:  Hwy 110

ENGINEER:  Larry Speaks & Associates

ADDRESS:  544 Martha Street

CITY:  Montgomery      STATE:  AL      ZIP:  36104      PHONE:  262-1091 (O)  262-2211 (F)

FILE NO.:  7566                        PC AGENDA:  12-11-2003

## PLAT DEPARTMENTAL APPROVAL

DEPARTMENT:  _Water_                    YES    NO

CONTACT PERSON:  _Marie Standifer (Daniel)_

PHONE NO.:  _206-3430_        DATE OF REVIEW:  _11/20/03_

COMMENTS:  _Please add note:_

2. Easements for sanitary sewers and water mains, if not previously dedicated, are hereby dedicated to The Water Works and Sanitary Sewer Board of the City of Montgomery, Alabama, its successors and assigns for ingress and egress in the installation and maintenance of sanitary sewers and water lines and their appurtenances. No permanent structure may be erected over any part of these easement.

_Cannot sign until construction security is received. Plans under review, easements subject to change._

**\*NOTE TO DEPARTMENT:**
Plat applications being reviewed for comment review process <u>also</u> need a copy sent to the applicant.  Approved circulation plats need to be returned to Planning Controls with comments on the review sheet.  <u>If plat cannot be approved, please submit comment and return copy of plat to Planning Controls and copy to the applicant.</u>  If additional information is needed, please contact us at 241-2722.

**NOTE TO ENGINEER:**
If plat has not been approved by applicable Department, please revise according to comments and resubmit to Planning Controls for circulation.

Revised April 2002

000021



000022



PRELIMINARY PLAT
FOR
CHANTILLY PLACE East
Montgomery County, Alabama

000023



PRELIMINARY PLAT
FOR
CHANTILLY PLACE East
Montgomery County, Alabama

000024



PRELIMINARY PLAT
FOR
CHANTILLY PLACE East
PLAT NO. 1
Montgomery County, Alabama

US HIGHWAY 110
CHANTILLY PLACE
(300' R.O.W.)

OLD CSX RAILROAD R.O.W.

P.O.C.
NORTHWEST CORNER
OF THE SW 1/4 OF SECTION 24
T18N, R1E,
MONTGOMERY COUNTY, AL.
1" ROUNDTOP

LOCATION MAP

GRAPHIC SCALE

LEGEND

SHEET 3 OF
18

000025



City of
Montgomery, Alabama

BOBBY N. BRIGHT
Mayor

MONTGOMERY CITY COUNCIL
CHALRES W. JINRIGHT-Pres.
JAMES A. NUCKLES-Pres. Pro tem
CORNELIUS (C.C.) CALHOUN
WILLIE COOK
TIM HEAD

JANET MAY
GLEN O. PRUITT, Jr.
MARTHA ROBY
JIM SPEAR

December 12, 2003

TO:          Larry Speaks & Associates

FROM:        Planning Controls Division

SUBJECT:     Planning Commission Agenda – December 11, 2003

**RE:**      **Plat**

File No.  7566    Chantilly Place East Plat No. 1          APPROVED
                  (Preliminary approval)

File No.  7715    Lakeview Place Plat No. 1               APPROVED
                  (Final approval)

TMT/tri

cc:  Engineering Department

NOTE:  All plats are approved subject to compliance with the Subdivision Regulations and
Engineering Department requirements.

000026



174.00

# LARRY E. SPEAKS & ASSOCIATES, INC.

CONSULTING ENGINEERS & LAND SURVEYORS
544 Martha Street
MONTGOMERY, ALABAMA 36104
Telephone: 334/262-1091
FAX Number 334/262-2211

AIRPORTS
BRIDGE DESIGN
CONSTRUCTION MANAGEMENT
ENVIRONMENTAL PERMITS
HIGHWAY DESIGN
LAND DEVELOPMENT PLANNING & DESIGN
LAND USE STUDIES
MUNICIPAL WORKS
PARKS & RECREATION FACILITIES

SEWAGE COLLECTION, TREATMENT & DISPOSAL
SOLID WASTE LANDFILLS
STORM DRAINAGE STUDIES & DESIGN
SUBDIVISIONS
SURVEYING:   LAND SURVEYS
                         CONSTRUCTION SURVEYS
                         TOPOGRAPHIC MAPS
WATER SUPPLY TREATMENT & DISTRIBUTION

December 21, 2004

City of Montgomery
Planning/Controls
P.O. Box 1111
Montgomery, AL  36101

**ATTN: Mrs. Helen Millican**

**RE:    Chantilly Place East Plat No. 1**
**           Montgomery AL**

Dear Mrs. Millican:

On behalf of our Client, Forest Glen L.L.C., we request that the above referenced Project be put before the Planning Commission for final Plat Approval at the January 13th hearing date. Enclosed you will find.

1.   Six (6) copies of the Final Plat
2.   One (1) check in the amount of $174.00

Following your review, please advise should you have any questions or comments.

Very truly yours,

Wesley H. Fulmer

WHF/whf

Enclosures

Cc:     Mr. Merril Ingram
          file

000027

4.    7566    **PRESENTED BY**: Larry Speaks & Associates

**REPRESENTING**: Merrill Ingram

**SUBJECT**: Request preliminary approval of Chantilly Place Preliminary located on the north side of Chantilly Parkway, approximately 3,000 ft. north of Vaughn Road in B-2 (Commercial) and B-3 (Commercial) Zoning Districts.

**REMARKS**: This plat creates 27 lots for commercial use and four (4) new streets. These lots range from 0.76 acres to 14.24 acres. There will be three (3) streets which run north off Chantilly Parkway. Street A (cul-de-sac) runs north approximately 1,100 ft. off Chantilly Parkway and Street B (cul-de-sac) runs north approximately 700 ft. north off Chantilly Parkway. Street C runs north off Chantilly Parkway and intersects Street A. Street D (cul-de-sac) runs west approximately 600 ft. off Street A. There are 12 lots along Chantilly Parkway, however the access will be provided off the new streets. A 10 ft. wide beautification easement is required along Chantilly Parkway with denied access. Lot 27 will have access off Chantilly Parkway. This plat is in compliance with the Zoning Ordinance and Subdivision Regulations for this district.

**COUNCIL DISTRICT: Police Jurisdiction**

## DEPARTMENT COMMENTS:

**ENGINEERING DEPARTMENT:**

**TRAFFIC ENGINEERING:** Plat is under review.

**FIRE DEPARTMENT:** Approved for platting only.

**WATER AND SEWER:**

**COUNTY HEALTH DEPARTMENT:**

**COMMENTS:**_____

**ACTION TAKEN:**_____

13.    7566    **PRESENTED BY:**    Larry Speaks & Associates

**REPRESENTING:** Merrill Ingram

**SUBJECT:** Request preliminary approval of Chantilly Place East Plat No. 1 located on the north side of Chantilly Parkway, approximately 3,000 ft. north of Vaughn Road in a B-2 (Commercial) Zoning Districts.

**REMARKS:** This plat creates 8 lots for commercial use and two (2) new streets. These lots range from 1.10 acres to 2.25 acres. Street A (cul-de-sac) runs north off Chantilly Parkway. Street B runs parallel with Chantilly Parkway along lots 1 thru 4. There are two (2) access drives onto Chantilly Parkway. This plat is in compliance with the Zoning Ordinance and Subdivision Regulations for this district.

**COUNCIL DISTRICT: Police Jurisdiction**

## DEPARTMENT COMMENTS:

**ENGINEERING DEPARTMENT:** No comment received.

**TRAFFIC ENGINEERING:** No comment received.

**FIRE DEPARTMENT:** Approved for platting only.

**WATER AND SEWER:** Please add required notes.

**COUNTY HEALTH DEPARTMENT:** Lot served by public sanitary sewer.

*COMMENTS:*_____

*ACTION TAKEN:*_____

## A RESOLUTION PROVIDING REGULATIONS GOVERNING THE SUBDIVISION OF LAND

Be it resolved by the Montgomery City Planning Commission, that regulations governing the subdivision of land within the corporate limits of the City of Montgomery and within the police jurisdiction of Montgomery are hereby prescribed and adopted as follows:

**Section I. Authority and jurisdiction.**

A. *Enabling legislative acts.* These regulations are adopted by the Montgomery City Planning Commission under authority of Act No. 480 of the 1961 Alabama Legislature, which refers to Chapter 16, Title 37, the 1940 Code of Alabama, as recompiled in 1958, and especially sections 797 and 803 thereof, both inclusive [now Code of Ala. 1975, §§ 11-52-30—11-52-36], which sections of said code, insofar as they are applicable, are hereby made a part hereof to the same extent as if they were set out in full.

B. *Limits of jurisdiction.* From and after the effective date hereof, these regulations shall govern all subdivision of land within the corporate limits of the City of Montgomery and its police jurisdiction. Any owner of land within the area governed by these regulations wishing to subdivide land shall submit to the planning commission a plat of the subdivision which shall conform at least to the minimum requirements and procedures set forth in these regulations.

C. *Penalty clause.* Whoever, being the owner, or agent of the owner, of any land located within a subdivision as defined herein, transfers or sells such land without first recording an approved plat, in the office of the Probate Judge of Montgomery County, shall forfeit and pay a penalty of $200.00 for each lot or parcel so transferred or sold. The City of Montgomery may injoin such transfer, or sale, or agreement, by action or injunction brought in any court for equity jurisdiction, or may recover the same penalty by a civil action in any court of competent jurisdiction.

**Section II. Procedures.**

A. *Pre-application procedure.*

1.  The subdivider may present a basic street layout, such layout to be the topographic map of the area to be subdivided and may be in the nature of a freehand sketch. If this step is requested by the subdivider, the data requirements shall be the same as for request for preliminary approval of a subdivision and at this time the adjoining property owners shall be notified of the fact that such proposed subdivision is before the commission for consideration. The basic lot sizes shall be given, but lots need not be shown on the basic street layout. The name of the subdivision shall be given, but the street names need not be assigned at this time.

2.  Upon receiving favorable consideration by the planning commission, the subdivider may then proceed to prepare the preliminary plat for submission.

3.  Favorable consideration by the planning commission under no circumstances shall be construed as preliminary or tentative approval.

§ II                              MONTGOMERY CITY CODE

B. *Procedure for conditional approval of preliminary plat.*

1. On reaching conclusions informally as described in section 2, part A, regarding his general program and objectives, the subdivider shall cause to be prepared a preliminary plat together with other supplementary material as deemed necessary by the planning commission and specified in section III.

2. Six copies of the preliminary plat and supplementary material specified shall be submitted with the names of surrounding property owners, if not previously furnished, to the planning controls director at least 20 days prior to the meeting of the planning commission at which the preliminary plat is to be considered.

3. Within ten days after the next meeting of the planning commission after the submission of the preliminary plat and other materials in conformity with these regulations, and discussions with the subdivider on any desired changes and the kind and extent of improvements to be made by him, the planning commission shall express its approval as conditional approval and state the conditions of such approval, if any, or its disapproval and the reasons therefor.

4. The action of the planning commission shall be noted on two copies of the preliminary plat, referenced, and attached to any conditions determined. One copy may be returned to the subdivider if requested and the other copy retained by the planning commission.

5. Conditional approval of the preliminary plat shall not constitute approval of the final plat. However, it shall be deemed an expression of approval of the layout submitted on the preliminary plat as a guide to the preparation of the final plat which will be submitted for the approval of the planning commission, and for recording upon the fulfillment of the requirements of these regulations and the conditions of the conditional approval, if any.

6. The subdivider shall not begin any construction without first notifying the city engineer, city traffic engineer, water works and sanitary sewer engineer or county engineer as appropriate and obtaining proper approval.

C. *Short form procedure for conditional approval of preliminary plat.* A subdivision having five lots or less with lots fronting a previously dedicated street, and the platting of said subdivision does not affect any major operation of utility installation, may be subdivided under the short form subdivision procedure prescribed as follows:

1. The pre-application procedure, as described in section II, part A, shall be performed.

2. The design standard and data of the filing plat of the short form subdivision shall be identical when applicable to those of the long form subdivision plats.

3. Six copies of the preliminary plat and supplementary materials specified shall be submitted to the planning commission.

4. Conditional approval shall be given to the subdivider by the director of the planning controls division. The action of the planning controls director shall be noted on two

CDB:4

copies of the preliminary plat referenced, and attached to any conditions determined. One copy shall be returned to the subdivider, if requested, and the other copy retained by the director of the planning controls division.

5.  After obtaining conditional approval from the director of the planning controls division, the subdivider may then proceed to prepare the final plat.

6.  The preliminary submission procedures, as prescribed in section II, part B of these regulations, shall be omitted in the short form submission subdivision procedure.

7.  Acting on his own responsibility, a subdivider may dispense with subparagraphs (1) through (7) inclusive and submit a plat for final approval to the planning commission.

D.  *Procedure for approval of final plat.*

1.  The final plat to be prepared as specified in section III, shall conform substantially to the preliminary plat as approved; and if desired by the subdivider, it may constitute only that portion of the approved preliminary plat which he proposes to record and develop at the time; all of this provided; however, that such portion conforms to all requirements of these regulations.

2.  Certification of conformance is required before recording the final plat of all or part of a proposed subdivision. The planning commission will require certification by the city engineer to the effect that all of the improvements required herein have been completed to his satisfaction and in accordance with the approved preliminary plat and these regulations; or that the developers of the subdivision have furnished satisfactory performance bond guaranteeing the installation of the improvements within the time specified in the bond by the city engineer.

    In lieu of the above certificate, further security or assurance may be furnished as is satisfactory to the city engineer guaranteeing the installation of these improvements within the time specified in the surety and in accordance with the specifications approved by the city engineer.

    When security in the form of a cashiers or certified check is given as such security a letter of additional assurance guaranteeing that the improvements will be installed as per the plans and in the time specified will be required.

3.  The final plat and other supplementary material required for approval shall be submitted to the planning commission at least 20 days prior to the meeting at which the final plat is to be considered.

4.  Within ten days after the next meeting of the planning commission, after the submission of the final plat and supplementary materials required for approval, including any necessary surety, the planning commission shall express its final actions.

5.  Ten copies of the final plat shall be submitted, and upon approval, two signed copies shall be returned to the subdivider; two copies retained in the files of the planning

§ II                           MONTGOMERY CITY CODE

commission; and one copy distributed to each of the following agencies: city building department, city engineer, city water works and sanitary sewer board, and city fire department.

6.   The approval of the final plat by the planning commission shall not be deemed to constitute or effect an acceptance by the public of the dedication of any street or other proposed public ways or space shown on the plat.

7.   After approval by the planning commission, the city engineer, the traffic engineer and the water works and sanitary sewer board engineer will sign a copy of the plat to be retained in the office of planning controls division. The executive secretary of the commission will sign all ten copies of the final plat, and five of these will be returned to the subdivider who shall have the same signed by the county engineer and have recorded in the office of the Montgomery County Probate Judge. The probate office will keep two copies for recording and properly stamp the other three copies, showing book and page number of said recording. The subdivider shall return two of the stamped copies of the final plat to the office of the planning commission.

8.   Approval of the final plat by the planning commission shall be null and void if the plat is not recorded within 12 months after the date of approval; unless application for an extension of time is made in writing during such 12-month period to the planning commission, and unless such an extension is granted.

9.   If the plat is disapproved, the grounds for disapproval shall be stated in the records of the planning commission.

E.  *Schedule of subdivision fees.*

1.   All subdivision plats submitted to the city planning commission for approval must be accompanied by cash or a check made payable to the City of Montgomery, Alabama, for the amount specified in the following schedule:

Preliminary Plat

Residential zones: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $50.00 plus
$1.00 per lot

All other zones:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $50.00 plus
$3.00 per lot

Final Plat

Residential zones: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$100.00 plus
$1.00 per lot

All other zones:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$150.00 plus
$3.00 per lot

Extension of approval of final plat:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        $25.00

2.  Each filing of a preliminary plat, whether or not a preliminary plat for the same property had been filed previously, shall be subject to the same requirements and fees as specified for filing the preliminary plat.

3.  Resubdivisions and replats may be submitted for final approval at first submission provided no new streets are proposed or included. Fees will be the same as if the property had never been platted.

4.  Each filing of a final plat, whether or not a final plat for the same property has been filed previously, shall be subject to the same requirements and fees as specified for filing of the final plat.

**Section III. Requirements for plats and supplementary data.**

A. *Pre-application and preliminary approval.*

1.  *Sketch plan.* Two copies shall show, in sketch form, the proposed layout of the streets and other features in relation to existing conditions. A sketch plan may be a freehand sketch made directly on a print of the topographic survey. The sketch plan shall include existing topographic data listed as is necessary for the consideration of the proposed sketch plan.

2.  *General subdivision information.* At the request of the planning commission or director of the planning controls division, two copies shall describe or outline the existing conditions of the site and the proposed development as necessary to supplement the sketch above. This information may include data on existing covenants, land characteristics, available community facilities and utilities, and information describing the proposed subdivision such as number of residential lots, typical lot widths and depths, minimum floor area in structures, business areas, playgrounds, park areas and other public areas, proposed protective covenants, and proposed utilities and street improvements.

3.  Data required as a basis for the preliminary plat in A(1) above shall include the following information and other pertinent data as required to support the preliminary design of the proposed development:

    (a)  Boundary lines: Bearings if available, and distances.

    (b)  Easements: Location, width, and purposes of existing easements.

    (c)  Significant contour data at such an interval (maximum two feet) as required to determine preliminary design of the proposed improvements and other dependant features.

    (d)  Other conditions on the tract, water courses, existing structures, and other significant features.

    (e)  Titles and certificates: Title under which the proposed subdivision is to be recorded or known with name of designer and owner.

§ III                                  MONTGOMERY CITY CODE

    (f)   A vicinity map showing the relationship of the subdivision site to the surrounding area.

    (g)   Scale; area in acres data; north arrow; date of survey; date of plat; and the section, township and range in which the subdivision is located.

    (h)   The proposed name of the subdivision and proposed street names shall not duplicate or too closely approximate phonetically the name of any other subdivision or street in Montgomery County, Alabama.

    (i)   Two copies of a draft of protective covenants whereby the subdivider proposes to regulate land use in the subdivision and otherwise protect the proposed development.

    (j)   For all planned unit developments, subdivisions consisting of more than 50 dwelling units, and for any subdivision when deemed appropriate by the planning commission; a comprehensive traffic analysis, which must be approved by the planning commission, indicating the probable effect of the proposed subdivision on traffic patterns and capacities of adjacent streets in the immediate area.

B. *Plat and data for final approval.*

1.   The final plat shall be drawn to a scale of not more than 100 feet to the inch. The final plat shall show the following:

    (a)   Sufficient data to readily determine and reproduce this plat on the ground. The dimensions of each lot shall be shown. Lot dimensions on curves shall be chord distances. The beginning and the ending of curves shall be shown and curved property lines that are not boundary lines of curved streets shall be given. Curve data for curved property lines that are not boundary lines of curved streets shall be given. Building lines adjacent to streets shall be shown. Also to be provided are bearings and distances to the nearest established street lines or official monuments, section lines accurately tied to the lines of the subdivision by distances and bearings, and bearings and distance to a section corner or to an immediately adjacent plat which is tied to a section corner.

    (b)   Tract boundary lines: Right-of-way liens of streets, easements, and other right-of-way and property lines of residential lots and other sites.

    (c)   All dimensions must be accurate to the nearest one-tenth of a foot, and all angles accurate to the nearest minute of angle.

    (d)   Name and right-of-way width of each street or other right-of-way.

    (e)   Title, name, and location of subdivision; north arrow, date, and scale; and the section, township and range number.

    (f)   Locations, dimensions, and purpose of any easements and any areas to be dedicated to public use, or sites for other than residential use, with notes stating their purpose and limitations.

APPENDIX B—SUBDIVISION REGULATIONS                    § III

(g)   Lots or sites numbered in numerical order and blocks designated either alpha-
      betically or numerically.

(h)   Accurate location, material of, and description of monuments and markers, other
      than lot corners.

(i)   That subdivider is the land owner and dedicates streets, rights-of-way, easements
      and sites for public use.

(j)   Certification by either professional engineer and land surveyor or land surveyor
      for the applicant stating that the plat is true and correct and was prepared from
      an actual survey of the property made under his supervision on the ground, and
      that corner irons and other markers have been placed.

(k)   Engineering drawings of construction plans shall bear the signature, seal, and
      registration number of a professional engineer.

(l)   A certificate by the owner of the land joining in and signing the surveyor's
      certificate and adopting the map as true and correct, together with a proper
      acknowledgement thereto.

(m)  A certificate shall read as follows:

      APPROVAL OF THE MONTGOMERY CITY PLANNING COMMISSION

          This plat has been submitted to and considered by the City Planning
      Commission of Montgomery, Alabama, and is approved by such commission.

      The Montgomery City Planning Commission

      By: _____    _____
                  Executive Secretary                        Date

2.   *Protective covenants.* Protective covenants, if any, shall be shown on the final plat.

C.   *Plat and data for planned unit developments.* In addition to the data described above, in
the case of planned unit developments the planning commission shall be furnished a final
development plan at the time of the filing of the preliminary plat. Such final development plan
shall include, but not be limited to:

1.   Comprehensive and detailed plans which include streets, utilities, lots or building
     sites, site plans, and elevations for all buildings as intended to be located, constructed,
     and used in detailed plans for other uses and improvements on the land as related to
     the buildings;

2.   Evidence of provision for operation and maintenance of such areas, improvements,
     facilities, and services as will be for common use by some or all of the occupants of the
     development, but will not be provided, operated, or maintained at general expense;
     and

§ III                    MONTGOMERY CITY CODE

3.  A comprehensive traffic analysis indicating the probable effect of the proposed development on traffic patterns and capacities of adjacent streets in the immediate area.

**Section IV. Design standards.**

A. *Streets.*

1.  The arrangement, character, extent, width, grade and location of all streets shall conform, when reasonable, to the master plan and shall be considered in their relation to existing and planned streets, to topographic conditions, to public convenience and safety, and in their appropriate relation to the proposed uses of land to be served by such streets.

2.  Where such is not shown in the master plan, the arrangements of streets in a subdivision shall either:

    (a)  Provide for continuation or appropriate projection of existing principal streets in surrounding areas; or,

    (b)  Conform to a plan for a neighborhood approved by or adopted by the planning commission to meet a particular situation where topographical or other conditions make continuance of conformance to existing streets impracticable.

3.  Minor streets shall be so laid out that their use by through traffic will be discouraged.

4.  Where a subdivision abuts or contains existing or proposed arterial streets, the planning commission may require marginal access streets, reverse frontage with screen planting contained in a non-access reservation along the rear property line, deep lots with rear service alleys, or such other treatment as may be necessary for adequate protection of residential properties and to afford separation of through and local traffic.

5.  Where a subdivision borders on or contains a railroad right-of-way or limited access highway right-of-way, the planning commission may require a street approximately parallel to it and to use the intervening land on both sides as for park purposes in residential districts, or for commercial or industrial purposes in appropriate districts. Such distances shall also be determined with due regard for the requirements of approach grades and future grade separations.

6.  Street jogs with centerline offsets of less than 125 feet shall be avoided.

7.  Street intersections shall be as nearly at right angles as practicable.

8.  Street rights-of-way and pavement widths shall be as shown in the master street plan, and where not shown therein shall be no less than as follows:

**EXHIBIT**

F



## City of
## Montgomery, Alabama

BOBBY N. BRIGHT
Mayor

MONTGOMERY CITY COUNCIL
MRS. ALICE D. REYNOLDS-Pres.
JAMES A. NUCKLES-Pres. Pro tem
WILLIE COOK
TERANCE D. DAWSON
CHARLES W. JINRIGHT

B. J. (BEN) MCNEILL
P. E. (PEP) PILGREEN
CHARLES W. SMITH

January 20, 2004

Mr. Gregory Gillian
Larry Speaks and Associates. Inc.
544 Martha Street
Montgomery, AL 36104

Dear Mr. Gillian:

This is being written in reference to the construction plans for Chantilly Place East Plat No. 1.  After review of the plans, the Traffic Engineering Department has the following comments:

1. Provide to this office a completed and approved copy of the ALDOT permit.

2. The access agreement parallel to Chantilly Pkwy. (Al. Highway 110) must be extended along the entire length of lot one.

3. Define apparent easement or access on north side of lots 7 and 8, adjacent to those lots.  If easement is to be used as an access by vehicles. the easement must be redefined to intersect the access road at the intersection of the access road and Al. Highway 110.

4. The developer will be responsible for providing all required street lighting, street name signs. and traffic control devices for the access road, street "A" and street "B".  If decorative poles or posts are to be used in the development, then shop drawings of the poles and/or posts must be provided for review and approval.  The final plat will not be approved until all required signs and street lights are installed.

5. The access road cannot extend into ALDOT R.O.W.   Clearly define ALDOT R.O.W. in relation to access road.

6. Provide striping plan for development.

7. The contractor will be responsible for providing a traffic control plan according to the MUTCD during all phases of the construction.

If you have any questions or comments concerning this matter, please call at 241-2910.

Sincerely,

Stuart Manson, Assistant Director
Traffic Engineering Department

SAM/un

cc: *Mr. Mark Waits, Third District Engineer*
    *ALDOT, Sixth Division*

    *Mr. Cecil Cork, City Engineering*

EXHIBIT
G

**STATE OF ALABAMA**

**COUNTY OF MONTGOMERY**

### PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement ("Agreement") is made and entered into by and between:

_Timber Creek LLC_ (hereinafter referred to as "Purchaser"),

and

**Alan and/or Ann J. Bush** (hereinafter referred to as "Seller").

### WITNESSETH:

1. Property. Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase and take from Seller, under and subject to the terms, conditions and provisions hereof, that certain real property consisting of _(Parcel 1 )_ _2.25_ acres lying in Montgomery County, Alabama and which for ad valorem tax purposes is described as Parcel No. _(Parcel 1, Metes & Bounds)_ and more particularly described or shown on Exhibit "A" attached hereto and made a part hereof by reference as if set out in full (hereinafter the "Property"), together with all appurtenances, rights of way, privileges, easements, appurtenances and other rights benefiting or pertaining to the Property and all right, title and interest of the Seller in and to any and lying in the right-of-way in front or adjoining the Property to the centerline thereof. An exact legal description of the Property shall be based on the survey to be obtained or furnished pursuant to Paragraph 6 hereof.

2. Purchase Price. The purchase price for the Property shall be _$3.50 per square foot._ The purchase price shall be payable as follows: _10,000⁰⁰_ _MVL - Non-Refundable AB_

   a. The sum of _$1000.~_ as the "Earnest Money", is to be deposited with **Alan and/or Ann J. Bush** , after Purchaser's receipt fully executed copy of this agreement; and _10,000 Ernest money + 3.50 per Ft. AB_

   b. The balance of the purchase price, after deductions for credits and prorations as herein provided, shall be paid in full at the Closing herein provided by check or cash on the day of Closing. The Earnest Money shall be credited against the purchase price at Closing

   c. The seller agrees to pay a _n/a_ commission fee of the total Sales Price to _n/a_ in full at the time of Closing.

3. Feasibility Period. Within _10_ days after the Effective Date of this Agreement, Seller shall furnish to Purchaser a copy of all the following pertaining to the Property which are in Seller's possession or which Seller has reasonably available to Seller; survey, soils report, environmental report, title report or policy, drainage and utility studies pertaining to the physical condition of the Property, and all documents or instruments pertaining to the physical condition of the Property or that might affect Purchaser's intended use or development of the Property. Purchaser shall have a period of _30 days_ after the Effective Date of this Agreement (the "Feasibility Period") to satisfy itself as to intended use and development thereof. During the Feasibility Period, Purchaser shall have the right to inspect the Property, to conduct a market analysis of the Property and the intended use thereof, to confirm and seek, as necessary, zoning and other governmental land use approvals, permits and licenses with respect to the Property and the intended use thereof, and to otherwise conduct a feasibility review analysis with respect to the Property and the intended use and

1


DEFENDANT'S
EXHIBIT
C-4
BUSH

112.

development thereof. Not withstanding anything contained herein to the contrary, in the event that Purchaser determines, in its sole right to terminate this Agreement at any time on or before the expiration of the Feasibility Period hereunder, this Contract shall cease and terminate and earnest money is to be refunded to Purchaser. Notwithstanding anything herein stated to the contrary, in the event Purchaser desires to extend the Feasibility Period, Purchaser may do so for an additional _____**n/a**_____ period by paying to seller within the feasibility Period the sum of _____**n/a**_____.        If Purchaser elects to close during the extended Feasibility Period, said sum shall be applied to the Purchase Price herein.

In the event that Purchaser determines, in its sole and absolute discretion, that the property is not satisfactory for any reason, Purchaser shall have the sole right to terminate this agreement at any time on or before the expiration of the Feasibility Period provided however, the additional earnest money shall not be refunded to Purchaser, although all other rights and obligations under the contract shall cease and terminate.

4. <u>Governmental Approvals</u>. Purchaser is hereby authorized to seek and obtain any and all permits, licenses, site and development plan approvals, permits and authorizations, zoning approvals, curb-cut approvals, and any and all other approvals or consents as Purchaser may deem necessary in connection with its proposed acquisition, development and use of the Property and Seller agrees to cooperate with Purchaser in such endeavor. If any such applications, approvals or permits are required to be sought in Seller's name, seller shall upon Purchaser's request seek same without cost to Seller. As part of the consideration for Purchaser's payment of the purchase price, Seller shall assign, transfer and convey to Purchaser at Closing all permits, approvals, licenses, site and development plans affecting the Property which Purchaser requests Seller to assign to Purchaser and shall deliver such originals to Purchaser at Closing.

5. <u>Entry Upon Property</u>. Upon execution of this Agreement, Purchaser, its agents, employees and all other persons authorized by it, or any of them, are permitted to enter upon the Property and to obtain and perform such tests, studies and maps as Purchaser may deem necessary or advisable including, but not limited to, percolation, soils, hazardous waste, environmental, and geological tests and studies

6. <u>Survey</u>. Seller shall at Sellers expense procure within thirty (30) days after the Effective Date of this Agreement a current on-site survey and topographical report on the Property prepared by Sellers engineer (the "Surveyor"). The Surveyor and their respective agents, employees and contractors, shall have the right to enter upon the Property for the purposes thereof and also may perform thereon such topographical and soil studies and related engineering tests as Purchaser deems necessary to evaluate its proposed use of the Property. The Surveyor shall also determine the extent and scope of any easements that now affect or benefit the Property. Notwithstanding anything herein stated to the contrary, in the event that Purchaser elects to purchase the property, Purchaser shall be entitled to a credit against the Purchase Price for the reasonable cost of the boundary survey of the Property prepared pursuant to paragraph 6 of the Contract.

7. <u>Abstract of Title</u>. Seller agrees at its cost to furnish to Purchaser within thirty (30) days after the Effective Date of this Agreement, an up-to-date abstract of title of the Property extending back at least sixty (60) years and disclosing good and merchantable fee simple title thereon vested in Seller. Purchaser shall have its attorney examine the abstract of title; provided, however, is Purchaser's requirement that the abstract of title disclose Seller as present owner of fee simple title to the Property without exception except for ad valorem taxes not yet due and payable, any existing mortgage (from which the property shall be released at closing) and such other easements and exceptions as Purchaser may, in its sole and absolute discretion, waive in writing (the "Permitted Exceptions"). If the abstract of title discloses a defect or defects in title to either the Property or discloses easements or other exceptions that Purchaser is unwilling to waive, then Purchaser agrees to notify Seller of such matters and Seller shall proceed to cure such matters at Seller's expense.        If said matters are not cured within twenty (20) days after notice, then Purchaser may grant Seller additional time to cure the defects and, further Purchaser may, at any time thereafter, at is option in writing waive such defect or unacceptable easements or other exceptions or cancel this Agreement, in which case of the latter event, Seller shall immediately refund to Purchaser the Earnest Money paid hereunder. Seller represents that it presently owns fee simple title to the Property, except for any existing mortgage which Seller covenants to have released with respect to the

2

Property at the time of closing, and will not permit any change in the status of the title to the Property until this Agreement has been consummated or otherwise terminated in accordance with the terms hereof. Risk of loss prior to closing shall be borne by Seller.

8. Closing. Subject to the satisfaction of all the conditions hereof or the waiver in writing thereof by Purchaser, the date of Closing shall be the date that is ___1___ days after the end of the Feasibility Period unless such date is a Saturday, Sunday or legal holiday, in which event the date shall be extended to the next business day. The sale shall be closed in Montgomery County, Alabama at the office of Purchaser's attorney. At Closing Seller shall deliver to Purchaser a Warranty Deed containing the usual and customary full covenants utilized in general warranty deeds in Montgomery County, Alabama, conveying a good and merchantable, indefeasible fee simple title in and to the Property subject only to Permitted Exceptions, and Purchaser shall be surrogate to all rights and actions of Seller against all former owners and vendors. The description used in the Deed shall be one and the same and shall coincide with the survey. Seller shall pay at closing, by deduction from the purchase price, any and all expenses herein provided to be paid by Seller and the cost of preparing the Deed. Purchaser shall pay to record its Deed. Ad Valorem taxes and utilities, if may, shall be prorated as of Closing.

Any assessments whether due or not, levied against the Property shall be paid in full by Seller at Closing. At Closing, Purchaser shall pay the balance of the purchase price, subject to adjustments and credits as herein provided, and the Earnest Money shall be applied and credited to the purchase price. Each party shall bear its own attorney's fees. Seller shall also execute and deliver at Closing such affidavits of title, lien and possession as may be required by Purchaser, a FIRPTA Affidavit, and appropriate 1099 forms. Except for the right of entry granted herein, possession shall be given to Purchaser on the Closing Date, free and clear of all tenancies and parties in possession.

9. Default: Remedies. Seller has complied with all of its obligations herein contained and all of Seller's representations and warranties are true and correct, and all of the conditions herein have been met to Purchaser's satisfaction or waived in writing by Purchaser, but Purchaser fails to proceed with the purchase of said Property, then Seller shall have the right of specific performance or any other right or remedy on account of a default by Purchaser and shall have the right to declare the Earnest Money forfeited to Seller as liquidated damages. If Seller defaults, violates, or breaches any of its warranties, covenants, obligations and representations and warranties herein provided, then in such event Purchaser may declare this Agreement canceled and of no further force and effect and promptly receive a return of the Earnest Money, or Purchaser shall have the right of specific performance or any other right or remedy on account of a default by Seller.

10. Assignment. This Agreement may be assigned by Purchaser and all powers, rights, and privileges herein reserved and given to Purchaser or the Seller shall inure to the benefit of and be held by the respective successors and assigns of the parties, and all liabilities or obligations imposed on each shall be binding upon the respective heirs, successors and assigns of the parties. The Purchaser will notify the Seller in writing of any Assignment of this contract.

11. Environmental Concerns. Notwithstanding anything contained in this Agreement to the contrary in the event that, as a result of Purchaser's investigation, "hazardous substances(s)", hazardous waste (s)" or hazardous material(s)", as defined under applicable federal or state law, or both, are found on the Property, then Purchaser shall have the right, at its option and election at any time, to terminate this Agreement and to receive a return of the Earnest Money; it being a condition precedent to Purchaser's obligation to purchase the Property that the results of Purchaser's environmental studies, reveal that the Property is free from any and all `hazardous substance(s)", "hazardous waste(s)" or "hazardous material (s)", as defined under applicable federal or state law, or both, provided such environmental studies are performed during the Feasibility Period. Purchaser, its agents and representatives, are hereby authorized to perform any and all studies, tests and inquiries as it may deem appropriate or necessary in furtherance of the foregoing, including entering upon the Property and performing tests and studies thereon. Seller agrees that Purchaser may make inquiry of pertinent governmental and administrative bodies and agencies concerning environmental violations or citations regarding the Property.

3

12. <u>Condemnation.</u> Seller covenants and agrees there is no pending or threatened condemnation or similar proceeding affecting the Property or any portion thereof, nor has Seller acknowledged that any such action is presently contemplated. Should any entity having the power of condemnation decide prior to the time of Closing to acquire any portion of or interest in the Property, Purchaser, at Purchaser's sole option, may elect to (a) terminate Purchaser's obligation to purchase the Property, by giving written notice to Seller at any time prior to the time of Closing and receive back all sums paid hereunder, or (b) complete the purchase of the Property with Seller immediately appointing Purchaser its attorney in fact to negotiate with said condemning entity and assigning to Purchaser all sums to be awarded.

13. <u>Notices.</u> Any notice permitted or required to be given hereunder shall be made in writing and sent to receiving party at the address set forth below by Certified Mail, return receipt requested, and shall be deemed given by either party to the other when the same is deposited in the United States Mail as certified, return receipt requested with postage prepaid sufficient to deliver to its addressed destination whether or not the receiving party receives the same. The address of the parties is as follows:

**SELLER:**                                        **PURCHASER:**
Alan and/or Ann J. Bush

Timber Creek LLC

14. <u>Agency Disclosure.</u>

<u>AGENCY DISCLOSURE</u> (Required per Code of Alabama 34-27-8c)

<u>Print Name of Listing Company</u>:

The Listing Company is:                          **(Two blocks may be checked)**
   o  An agent of the Seller
   o  An agent of Purchaser
   o  An agent of both the Seller and The Purchaser as is acting as a limited consensual dual agent
   o  Assisting the Purchaser Seller as a transaction broker

<u>Print Name of Selling Company</u>:

The Selling Company is:                          **(Two blocks may be checked)**
   o  An agent of the Seller
   o  An agent of Purchaser
   o  An agent of both the Seller and The Purchaser as is acting as a limited consensual dual agent
   o  Assisting the Purchaser Seller as a transaction broker

Seller(s) initials _____                Purchaser(s) initials_____

15. <u>Miscellaneous.</u>

(a) Seller warrants and represents to Purchaser as follows, which representations and warranties shall expressly service hereunder:

That Seller owns fee simple title to the Property and has the power and authority to enter into this Agreement, and the entering into of this Agreement and the performance of Seller's obligations hereunder shall not violate the terms or conditions of any applicable law, rule or regulation pertaining to Seller or the Property.

(b) In the event it becomes necessary for either Seller or Purchaser to employ the services of an attorney to enforce any term, covenant or provisions of this Agreement, then each party agrees that the non-prevailing party shall pay the reasonable attorney's fees incurred by the prevailing party in enforcing this Agreement.

(c) This Agreement constitutes the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties with respect to the Property. It is expressly agreed that there are no verbal understandings or agreements which in any way change the terms, covenants, and conditions herein set forth, and that no modification of this Agreement and no waiver of any of its terms and conditions shall be effective unless made in writing and duly executed by the parties hereto.

(d) All personal pronouns used in this Agreement whether used in masculine, feminine, or neuter gender, shall include all other genders, the singular shall include the plural, and vice versa.

(e) Any provision of this Agreement or any paragraph, sentence, clause, phrase or wording appearing herein which shall prove to be invalid, void or illegal for any reason shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions, paragraphs, sentences, clauses, phrases and words hereof shall nevertheless remain in full force and effect.

(f) Contract is contingent upon the purchaser obtaining the financing he/she is seeking. If these conditions are not met, the purchaser has the sole right to terminate this contract, and all monies returned immediately with the purchaser having no further obligations or liabilities. The Purchaser will secure financing during the feasibility period.

(g) This Agreement shall be construed and enforced in accordance with the laws of the Sate of Alabama.

(h) The submission of this Agreement, executed by Purchaser, shall not be deemed a continuing offer to enter into this Agreement shall be effective only upon the execution and delivery thereof by both Seller and Purchaser on or before as used herein the "Effective Date of this Agreement" shall be the last date of execution of this agreement by the parties comprising Seller and the Purchaser.

(i) It is understood and agreed between the Seller and the Purchaser that, in order to facilitate a tax-free exchange acquisition of the Property for the benefit of the Purchaser, the Seller will cooperate fully with the Purchaser in making such exchange, and execute such documents as may be required. Provided, however, that in no event shall the Seller be requested or required to incur any additional cost or expense, risk or liability, in assisting the Purchaser in effecting an exchange of property.

(j) This offer expires at _____, _____N/A_____.

IN WITNESS WHEREOF, the parties have hereunto executed this Agreement on this ___5TH___ Day of ___FEBRUARY, 2004___.

WITNESS:                          PURCHASER:

_____         By:_____Timber Creek LLC_____

                                  Its:___As its Manager___

WITNESS:                          SELLER:

_____         Alan and/or Ann J. Bush

                                  _____

                                  _____

5

A. Settlement Statement

U.S. Department of Housing
and Urban Development

Parnell & Crum. P.A.



OMB No. 2502-0265

**B. Type of Loan**

| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ Conv. Unins. | 6. File Number W-35518 | 7. Loan Number | 8. Mortgage Insurance Case Number |
| 4. ☐ VA | 5. ☐ Conv. Ins. | | | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| Timbercreek, L.L.C.<br>104 Timberlane Road<br>Pike Road, AL 36064 | Alan Bush<br>Ann J. Bush | Compass Bank<br>701 South 32nd Street<br>Birmingham, AL 35233 |

| G. Property Location | H. Settlement Agent | Matthew T. Ellis |
|---|---|---|
| 2.25 acres Montgomery County | | TIN-63-0761852 |
| Montgomery, AL | Place of Settlement | Phone: (334)832-4200 | I. Settlement Date |
| Montgomery County, AL | 641 South Lawrence Street | 2/25/04 |
| Metes and Bounds | Montgomery, Alabama 36104 | |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract sales price | 353,794.50 | 401. Contract sales price | 353,794.50 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 2,397.00 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments for items paid by seller in advance* | | *Adjustments for items paid by seller in advance* | |
| 106. City/town taxes        to | | 406. City/town taxes        to | |
| 107. County taxes        to | | 407. County taxes        to | |
| 108. Assessments        to | | 408. Assessments        to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due From Borrower** | 356,191.50 | **420. Gross Amount Due To Seller** | 353,794.50 |
| **200. Amounts Paid By Or In Behalf Of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. Deposit or earnest money | 10,000.00 | 501. Excess deposit (see instructions) | 10,000.00 |
| 202. Principal amount of new loan(s) | 355,000.00 | 502. Settlement charges to seller (line 1400) | 10,475.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments for items unpaid by seller* | | *Adjustments for items unpaid by seller* | |
| 210. City/town taxes        to | | 510. City/town taxes        to | |
| 211. County taxes 10/01/03 to 2/25/04 | 198.45 | 511. County taxes 10/01/03 to 2/25/04 | 198.45 |
| 212. Assessments        to | | 512. Assessments        to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | 365,198.45 | **520. Total Reduction Amount Due Seller** | 20,673.45 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross amount due from borrower (line 120) | 356,191.50 | 601. Gross amount due to seller (line 420) | 353,794.50 |
| 302. Less amounts paid by/for borrower (line 220) | ( 365,198.45 ) | 602. Less reductions in amt. due seller (line 520) | 20,673.45 ) |
| **303. Cash** ☐ From ☒ To Borrower | 9,006.95 | **603. Cash** ☒ To ☐ From Seller | 333,121.05 |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained in Blocks E, G, H and I, lines 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

Timbercreek, L.L.C.
By: _____
Merrill H. Ingram, Member

Alan Bush

Ann J. Bush

**DEFENDANT'S
EXHIBIT**

C5

Previous Edition is Obsolete
DCMU005 Initial(s) _____

FIRST DATA SYSTEMS, INC.
FDS (Rev. 12/92)

RESPA, HB 4305.2; HUD-1 REV. (3/86)
1-615-361-8404

L.    Settlement Charges

| 700. Total Sales/Broker's Commission based on price $ | @ | %= | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|
| Division of Commission (line 700) as follows: | | | | | |
| 701. $ | to | | | | |
| 702. $ | to | | | | |
| 703. Commission paid at Settlement | | | | | |
| 704. | | | | | |
| **800. Items Payable In Connection With Loan** | | | | | |
| 801. Loan Origination Fee | .2500 % Compass Bank | | | 887.50 | |
| 802. Loan Discount | % | | | | |
| 803. Appraisal Fee to | | | | | |
| 804. Credit Report to | | | | | |
| 805. Lender's Inspection Fee to | | | | | |
| 806. Mortgage Insurance Application Fee to | | | | | |
| 807. Assumption Fee to | | | | | |
| 808. | | | | | |
| 809. | | | | | |
| 810. | | | | | |
| 811.  Assignment Fee to Robert Wells | | | | | 10,000.00 |
| **900. Items Required By Lender To Be Paid In Advance** | | | | | |
| 901. Interest from | to | @ $ | /day | | |
| 902. Mortgage Insurance Premium for | | months to | | | |
| 903. Hazard Insurance Premium for | | years to | | | |
| 904. Flood Insurance Premium for | | years to | | | |
| 905. | | | | | |
| **1000. Reserves Deposited With Lender** | | | | | |
| 1001. Hazard insurance | months @ $ | | per month | | |
| 1002. Mortgage insurance | months @ $ | | per month | | |
| 1003. City property taxes | months @ $ | | per month | | |
| 1004. County property taxes | months @ $ | | per month | | |
| 1005. Annual Assessments | months @ $ | | per month | | |
| 1006. Flood Insurance | months @ $ | | per month | | |
| 1007. | months @ $ | | per month | | |
| 1008. | months @ $ | | per month | | |
| 1009. | months @ $ | | per month | | |
| 1010. | months @ $ | | per month | | |
| **1100. Title Charges** | | | | | |
| 1101. Settlement or closing fee to | | | | | |
| 1102. Abstract or title search    to  State Abstract | | | | | 110.00 |
| 1103. Title examination    to  Parnell & Crum | | | | | 300.00 |
| 1104. Title insurance binder    to | | | | | |
| 1105. Document preparation    to | | | | | |
| 1106. Notary fees    to | | | | | |
| 1107. Attorney's fees    to | | | | | |
| (includes above item numbers: | | | ) | | |
| 1108. Title insurance    to  Mississippi Valley / PCA | | | | 940.00 | |
| (includes above item numbers: | | | ) | | |
| 1109. Lender's coverage    $ | | | | | |
| 1110. Owner's coverage    $ | | | | | |
| 1111.  Deed Prep to Parnell & Crum, P.A. | | | | | 65.00 |
| 1112. | | | | | |
| 1113. | | | | | |
| **1200. Government Recording and Transfer Charges** | | | | | |
| 1201. Recording fees: Deed $  11.00 | ; Mortgage $  26.00 | ; Releases $ | | 37.00 | |
| 1202. City/county tax/stamps: Deed $ | ; Mortgage $  532.50 | | | 532.50 | |
| 1203. State tax/stamps: Deed $ | ; Mortgage $ | | | | |
| 1204. | | | | | |
| 1205. | | | | | |
| **1300. Additional Settlement Charges** | | | | | |
| 1301. Survey    to | | | | | |
| 1302. Pest inspection to | | | | | |
| 1303. | | | | | |
| 1304. | | | | | |
| 1305. | | | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | | 2,397.00 | 10,475.00 |

SELLER INSTRUCTIONS:  If this real estate was your main home, file Form 2119, even if you had a loss or did not replace it.  If not your main home, use the applicable parts of Forms 4797, 6252 and/or 1040 (Schedule D).  You may have to recapture all or part of a Federal mortgage subsidy, if you sold a Federally-subsidized home.  This may increase your tax.  See Form 8828, Recapture of Federal Mortgage Subsidy and Pub. 523, Selling Your Home.

MONTHLY PAYMENT

Timbercreek, L.L.C.                    Alan Bush

By: _____       _____
Merrill H. Ingram, Member              Ann J. Bush

| | |
|---|---|
| TAXES | .00 |
| PMI/MIP | .00 |
| HAZARD/FLOOD INSURANCE | .00 |
| TOTAL ESCROW | .00 |
| P&I | .00 |
| MONTHLY PAYMENT | .00 |

FIRST PAYMENT DUE

Initial(s) _____ W-35518
DCMU005

FIRST DATA SYSTEMS, INC.
FDS (Rev. 12/92)

HUD-1, REV. (3/86)
1-615-361-8400



This is to certify that the attached documents are a true and correct copy of the minutes from the Pike Road Town Council on July 2, 2007 and an ordinance adopted during such meeting as requested.

*Charlene N. Rabren*
Charlene H. Rabren, Clerk
Town of Pike Road

*Feb. 28, 2008*
Date



ORDINANCE 2007-0111

STATE OF ALABAMA
MONTGOMERY COUNTY
TOWN OF PIKE ROAD

AN ORDINANCE ALTERING AND ENLARGING THE CORPORATE LIMITS OF THE TOWN OF PIKE ROAD BY INCLUDING WITHIN THE BOUNDARIES OF THE TOWN OF PIKE ROAD THAT TERRITORY OF REAL PROPERTY AS DESCRIBED HEREIN IN THIS ORDINANCE.

BE IT ORDAINED by the Town Council of the Town of Pike Road, Alabama as follows:

Section 1. Findings by the Town Council of the Town of Pike Road, Alabama. The Town Council (hereinafter referred to as "the Council) of the Town of Pike Road (hereinafter referred to as "Pike Road"), in the State of Alabama, has caused investigations to be made of the matters hereinafter referred to and, on the basis of the facts disclosed by such investigations, does hereby find and declare that the following are true statements of facts:

(a) The Town is an incorporated municipality under the laws of Alabama and is located wholly within the limits of Montgomery County in said State. The real property hereinafter particularly described in Section 2 of this Ordinance is owned by the owners of property as shown on the petition for annexation which is attached as Exhibit 1, and there are no other owners thereof. The said real property lies within the County of Montgomery, and the boundary of the said real property is contiguous and adjacent to, and borders on, the corporate limits of the Town. The said real property does not lie within the corporate limits of any other municipality. The said real property lies within the police jurisdiction of both the Town of Pike Road and the City of Montgomery. The said real property does not cross a boundary which is equidistant from the respective corporate limits of the City of Montgomery and the Town of Pike Road

(b) The Council is the governing body of the Town of Pike Road and is of the opinion that it will be in the best interest of the Town and the inhabitants thereof if the said real property should be annexed to the Town and the corporate limits of the Town should be extended and rearranged so as to embrace and include the said real property so that, from and after publication of this Ordinance, the said real property will, in its entirety, be wholly within the boundaries of and will be a part of the corporate area of the Town, all pursuant to the provisions of §11-42-21, Code of Alabama 1975, as amended.

(c) A written petition by the owners of the property has been filed with the Town Clerk of the Town pursuant to §11-42-21, Code of Alabama 1975, as amended, in which petition it is requested that the said real property be annexed to the Town and the corporate limits or boundaries of the Town be extended and rearranged so that the said real property or territory not now within the corporate boundaries of the Town shall be embraced and included therein, all as shown on the map attached to said petition as Exhibit A and the description as shown in Section 2.

Section 2. Description of Property. The said real property is described as:

LEGAL DESCRIPTION: PIKE ROAD ANNEXATION AREA.

Parcel 09062404003001.000 of the W ½ of the SE 1/4 of Section 24 lying South of the Seaboard coastline RR and N of Chantilly Parkway containing 2.5 acres more or less. Parcel 09062404001002.000 of the SE 1/4 of Section 24 containing 44.33 acres and parcel 09062401004003.000 of the NE 1/4 of Section 24 and containing 7 acres more or less all in Township 16N Range 19E of Montgomery County, Alabama.

Section 3. <u>Assent by Council to Annexation</u>. By the adoption of this Ordinance, the Council, as the governing body of the Town, does assent to the annexation of the said real property to the Town, and does hereby direct that upon this Ordinance becoming effective, the corporate town limits of the Town shall be extended and rearranged so as to embrace and include the said real property, which shall become a part of the corporate area of the Town upon the date of publication of this Ordinance.

Section 4. <u>Filing of Description</u>. That a description of the property or territory annexed and incorporated be filed in the Office of the Judge of Probate in Montgomery County, Alabama.

Section 5. <u>Publication and Effective Date of This Ordinance</u>. Within five days of the time a certified copy of the annexation ordinance, Petition and map is filed, the Town shall give notice by publication in a newspaper of general circulation. This Ordinance shall become effective upon the date of publication.

ADOPTED AND APPROVED this the 2ND day of JULY , 2007.



_____
GORDON STONE, MAYOR

_____
Councilman

_____
Councilman

_____
Councilman

_____
Councilman

_____
Councilman

ATTEST:

_____
CHARLENE RABREN, TOWN CLERK

PETITION FOR ANNEXATION

TO:  The Mayor and Town Council of the Town of Pike Road, Alabama, a municipal

corporation, located in Montgomery County, State of Alabama.

The undersigned Petitioners, pursuant to §11-42-20 through §11-42-24, Code of

Alabama 1975, as amended, respectfully petition the Mayor and Town Council of the

Town of Pike Road, Alabama for annexation to the Town of Pike Road of the following

described unincorporated territory or property in the County of Montgomery, State of

Alabama, to wit:

**LEGAL DESCRIPTION:**

Parcel 09062404003001.000 of the W ½ of the SE 1/4 of Section 24 lying South
of the Seaboard coastline RR and N of Chantilly Parkway containing 2.5 acres more or
less. Parcel 09062404001002.000 of the SE 1/4 of Section 24 containing 44.33 acres and
parcel 09062401004003.000 of the NE 1/4 of Section 24 and containing 7 acres more or
less all in Township 16N Range 19E of Montgomery County, Alabama.

1.  That the territory or property described above lies within the police

jurisdiction of the Town of Pike Road .

2.  That the territory or property described above abuts upon and is contiguous to

the corporate limits of the Town of Pike Road.

3.  That the undersigned Petitioners are the sole owners of the territory or

property described above and requested to be annexed.

4.  This Petition is accompanied by a map or plat of the said territory to be

annexed, showing with reasonable certainty the territory to be annexed, the

boundaries thereof, and its relationship to the established corporate limits of

the Town of Pike Road.  The map or plat is attached as Exhibit A.

WHEREFORE, Petitioners respectfully request that the territory or property described above be annexed to the Town of Pike Road, Alabama and that the governing body of said Town of Pike Road adopt an ordinance assenting to this annexation and take such action as is appropriate in the premises.

Dated this the 2nd day of July, 2007.

Signatures of Petitioners attached hereto by separate pages

Name of owner/owners _Alden & Betty Kay Webb_

Address or description of property _Lot 11 of Antioch Plans Plat Book 4 page 83_

Signature of owner/owners _Alden Webb  Betty Kay Webb_

Date of signature _6/4/07_

± 7.2 Acres that Adjoins Lafayette @ Chantilly Property was purchases ± 2 weeks Ago from the "Beoarz" Family.

Name of owner/owners _Lafayette at Chantilly, inc_

Address or description of property _Chantilly Parkway, 41 +/- Acres_

Signature of owner/owners _Jordien D Hall, President_

_Lafayette at Chantilly, inc_

Date of signature _5/4/07_

Lafayette at Chantilly, inc and HJR LLC

Name of owner/owners _Georgetowne Development, LLC_

Address or description of property _Chantilly Parkway, 2.49 Acres_

Signature of owner/owners _Andrew D Hall, President_

Date of signature _6/4/07_

STATE OF ALABAMA

MONTGOMERY COUNTY

TOWN OF PIKE ROAD

I, the Undersigned, Gordon Stone, Mayor of the Town of Pike Road, Alabama, hereby certify that the petition hereto attached is that petition referred to in Ordinance 2007-0111 adopted by the Town Council of the Town of Pike Road, Alabama, on the 2nd day of July, 2007 and that Petition is attached to Ordinance 2007-0111 as Exhibit 1.

IN WITNESS WHEREOF, I have affixed my signature as Mayor of the Town of Pike Road, Alabama, and have caused the official seal of the Town to be hereunto affixed and this certificate to be attested by Charlene Rabren as Town Clerk of the Town of Pike Road, Alabama, on this the 2nd day of July, 2007.

Gordon Stone, Mayor
Town of Pike Road

Attest:

Town Clerk



MAP LEGEND
Exhibit A
TOWN OF PIKE ROAD
JULY 2007 Annexation

Existing Town Limits

A    Proposed Area

STATE OF ALABAMA

MONTGOMERY COUNTY

TOWN OF PIKE ROAD

    I, the Undersigned, Gordon Stone, Mayor of the Town of Pike Road, Alabama, hereby certify that the map hereto attached is the map referred to in Ordinance 2007-0111 adopted by the Town Council of the Town of Pike Road, Alabama, on the 2ND day of July, 2007, and that said map is attached as Exhibits A, to the Petition for Annexation which is attached to Ordinance 2007-0111 as Exhibit 1 shows the territory proposed to be brought within the corporate limits of the Town of Pike Road, Alabama, as described and set forth in said ordinance.

    IN WITNESS WHEREOF, I have affixed my signature as Mayor of the Town of Pike Road, Alabama, and have caused the official seal of the Town to be hereunto affixed and this certificate to be attested by Charlene Rabren as Town Clerk of the Town of Pike Road, Alabama, on this the 2nd day of July, 2007.

Gordon Stone , Mayor
Town of Pike Road, Alabama

Attest:

Town Clerk

I, Charlene Rabren, Clerk for the Town of Pike Road hereby certify the foregoing ordinance was published according to sec. 11-45-8, Al code.

*Charlene Rabren*

Charlene Rabren, Town Clerk
Town of Pike Road

Ordinance Number 2007-0111    Date adopted July 2, 2007

Legal published in Montgomery Independent

**MINUTES FOR TOWN OF PIKE ROAD**
**REGULAR MEETING**
**MONDAY, JULY 2, 2007**
**7:30 P.M**
**PIKE ROAD BAPTIST CHURCH**
**(Date and place of meeting changed due to holiday schedules and to accommodate**
**large crowd expected for announcements)**
**Notices were placed around the town beginning June 28, 2007.**

Present
Mayor Gordon Stone, Councilmen: Chris Dunn, Jay Hinton, Wayne Rabren, Rob Steindorff, and
Lee Tolliver
Quorum established.

Staff Present:
Clerk; Charlene Rabren, Mary Catherine Bargainer, and
Building and Planning Official Buddy Garland

Mayor Stone called the meeting to order at 7:40 p.m. Councilman Steindorff opened the meeting with prayer. Mayor Stone led the group in the pledge of allegiance.

Consideration of the minutes; Councilman Chris Dunn moved to accept minutes of the June 2007 regular meeting as received. Second from C. Steindorff. Unanimous consent was given.

Due to the date change of the meeting the statement of accounts not ready for review. Bank statements are due to drop on the 5 of July. Statements will be distributed to council members later in the month.

**Reports-**

**Trail Committee-** Councilman Rabren reported that the town has secured a transportation enhancement grant from the Alabama Department of Transportation for construction of a multi-use natural trail spanning 15 miles through the community. The trail will run along Meriwether Road to Pike, on to Old Pike along Mathews and end on Flowers Road. Mayor Stone has appointed a citizen advisory committee, which held their first meeting June 12 and will meet again July 10 at town hall.

**Summer Fest-** Andrew Gerachis, Chairman of the July 4th event gave an overview of the celebration to be held at The Waters and co-sponsored by the town and The Waters. Time for the event will be 5:30 and will conclude with fireworks at dark. Gerachis asked for volunteers.

**Leadership Pike Road-**Carol Miller, special assistant to the mayor reported on Leadership Pike Road and their second meeting held this afternoon at 5:30. Program designed to give residents the opportunity to learn about their town and in turn the town to hear from residents. Group met earlier with members of the Pike Road Education Committee.

**OLD BUSINESS-**

Mayor Stone shared updates of the Economic and Community Development Plan.

Planning- the town architects have presented updated land use and sector maps which will be reviewed in a public hearing in August 13th.

Services- Mayor Stone commended the excellent job done by the volunteer fire departments of the area.

Schools- Mayor Stone recognized Councilman Rob Steindorff and the Dr.'s Land and Mills for the excellent work done by the education committee on the curriculum. The PRSET DVD was viewed and

well received by the audience. Mayor Stone shared that a great amount of citizen input has gone into this project. C. Steindorf was recognized for comments.

C. Steindorff shared comments about the school project and then presented to the council for consideration Resolution 010-2007- a resolution adopting the Patriot as the Pike Road School Mascot. Discussion with favorable comments followed. Councilman Rabren seconded. Unanimous consent was given. The mayor then read the Patriot poster and challenge written by Mayor Stone.

## NEW BUSINESS

### Consideration of ordinances and resolutions

**Resolution 011-2007**, a resolution authorizing the mayor to execute the trail grant on behave of the town was presented. Motion to adopt by C. Rabren. Second by C. Dunn. Unanimous consent was given.

**Consideration of petitions for annexation were presented.** Area for consideration was the Chantilly Parkway area beginning at the intersection of Vaughn and Chantilly. To include the properties of Lester Hall, and developments on the east side. Developments called Georgetown and Lafayette belonging to Andrew Hall and David Webb. These gentlemen were recognized and thanked for their confidence in the Town of Pike Road. C. Hinton moved to suspend with the rules for consideration. C. Tolliver seconded. **Ordinance 2007-0109** was presented for consideration. Property included is the area adjoining William Martin and a portion of the railroad bed. C. Hinton moved to adopt. Second by C. Steindorff. Unanimous consent was given.

A second petition for annexation was presented. Area for consideration was the area on the west side of Chantilly Parkway, with properties fronting Chantilly Parkway and Vaughn Road west of the Vaughn/Chantilly intersection. Properties owned by Lester Hall and Chantilly Developments. C. Hinton moved to suspend with the rules. C. Dunn seconded. Unanimous consent was given. **Ordinance 2007-0110** was presented for consideration. C. Dunn moved to adopt. C. Hinton seconded. Unanimous consent was given.

A third petition for annexation was presented. Area for consideration was the area on the east side of Chantilly to be developed as a commercial center and a residential area known as Georgetown and Lafayette. C. Rabren moved to suspend with the rules. C. Hinton seconded. Unanimous consent was given. **Ordinance 2007-0111** was presented. C.Rabren moved to adopt. C. Tolliver seconded. Unanimous consent was given.

**Announcement-** Mayor Stone added comments relating to the great opportunity we have had to plan and dream about what our town can be. He added that he and the council had also realized that to make our dreams a reality we must have retail establishments. With these comments he announced and flashed on a screen the Home Depot logo and their commitment to be in the Town of Pike Road. The announcement was met with cheers from the audience. Mayor Stone added that Home Depot is the first nationally known company to commit to the Town of Pike Road. While it was noted that Home Depot is not yet contiguous to the town limits the town is working diligently to acquire the consent of the adjoining landowner.

PRICE Foundation- C. Hinton announced and encouraged citizens to give to the foundation, which is a 501-3C fund for raising monies for community projects.

Public Comment- Council Rabren added special thanks to our mayor for his dedication to our town. Citizen comment by Jim Cowen, who also extended genuine thanks to the mayor and council for their many hours of work and dedication.

Garrett Cook a resident presented to the public attendee's a petition to distribute to residents and friends of Pike Road for signatures showing support of the Home Depot and their desire to become part of the Town of Pike Road. Mr. Cook hopes to obtain 5,000 signatures to present to the landowners of property blocking the annexation of Home Depot.

Reminders of the 4th of July Parade at 10 a.m. beginning at the Pike Road Baptist Church and Summer Fest at 5:30 p.m. at The Waters. Have a safe holiday.

Adjourn- With no further business the meeting was adjourned.


Respectfully Submitted;                                    Attest:

*Charlene Rabren*                                          *[signature]*

Charlene Rabren                                            Gordon Stone
Clerk                                                      Mayor



EXHIBIT

*I*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

| | |
|---|---|
| FOREST GLEN, L.L.C. and TIMBER CREEK, L.L.C., | ) Case No.: 2:07-CV-836 |
| | ) |
| | ) **AFFIDAVIT OF STUART MANSON** |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| CITY OF MONTGOMERY, and THE WATER WORKS AND SANITARY SEWER BOARD FOR THE CITY OF MONTGOMERY, | ) |
| | ) |
| | ) |
| Defendant | ) |
| | ) |
| | ) |

STATE OF ALABAMA

COUNTY OF MONTGOMERY

     In person appeared before the undersigned officer, duly authorized to administer

oaths, Stuart Manson, who, after being duly sworn, states under oath as follows:

     1.     I am the Assistant Director for the Traffic Engineering Department of the

City of Montgomery, and I have personal knowledge of the facts set forth in this

affidavit. I am an adult resident citizen of the State of Alabama and am competent to

testify to the matters set forth herein.

     2.     Alabama Highway 110, also known as Chantilly Parkway, is a state

highway. The Alabama Department of Transportation alone dictates the quantity and

location of median cross-overs. The City of Montgomery has no jurisdiction whatsoever

to make such decisions. The City of Montgomery's powers begin at the point where the

state right-of-way ends, and the Montgomery Planning Commission must plan for

entrances and exits into and out of the state right-of-way based upon the Department of

Transportation's placement of intersections, cross-overs, and traffic signals.

    3.      Further, the affiant saith not.

_Stuart Manson_
Stuart Manson

STATE OF ALABAMA

COUNTY OF MONTGOMERY

    I, the undersigned notary public in and for said county in said state, hereby certify that Stuart Manson, whose name is signed to the foregoing affidavit, and who is known to me, after being fully informed of the contents of the instrument, signed and executed the same voluntarily after first being duly sworn by me on the date set forth below.

    GIVEN under my hand and official seal, this ___1st___ day of

___May_____, 2008.

_____
NOTARY PUBLIC

My Commission Expires: _____

NOTARY PUBLIC STATE OF ALABAMA AT L/
MY COMMISSION EXPIRES: Sept 23,
BONDED THRU NOTARY PUBLIC UNDERWRI

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

FOREST GLEN, L.L.C.,                    )
an Alabama Limited Liability Company,   )
and TIMBERCREEK, L.L.C., an             )
Alabama Limited Liability Company,      )
                                        )
        Plaintiff,                      )
                                        )
vs.                                     )        Civil Action Case No. CV 07-1246
                                        )
CITY OF MONTGOMERY and                  )
THE WATER WORKS &                       )
SANITARY SEWER BOARD OF                 )
THE CITY OF MONTGOMERY,                 )
                                        )
        Defendants.                     )

FILED
CIRCUIT COURT OF
MONTGOMERY COUNTY
2007 AUG -8 AM 9:19

## COMPLAINT

1.      Forest Glen, L.L.C. and TimberCreek, L.L.C. ("Plaintiffs') are Alabama limited

liability companies with their principal places of business in Montgomery County, Alabama.

Plaintiffs own commercial real estate properties along Chantilly Parkway in Montgomery

County, Alabama. Specifically, Plaintiffs are involved in the ownership and development of that

certain commercial real estate development called "Chantilly Place" along Chantilly Parkway in

Montgomery County, Alabama, which runs between Interstate 85 at the Mitylene Exit and

Vaughn Road.

2.      As part of Plaintiffs' development of Chantilly Place, Defendants required

Plaintiffs to build and construct, at Plaintiffs' expense, an access or service road along Plaintiffs'

property boundaries and Chantilly Parkway.   Plaintiffs built said service/access road as

instructed.  They did so at significant expense to Plaintiffs in construction costs and the sacrifice

of significant portions of Plaintiffs' frontage property along Chantilly Parkway.  Defendants



EXHIBIT
J

through Stuart Manson, Assistant Director/City of Montgomery Traffic Engineering Department, Mark Waites, Alabama Department of Transportation, Cecil Cork, City of Montgomery Engineering Department and others, repeatedly informed Plaintiffs that the service road was required and that all landowners along Chantilly Parkway would be required to build service roads, because they – on behalf of the Defendants – did not want "another Atlanta Highway."

3.      Once the service road was completed, Defendants later informed Plaintiffs they would also have to extend said service road to the end of Plaintiffs' property along Chantilly Parkway and to install at its expense, sanitary sewer lines along said service road and to the extension thereof to the end of Plaintiff's properties. Defendants informed Plaintiffs that they were being required to do so as a part of the general development plan of Chantilly Parkway. Defendants refused to approve Plaintiffs' development plan until the extension of the service road and sewer line was completed. Additionally, at one point, one of Plaintiffs' lot owners, was refused a building permit and was told none would be issued until the service road and sewer lines were extended to the far end of Plaintiffs' property. Plaintiffs were also told by Defendants that the adjoining landowner along Chantilly Parkway would be required to extend the service road and sewer lines along that adjoining landowner's property at least to the next median "crossover" on Chantilly Parkway.

4.      As a result of Defendants' demands, Plaintiffs spent the required money and extended the service road and sewer lines to the farthest end of its property in reliance on those demands and assurances that the adjoining property owner would be required to do the same, and Plaintiffs would have an outlet along said service road to Chantilly Parkway.

5.      After having been required to use large portions of its property frontage and to spend those monies to construct the service road and extend the sewer lines, Plaintiffs have now

2

learned that Defendants are not requiring the adjoining landowners to extend the service road or sewer line, and Plaintiffs are stuck with a dead-end service road and sewer line with no access off of such stub to Chantilly Parkway.

6.      Further, no other landowner on Chantilly Parkway has been required to build a service/access road as Defendants required of Plaintiffs, and on information and belief, no other such landowner is going to be required to do so.

7.      As a result of the actions of Defendants, Plaintiffs have been damaged as follows:

(a)      Plaintiffs have been required to expend monies to build an access road and sewer line and extend same to the farthest point of its property, when it is now apparent it should not have been required to do so, nor is the adjoining landowner being required to extend said service road and sewer line as represented by Defendants to Plaintiffs;

(b)      Plaintiffs extended said service road and sewer lines to its farthest property boundary on the additional assurance that said road would be extended to the next median "crossover" on Chantilly Parkway, giving Plaintiffs and their lot owners access off of this service road to the Southeast onto Chantilly Parkway;

(c)      Plaintiffs were required to repurchase a commercial lot which sold in Chantilly Place along the border where Plaintiffs were required to extend the service road and sewer line when that property owner was refused a building permit until such extensions occurred. Plaintiffs were forced to repurchase that lot as a result of Defendants'

3

actions at approximately $100,000 more than Plaintiffs had just sold the property to that landowner.

(d)    In reliance on the representations and in response to the demands of Defendants, Plaintiffs were required to use large portions of its valuable Chantilly Place property fronting Chantilly Parkway for the construction of said service road;

(e)    Plaintiffs are stuck with a dead-end service road and sewer line with no access off of such stub to Chantilly Parkway; all to the detriment of Plaintiffs' property, its value, and its lot owners;

(f)    Defendants' requirements of Plaintiffs are inconsistent with and in contravention of the Access Management Plan for Taylor Road and Chantilly Parkway;

(g)    As a result of the Defendants' actions, Plaintiffs have suffered additional and different damages as a result of Defendants' demands and Plaintiffs' reliance thereon.

## COUNT I

### Reckless Fraud

8.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 7 hereinabove.

9.    Defendants represented to Plaintiffs – and repeatedly did so – that Defendants were requiring Plaintiffs to build the service road along Plaintiffs' property parallel to Chantilly Parkway because all landowners along Chantilly Parkway were being required to do so because

4

defendants did not want another Atlanta Highway where service roads were not required, and traffic problems exist today because of that failing.

10.    Defendants represented to Plaintiffs that Plaintiffs were required to extend the service road along its property and Chantilly Parkway as well as the sanitary sewer line to the end of its property with the assurance that the adjoining land owner would be required to extend same to the next median crossover on Chantilly Parkway; thus giving Plaintiffs and Chantilly Place lot owners access to Chantilly Parkway off of said extension.

11.    Those representations were false as Defendants have not required, nor, on information and belief, are Defendants going to require other landowners on Chantilly Parkway to build a service road, nor have Defendants required, nor on information and belief, are going to require the adjoining landowner to extend the service road and sewer line to the next median crossover on Chantilly Parkway.  Plaintiffs and Chantilly Place lot owners are stuck with this "stub" at the end of Plaintiffs' property with no access to Chantilly Parkway off of said stub.

12.    In reliance on said representations, Plaintiffs expended significant sums of money to build the service road and later to extend the service road and sewer line to its property borders along Chantilly Parkway and in doing so, used large portions of its valuable property frontage along Chantilly Parkway for these purposes.

13.    As a result of Defendants' reckless misrepresentations, Plaintiffs have been harmed as set forth hereinabove.

WHEREFORE, Plaintiffs seek damages against Defendants in that amount reflecting all monies Plaintiffs were required to expend in the construction of said service road and extension of said service road and sewer line to its property borders as well as the value of Plaintiffs' frontage property which it was forced to use to effect said construction and extension as well as

5

the cost of having to repurchase a lot when Defendants refused to issue said lot owner a building permit until such extension occurred. Plaintiffs seek such other, further and different relief, including loss of property values, to which this Court may deem it entitled to include, but not be limited to interest and costs.

<u>COUNT II</u>

<u>Due Process and Equal Protection</u>

14.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 13 hereinabove.

15.    Defendants' actions in requiring Plaintiffs to extend the subject service road and sewer line to the property borders and in fact to require a service road at all when no other property owners along Chantilly Parkway had been required to do the same, violate Plaintiffs' rights of due process and equal protection under the law.

16.    Defendants' actions have:

(a)    Unduly burdened Plaintiffs as compared to other property owners along Chantilly Parkway whom Defendants have not required to take the actions and spend the monies Defendants have required of Plaintiffs;

(b)    Defendants' actions have effected a disparate treatment of Plaintiffs compared to other property owners along Chantilly Parkway similarly situated;

(c)    Plaintiffs have been required to carry a burden not similarly operative on other property owners along Chantilly Parkway similarly situated;

6

(d)    Defendants' actions and requirements of Plaintiffs have no

rational relation between justification of the disparate treatment

of Plaintiffs compared to other similarly situated property

owners along Chantilly Parkway.

WHEREFORE, Plaintiffs demand judgment against Defendants in that amount reflecting

all monies Plaintiffs were required to expend in the extension of said service road and sewer line

to its property borders as well as the value of Plaintiffs' frontage property which it was forced to

use to effect said extension as well as the cost of having to repurchase a lot when Defendants

refused to issue a building permit until such extension occurred.    Plaintiffs seek such other,

further and different relief, including loss of property values, to which this Court may deem it

entitled to include, but not be limited to interest and costs.

## COUNT III

### Violation of Access Management Plan

17.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1

through 16 hereinabove.

18.    Defendants' actions set forth herein are in direct contravention of the Access

Management Plan for Taylor Road and Chantilly Parkway (the "Plan") adopted by the City of

Montgomery Planning Commission on June 26, 2003.

19.    The Plan required certain intersections/median crossovers as well as service roads

along Chantilly Parkway.  After requiring Plaintiffs to extend the service road, and sewer line, on

the representation and assurance that the adjoining landowner would be required to do the same,

at least to the next median crossover on Chantilly Parkway, Defendants have now failed and

refused to require such extension, and Plaintiffs are stuck with a "stub" at the end of the service

7

road with no outlet/access. Defendants have also changed the locations of the median crossovers on Chantilly Parkway from those set forth in the Plan after allowing Plaintiffs to develop Chantilly Place in reliance on the locations of those crossovers.

WHEREFORE, Plaintiffs demand judgment against Defendants in that amount reflecting all monies Plaintiffs were required to expend in the extension of said service road and sewer line to its property borders as well as the value of Plaintiffs' frontage property which it was forced to use to effect said extension as well as the cost of having to repurchase a lot when Defendants refused to issue a building permit until such extension occurred. Plaintiffs seek such other, further and different relief, including loss of property values, to which this Court may deem it entitled to include, but not be limited to interest and costs.

H. Dean Mooty, Jr. (MOO018)
Attorney for Plaintiffs, Forest Glen, L.L.C.
and TimberCreek, L.L.C.

OF COUNSEL:
MOOTY & ASSOCIATES, P.C.
600 Clay Street
Montgomery, Alabama 36104
Telephone:    (334) 264-0400
Facsimile:    (334) 264-0380
E-mail:    hdm@mooty-assoc.com

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

H. Dean Mooty, Jr.