IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| FOREST GLEN, L.L.C., an Alabama Limited Liability Company, and TIMBERCREEK, L.L.C., an Alabama Limited Liability Company, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | CIVIL ACTION NO.: 2:07-cv-00836-WKW |
| CITY OF MONTGOMERY and THE WATER WORKS & SANITARY SEWER BOARD OF THE CITY OF MONTGOMERY, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**EVIDENTIARY SUBMISSION IN SUPPORT OF
THE WATER WORKS & SANITARY SEWER BOARD
OF THE CITY OF MONTGOMERY'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

The Water Works & Sanitary Sewer Board of the City of Montgomery (the "Board"), submits the following evidence in support of its Motion for Summary Judgment:

Exhibit A: The Affidavit of Keverly Daniels

Exhibit B: The Affidavit of Buddy Morgan

Exhibit C: Excerpts from the Deposition of Merrill Ingram

Exhibit D: Excerpts from the Deposition of Alan Bush

Exhibit E: Excerpts from the Deposition of Greg Gillian

Exhibit F: Purchase and Sale Agreement between Timbercreek and Bushes

/s/    *Randall Morgan*
RANDALL MORGAN [MOR037]
Attorney for Defendant Montgomery Water
Works and Sanitary Sewer Board

OF COUNSEL:
Hill, Hill, Carter, Franco, Cole & Black, P.C.
425 South Perry Street
Montgomery, Alabama 36104
334-834-7600

## CERTIFICATE OF SERVICE

I hereby certify that on this the 16th day of June, 2008, I have electronically

filed the foregoing with the Clerk of the Court using the CM/ECF system, which

will send notification to the following via email:

H. Dean Mooty, Jr., Esq.
Mooty & Associates, P.C.
600 Clay Street
Montgomery, Alabama 36104

Wallace D. Mills, Esq.
City of Montgomery
103 North Perry Street
Montgomery, Alabama 26104

/s/    *Randall Morgan*
OF COUNSEL

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| FOREST GLEN, L.L.C., an Alabama Limited Liability Company, and TIMBERCREEK, L.L.C., an Alabama Limited Liability Company, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No.: 2:07-cv-00836-WKW-WC |
| | ) | |
| CITY OF MONTGOMERY and THE WATER WORKS & SANITARY SEWER BOARD OF THE CITY OF MONTGOMERY, | ) ) ) ) ) | |
| Defendants. | ) | |

### AFFIDAVIT OF KEVERLY DANIEL

BEFORE ME, the undersigned personally appeared Keverly Daniel, who being duly sworn, gives testimony as follows:

My name is Keverly Daniel and I am a Project Engineer with the City of Montgomery Water Works and Sanitary Sewer Board ("Board"). Prior to that, I was a Graduate Engineer. I am familiar with the projects developed on Chantilly Parkway. On March 19, 2003, construction plans were submitted by Greg Gillian, the engineer for the project, to the Board for Chantilly Place Plat No. 1. I was involved in reviewing these plans. On April 11, 2003, the engineer was requested to submit an overall of the water and sewer layout for the entire site. These plans were received sometime around September 23, 2003.



EXHIBIT

A

On October 3, 2003, over my signature, one of the Board's engineers, Henrique Rizzo, sent a letter to Greg Gillian with attached required changes which included extending the sewer line in question to the property line. (See Exhibit "A.") This required an extension consistent with the Board's long standing practice for development of projects similar to this one.

On November 20, 2003, construction plans were received for Chantilly Place East Plat No. 1. I reviewed those plans and made suggested comments which were then reviewed by the Chief Engineer. On December 10, 2003, a letter was sent to Wes Fulmer, employed by Larry Speaks & Associates, advising again that the sewer line be extended to the property line. (*See* Exhibit "B.") On May 13, 2004, the City Planning Controls Department was sent a letter by Henrique Rizzio, Chief Engineer for the Board, approving the revised construction plans. (*See* Exhibit "C.") The approved construction plans would have included the sewer line being extended to the property line.

On January 24, 2005, the Board received the "As Built Plans". This means that by that date, the sewer line would have been in ground. The recorded plat was received by the Board April 6, 2005.

2

_____

KEVERLY DANIEL

SWORN TO AND SUBSCRIBED before me this the 16th day of June, 2008.

[SEAL]

_____

NOTARY PUBLIC

My Commission Expires: 10-10-10

3

# W ATER
## ORKS & SANITARY SEWER BOARD
### *of the City of Montgomery*

22 Bibb Street, P.O. Box 1631, Montgomery, Alabama 36102-1631      (334) 206-1600    (334) 240-1616 FAX

**Thomas R. Morgan**
General Manager

William R. Henderson, P.E.
Asst. General Manager

Roy D. Holmberg, P.E.
Asst. General Manager

Charlene F. Wachs
Asst. General Manager

*Board of Directors*

**Richard E. Hanan**
Chairman

Bobby W. Bledsoe
Vice - Chairman

Bernice Robertson
Secretary

Louie E. Blankenship
Hugh M. Cole
Reverend Al Dixon
Anthony V. Dumas
Ray L. Roton
Mildred J. Worthy

Oct 03, 2003

MR. GREG GILLIAN
LARRY E. SPEAKS & ASSOCIATES
544 MARTHA STREET
MONTGOMERY AL 36104

Re: **CHANTILLY PLACE PLAT 1**

DEAR MR. GILLIAN:

Attached please find comments and/or revisions to the plans for the referenced
project. Revisions are requested on the attached drawings and one (1) copy of the
plans are to be resubmitted for approval.

Should you have any questions, please call me at (334) 206-3465 .

Sincerely,

KEVERLY DANIEL
GRADUATE ENGINEER
Enclosures

EXHIBIT

A



* This page from Chantilly Place East Overall

HIGHWAY 110
CHANTILLY PLACE
(30' R.O.W.)

Sewer line & Easement to East Property Line

This parcel Neel's sewer

CENTERLINE OF CREEK

CENTERLINE OF CREEK

LEGEND:
FOUN
SET L
(5/8
W/#
CALC
FOUN
FENCI
DEED





NOTE: Adjust/Repair any valves, manholes, piping affected by grading operations or in any way damaged during construction. Adjustments and Repairs shall be in compliance w/ all applicable MWWSSB Standards.

CURRENTLY UNDER CONSTRUCTION (BY OTHERS)

8" F.M.

16" W (D.I.)

(S)



# NOTES:

1. All water and sewer work performed shall meet the MWWSSB standards and specifications.

2. All existing water and sewer laterals that will not be used, must be abandoned per MWWSSB Standards. (see details)

3. All ductile iron pipes must be polywrapped

4. Size of laterals and meters shall be determined on a per lot basis

*Change note to: No water taps shall Be MADE UNDER THIS PROJECT*

## SANITARY SEWER MAIN PIPE AND STRUCTURE

| STRUCTURE NUMBER | | PIPE LENGTH | PIPE DIA. | SLOPE % | INVERT ELEVATION | | TYPE/CL. OF PIPE | STRUCTURES | | |
|---|---|---|---|---|---|---|---|---|---|---|
| FROM | TO | | | | UP STREAM | DOWN STREAM | | NO. | TYPE STR. | INV. |
| B3 | B2 | 176 LF | 6" | 0.94 | 220.00 | 218.34 | D.I. | A | MH | 209.87 |
| B2 | B1 | 117 LF | 6" | 1.00 | 218.24 | 217.07 | D.I. | B | MH | 216.26 |
| B1 | B | 73 LF | 8" | 0.91 | 216.97 | 216.31 | P.V.C. | B1 | MH | 217.02 |
| B | A | 244 LF | 8" | 2.60 | 216.21 | 209.87 | P.V.C. | B2 | MH | 218.24 |
| D | C1 | 361 LF | 8" | 0.76 | 208.50 | 205.75 | P.V.C. | B3 | MH | 220.00 |
| C1 | C | 294 LF | 8" | 1.61 | 205.65 | 200.91 | P.V.C. | C | MH | 200.91 |
| | | | | | | | | C1 | MH | 205.70 |
| | | | | | | | | D | MH | 208.50 |

NOTE: FOR PIPE AND STRUCTURAL MATERIAL REQUIREMENTS, SEE THE SPECIFICATIONS.





REQ'D S INLET I
INV IN 206.48
INV OUT 205.46

Ⓒ

SS

I

REQ'D DOGHOUSE
MANHOLE C
INV OUT 200.91

Cut in one joint of ductile iron @ crossing. Use concrete collar transitions

SCALE: H : 1"=
V : 1"=



CHANTILLY PLACE
PLAT NO. 1
Montgomery, Alabama

STORM PIPE/
SANITARY SEWER
PROFILES

*** That private lines & manholes shall be installed & tested w/ MWWSSB Standard Specifications.

230.0

229.9

1+00

230.2

2+00

230.2

229.9

3+00

227.9

SLOPE = 0.94 %
6" PRIVATE D.I. PIPE
REQ'D 176 LF

REQ'D MANHOLE B
INV IN 218.34
INV OUT 218.24

SLOPE = 1.00 %
6" PRIVATE D.I. PIPE
REQ'D 117 LF

REQ'D MANHOLE B1
INV IN 217.07
INV OUT 216.97

REQ'D 73 LF
8" SS
SLOPE = 0.91

DWG: STOPRO
FILE NO.:
COOR. FILE:
DATE:    2/28/2003
AUTOCAD: VER. 14
JOB. NO.:    6102
DESIGNED BY: GWG
DRAWN BY:    WHF
SCALE: H: 1" = 20'
       V: 1" = 5'

LARRY E.
& ASSOC
CONSULTING EN
LAND SURVE
544 MARTIN S
MONTGOMERY, A
TEL: 334/262-



# WATER WORKS & SANITARY SEWER BOARD
### of the City of Montgomery

22 Bibb Street, P.O. Box 1631, Montgomery, Alabama 36102-1631          (334) 206-1600    (334) 240-1616 FAX

**Thomas R. Morgan**
General Manager

William R. Henderson, P.E.
Asst. General Manager

Charlene F. Wachs
Asst. General Manager

*Board of Directors*

**Richard E. Hanan**
Chairman

Bobby W. Bledsoe
Vice - Chairman

Bernice Robertson
Secretary

Louie E. Blankenship
Hugh M. Cole
Reverend Al Dixon
Anthony V. Dumas
Ray L. Roton
Mildred J. Worthy

Dec 10, 2003

MR. WES FULMER
LARRY E. SPEAKS & ASSOCIATES
544 MARTHA STREET
MONTGOMERY AL 36104

Re:  CHANTILLY PLACE EAST PLAT NO. 1

DEAR MR. FULMER:

Attached please find comments and/or revisions to the plans for the referenced project.  Revisions are requested on the attached drawings and one (1) copy of the plans are to be resubmitted for approval.

Should you have any questions, please call me at  (334) 206-3465 .

Sincerely,

KEVERLY DANIEL
GRADUATE ENGINEER
Enclosures

EXHIBIT
B



U.S. HIGHWAY 110
CHANTILLY PLACE
(300' R.O.W.)

# PLAT NO. 1

# MONTGOMERY, ALABAMA



Vicinity MAP

PROJECT LOCATION MAP

## PREPARED BY:

# LARRY E. SPEAKS & ASSOCIAT
## Consulting Engineers & Land Survey

REVISIONS

Construction Security
required.

Backflow Information
form.

T:

GLEN L.L.C.
S. INGRAM,
NG MEMBER
BERLANE ROAD
OAD AL,
334) 272-1777

PLACE EAST PLAT NO. 1

2003







REQ'D 16" X 8" D.I. TAPPING
SLEEVE AND VALVE.
RESTRAIN FROM TAP THROUGH
18' FROM LAST BEND WITH MEGALUGS
WEDGE ACTION.   BELL RESTRAINT
AS NECESSARY

*Core Drill to tie to ex. MH*

8" W

REQ'D 24" COMBINATION
CURB AND GUTTER

STREET 'A'

REQ'D 7' SIDE WALK

R25.0'

REQ'D STREET
SIGN

REQ'D STOP SIGN

ACCESS ROAD

REQ'D 7' SIDE WALK

Included angle = 14°57'12"
Radius = 891.61'
Tangent length = 117.01'
Arc length = 232.70'
Chord length = 232.04'
External secant = 7.65'
Mid ordinate = 7.58'
Degree of curve = 06°25'34"

PVI STA = 1+00
PVI ELEV = 227.34
A.D. = 2.82
K = 28.37

80.00' VC

BVCE: 228.79

EVCE: 227.02

EX MH
INV IN 213.51
INV IN 213.51

EVCS: 1+40

REQ'D MANHOLE
ADJUSTMENT

−0.79%

8" W

EX 16" W



Degree of curve = 06°25'34"

Arc length = 66.25'
Chord length = 66.17'
External secant = 1.40'
Mid ordinate = 1.39'
Degree of curve = 14°34'11"

SCALE: H : 1"=2
       V : 1"=5



INSTALLED UNDER PROPOSED SEWER LINE
IMPROVEMENTS CHANTILLY PLACE EAST

ACCESS ROAD

REQ'D 24" COMBINATION CURB AND GUTTER

Future ?

REQ'D 7" SIDEWALK

REQ'D TAP EXISTING ?
SEWER

REQ'D TAP EXISTING SEWER

21.0'

29.0'

SS

REQ'D TAP EXISTING
SEWER

RELOCATE IN THE FIELD AS
DIRECTED BY THE ENGINEER

Future ?
Size ?
REQ'D TAP EXISTING
WATER

FL (24") — 226.48



REQ'D 7' SIDEWALK

5+00                    EX SS                5+00

REQ'D TAP EXISTING SEWER          REQ'D TAP EXISTING SEWER

RELOCATE IN THE FIELD AS DIRECTED BY THE ENGINEER

Future? Size?
REQ'D TAP EXISTING WATER

21.0'

FL(24")−226.48

REQ'D TAP EXISTING SEWER

SCALE: H : 1"=20'
       V : 1"=5'

Show AIR/Vacuum combo in profile

BVCS: 5+75
BVCE: 232.31

EX W

REQ'D 400 LF
SLOPE = 0.46 %
8 " RCP



REQ'D CLASS 3 R ... 24" THICK W/
FILTER FABRIC

D1

FL(36")−226.81

REQ'D 7' SIDEWALK

D  8+00

EX SS  9+00

OAD

FL(36")−227.71

REQ'D ONE JOINT OF DUCTILE IRON
CENTERED UNDER STORM. USE
CONCRETE COLLARS AT TRANSITION

C

B

PC = 7+49.95

PCC = 7+80.69

FL(36")−228.03

A1

R25.0'

SHOW FM
− TAKE
SHOT ON IT

DOT permit
required for
walk on Force
Main.

LOW POINT ELEV = 231.64
LOW POINT STA = 7+81.92
PVI STA = 7+82.25
PVI ELEV = 231.50
A.D. = 1.71
K = 38.04

Take shot on
Ex 16" H2O four
determine depth
Split encase or
16" H2O

EX MH 7
INV IN 223.87
INV OUT 223.87

BVCS: 7+49.75
BVCE: 231.77

226.61

EVCS: 8+14.75
EVCE: 231.78

BVCS: 9+26.07

+0.85%

0.86%

65.00' VC

~5

EX W
REQ'D 339 LF
SLOPE = 0.47 %
8" RCP

350g

REQ'D ONE JOINT OF DUCTILE IRON
CENTERED UNDER STORM. USE
CONCRETE COLLARS AT TRANSITION.



Include Fire Hydrant detail

Casing detail

Detail #260 ARV (>4")

REVISIONS



GRAVITY SEWER

6" SANITARY LATERAL

PROVIDE FULL LENGTH
SEGMENT OF PIPE

WYE FITTING

WATERTIGHT PLUG
OR CAP

SERVICE CONNECTION
ELECTRONIC MARKER

PLAN

PROPERTY LINE, R/W,
OR EDGE OF EASEMENT,
WHICHEVER IS THE GREATER
DISTANCE FROM THE MAIN

6'-0"
MIN

GROUND SURFACE

Show gravity sewer,
Force main & water @ sections-
Access Rd cross sections-

Provide a cross-section
at Air/Vacuum Combo Valve
location.



# W ATER
## ORKS & SANITARY SEWER BOARD
*of the City of Montgomery*

22 Bibb Street, P.O. Box 1631, Montgomery, Alabama 36102-1631        (334) 206-1600    (334) 240-1616 FAX

**Thomas R. Morgan**
General Manager

William R. Henderson, P.E.
Asst. General Manager

Charlene F. Wachs
Asst. General Manager

*Board of Directors*

**Richard E. Hanan**
Chairman

Bobby W. Bledsoe
Vice - Chairman

Bernice Robertson
Secretary

Louie E. Blankenship
Hugh M. Cole
Reverend Al Dixon
Anthony V. Dumas
Ray L. Roton
Mildred J. Worthy

May. 13, 2004

City Planning Controls Department
P.O. Box 1111
Montgomery, AL  36101-1111

Re:    **CHANTILLY PLACE EAST PLAT NO. 1**

Dear Sir or Madam:

Plans for the installation of the Water and/or Sanitary Sewer facilities to serve the referenced project are hereby approved.  At this time the Owner's engineer is required to submit to the Board the Owner Information for Project Approval form.  Once the Board is in receipt of this information, the Board's attorney will contact the Owner to obtain for the Board the required Indemnification Agreement and construction security.

The engineer must provide five (5) full sets of corrected plans.  The contractor must pick up an approved set of plans from this office prior to beginning construction.

Should you have any questions regarding the above referenced project, please feel free to contact me at 334-206-1679.

Sincerely,

Henrique Rizzo, P.E.
Chief Engineer

Enclosure

cc:    CITY ENGINEERING
       HEALTH DEPARTMENT
       LARRY E. SPEAKS & ASS

**EXHIBIT**

C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FOREST GLEN, L.L.C., an )
Alabama Limited Liability )
Company, and TIMBERCREEK, )
L.L.C., an Alabama Limited )
Liability Company, )
                         )
     Plaintiffs, )
                         )
v.                      ) Civil Action No.: 2:07-cv-00836-WKW-WC
                         )
CITY OF MONTGOMERY and )
THE WATER WORKS & )
SANITARY SEWER BOARD )
OF THE CITY OF MONTGOMERY, )
                         )
     Defendants. )

## AFFIDAVIT OF BUDDY MORGAN

BEFORE ME, the undersigned personally appeared Buddy Morgan, who being duly sworn, gives testimony as follows:

My name is Buddy Morgan and I am the General Manager for the Montgomery Water Works and Sanitary Sewer Board ("Board"). I am familiar with the project in question and I am also familiar with testimony of Merrill Ingram in this case. I know Mr. Ingram complains the Plaintiffs were required to install a water line across the property to the adjoining property line. That is incorrect. The Board installed a 16" water line at its expense. Mr. Ingram was not required to pay for nor install that water line. He was allowed to hook up to it and take water to his property.

The developer of Chantilly Place East Plat No. 1 was required to extend the



EXHIBIT
B

sewer line to the adjoining upstream property line. This is in accord with the Board's long standing practice in similar circumstances of requiring the developer to extend the sewer line to the adjoining upstream property owner. Without this requirement, developers could have the sewer line short of the property line. The upstream property developer would then have to negotiate an easement across this property.

I understand Mr. Ingram claims that after this property was sold to Allen Bush, Mr. Bush was unable to have his development plan approved by the Board. Allen Bush never submitted any development plan for a project at this site.

_____
BUDDY MORGAN


SWORN TO AND SUBSCRIBED before me this the 16th day of June, 2008.

[SEAL]                    _____
                         NOTARY PUBLIC
                         My Commission Expires:   10-10-10

2

1

1      IN THE UNITED STATES DISTRICT COURT FOR

2          THE MIDDLE DISTRICT OF ALABAMA,

3               NORTHERN DIVISION

4

5    CIVIL ACTION NUMBER

6    2:07-CV-836

7

8    FOREST GLEN, LLC AND TIMBER CREEK, LLC,

9        Plaintiff(s),

10   vs.

11   CITY OF MONTGOMERY, AND THE

12   WATER WORKS AND SANITARY SEWER

13   BOARD FOR THE CITY OF MONTGOMERY,

14       Defendant(s).

15

16

17           DEPOSITION TESTIMONY OF:

18               MERRILL INGRAM

19

20   March 12, 2008

21   12:24 PM

22   SELAH M. DRYER, CCR

23   ACCR #: 393

EXHIBIT

C

A P P E A R A N C E S

FOR THE PLAINTIFF(S):

    Harold Dean Mooty, Jr., Esq.

    MOOTY & ASSOCIATES

    600 Clay Street

    Montgomery, Alabama  36104

FOR THE DEFENDANT(S):

      REPRESENTING THE CITY OF MONTGOMERY:

    Wallace D. Mills, Esq.

    CITY OF MONTGOMERY

    Legal Department

    103 N. Perry Street

    Suite 200

    Montgomery, Alabama  36104

      REPRESENTING THE WATER BOARD:

    Randall Morgan, Esq.

    HILL, HILL, CARTER, FRANCO,

      COLE & BLACK, P.C.

    425 South Perry Street

    Montgomery, Alabama  36104

ALSO PRESENT:

    Keverly F. Daniel

---

    I, Selah M. Dryer, a Notary Public for
the State of Alabama at Large, acting as
Commissioner, certify that on this date,
pursuant to the Alabama Rules of Civil
Procedure, and the foregoing stipulation of
counsel, there came before me at the law
office(s) of Mooty & Associates, 600 Clay
Street, Montgomery, Alabama  36104, commencing
at approximately 12:24 PM on March 12, 2008,
MERRILL INGRAM, witness in the above cause, for
oral examination, whereupon the following
proceedings were had:

          MERRILL INGRAM,
being first duly sworn, was examined and
testified as follows:

EXAMINATION BY MR. MILLS:

    Q.  Mr. Ingram, my name is Wallace
Mills and I'm representing the City in this
lawsuit that you have against the City and the
Water Works Board.  Have you ever given a
deposition before?

---

    A.  Yes.

    Q.  If for some reason you don't
understand one of my questions, ask me to
restate it and I will.  Otherwise I'll assume
that you understood the question.  If you need
to take a break, anything like that, just ask me
and we can do that.

    If you will, give me your full name,
please.

    A.  Merrill, M-E-R-R-I-L-L, Harvey,
H-A-R-V-E-Y, Ingram, I-N-G-R-A-M.

    Q.  Give me your Social Security
number.

    A.  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.

    Q.  Have you ever been convicted of
any crimes?

    A.  Yes.

    Q.  What?

    A.  Possession of marijuana.

    Q.  When was that?

    A.  Twenty-something years ago.

    Q.  Over 10 years?

    A.  Yes.

---

    Q.  Any other crimes?

    A.  No.

    Q.  Have you ever been a party to any
other lawsuits besides the one we are here on
today?

    A.  Yes.

    Q.  A lot or just a few -- how many
are we talking about?

    A.  One.

    Q.  What was that one?

    A.  I broke my neck 20-something years
ago.

    Q.  What was that for?

    A.  Working for a drilling company out
in the Gulf.

    Q.  Did you file a lawsuit against
them?

    A.  Yes.

    Q.  Who was that that you sued?

    A.  Texaco.

    Q.  Where was that filed?  Do you
remember?

    A.  Lafayette, Louisiana.

**41**

pay cash.

1   I'm sure your attorney appreciates
2   that.
3   A. I would think so.
4   Q. The two purchase contracts,
5   Defendant's Exhibit No. 1 and 4, the first one
6   purports to be a contract to sell this property
7   to Allen and Ann Bush from Forest Glen, and the
8   second purports to be the sale agreement whereby
9   Timber Creek, LLC bought this property from
10   Allen and Ann Bush.
11   A. Uh-huh.
12   Q. Can you tell me why the property
13   was first sold by Forest Glen, but then
14   repurchased by Timber Creek?
15   A. Because Forest Glen owned it when
16   they sold it -- my wife is a lot harder business
17   person to deal with than I am.
18   Q. So basically you are saying the
19   managing partner didn't want to buy it back?
20   A. I'm not saying that. I'm saying
21   that I had the funds or that could have been a
22   possibility as well, whereas I would rather just

**42**

1   try to get it gone. She fought it until hell
2   froze over.
3   MR. MOOTY: The question on
4   the table though, Merrill --
5   THE DEPONENT: That's the
6   reason why other than financially.
7   MR. MOOTY: If you might have
8   had the funds in one entity versus the other one
9   at the time?
10   THE DEPONENT: Yes.
11   Q. (Mr. Mills) Are you aware of any
12   of the property or land along Chantilly Parkway
13   being annexed by the Town of Pike Road?
14   A. I know that they have tried to
15   annex a lot of it.
16   Q. Did you own any property which you
17   petitioned to have annexed in the Town of Pike
18   Road?
19   A. They petitioned me, or came to me
20   and asked me if I would like to be in Pike Road
21   and I said, I just about assume to be anywhere
22   other than to deal with Montgomery.
23   Q. Did you then put some land in Pike

**43**

1   Road?
2   A. I'm not sure when the time frame
3   was, or when it happened, but I did sign
4   something saying that I wanted to go into Pike
5   Road.
6   Q. Do you remember specifically which
7   properties that included?
8   A. I couldn't sign for anyone but my
9   own which is Timber Creek, but I did lobby for
10   Forest Glen to get there.
11   Q. Did they?
12   A. I'm not sure about the time
13   frame -- some of it did, and some of it didn't.
14   Q. Who did you talk to at the Town of
15   Pike Road about annexation?
16   A. To their mayor, and I think that
17   was Mr. Stone.
18   Q. Gordon Stone?
19   A. I think so, yes.
20   Q. Anybody else over there?
21   A. I think Mr. Gardner was present.
22   Q. Do you remember what position he
23   has with them?

**44**

1   A. I think he's over all of their
2   construction --
3   Q. Development?
4   A. Yeah, getting things done
5   property.
6   Q. In those conversations with the
7   mayor and/or Mr. Gardner, did you and them ever
8   discuss what type of developments Pike Road
9   might allow you to have as opposed to
10   Montgomery?
11   A. No, they didn't promise me
12   nothing.
13   Q. Do you have any family members
14   with a different last name than you that live
15   say within 100 miles of Montgomery?
16   A. Not off the top of my head.
17   Q. Do you have any relatives that
18   share your last name around here?
19   A. I do not -- not to my knowledge.
20   I was raised in an orphanage in Selma, Alabama.
21   I changed my name before I got married from what
22   I went by to what it is now.
23   MR. MOOTY: That was a jury

53

```
 1      Q.   Have you developed other
 2  properties in Montgomery or in Montgomery County
 3  other than the Chantilly Park along Chantilly
 4  Parkway?
 5      A.   That was the first time I ever had
 6  any dealings with the Montgomery water and sewer
 7  Board.
 8      Q.   Do you know whether or not it's a
 9  board policy that you have to take your sewer
10  lines to the end of the property line?
11      A.   I don't know their policies.
12      Q.   Do you know any developments in
13  Montgomery where the developer was not required
14  to take the sewer line to the property line?
15      A.   Not to my knowledge -- I don't
16  know of any, but I don't know if that's the case
17  or not.
18      Q.   Have you had any problems on any
19  of your developments with any employees of the
20  Water Board?
21      Q.   Have I had any problems?
22      Q.   Yes.
23      A.   I received a letter, which I would
```

54

```
 1  like to have a copy of, that said:  If you ever
 2  curse any one of my employees again you will
 3  never get another drop of water from Montgomery
 4  Water and Sewer Board from Mr. Buddy Morgan.  I
 5  felt like that had some impact on my dealings
 6  with them.
 7      Q.   Were you cussing employees?
 8      A.   He said I did -- I said I didn't.
 9      Q.   Do you remember who the employee
10  was that said you did?
11      A.   I don't remember what his name
12  was.
13      Q.   Where did this incident occur?
14      A.   Chantilly.
15      Q.   What was going on?  What was the
16  reason for him being out there?
17      A.   He was an inspector.
18      Q.   What did the inspector say that
19  you did?
20      A.   Said I cursed him.
21      Q.   Do you know what he was
22  inspecting?
23      A.   Manhole.
```

55

```
 1      Q.   Did it have anything to do with
 2  this project or another project?
 3      A.   It was on Chantilly, it was
 4  regarding this.
 5      Q.   This particular tract or plat?
 6      A.   We're having to extend a water
 7  line on the other side of the highway.
 8      Q.   Were you unhappy with his
 9  inspection results?
10      A.   I was unhappy with his critical
11  nature of a couple of my employees.
12      Q.   What did he say?
13      A.   That they didn't know what they
14  were doing -- and if that was his feelings, he
15  should have came to me or one of my assistants.
16      Q.   But you did not cuss him?
17      A.   Not to my knowledge -- I ain't
18  going to say I wouldn't have.
19      Q.   What is your claim against the
20  Water Board?  Why have you sued the Water Board?
21      A.   Because they required me -- they
22  wouldn't approve the man's development plan and
23  I had to extend the water all the way down, too.
```

56

```
 1  to the end of the property right there.
 2      Q.   They would not approve whose?
 3      A.   According to what I was told, they
 4  wouldn't approve Allen Bush's development plan.
 5      Q.   What else?  Any other reason you
 6  sued this Water Board other than they would not
 7  approve Allen Bush's development plan?
 8      A.   No.
 9      Q.   That was it?
10      A.   Yeah.  Because I had to buy the
11  property back is why I sued them.  I was trying
12  to get my money back from having to purchase
13  that property back.
14      Q.   So your complaint against the
15  Water Board is that it would not approve Allen
16  Bush's development plan, and therefore Timber
17  Creek purchased the property back?
18      A.   Yes.
19      Q.   Any other claim that you have
20  against the Water Board?
21      A.   Not to my knowledge -- not just
22  off my recollection right here sitting here, I
23  don't know.
```

1 Q. You have in this complaint some
2 allegations of due process and equal protection
3 violations -- do you know what those are about?
4 A. Beg your pardon?
5 Q. You've got a complaint in here
6 that you have been denied your due process.
7 What is that? What is the basis of that claim?
8 A. I just don't feel like it was my
9 responsibility to have to extend that water line
10 to the end of that property, or the street to
11 the end of that property. I feel like if the
12 Montgomery Water and Sewer Board wanted the
13 water to the end of that property, they should
14 have done it themselves. To be quite frank with
15 you, I've done a lot of stuff as far as
16 extending lines and things out there that I
17 didn't have any problem with before. Well,
18 that's why I'm suing them is trying to get my
19 money back for them requiring me to put that
20 water line in at the end of the property.
21 Q. You have also a claim for equal
22 protection violation. What is that claim for?
23 A. Well, I just feel like they made

57

1 me do that when they don't make other people do
2 it, other developers. I don't think they would
3 have made them extend the water lines to the end
4 of the property. And all along they're sitting
5 there with a billboard sitting right on the
6 right-of-way where we couldn't extend the road
7 any further. It was like it was bogus to begin
8 with.
9 Q. We're talking about two different
10 things.
11 A. The road and the water line -- the
12 water line would have to go right through that
13 billboard to be able to say stay on the
14 right-of-way.
15 Q. Going back to an earlier
16 question: You don't know of any developers,
17 though, that have not been required to extend it
18 to the property line, do you?
19 A. No, I don't.
20 Q. Now the sewer line is actually in
21 an easement, is it not, off the road? Isn't the
22 sewer line an easement that's dedicated for
23 utilities or for Water Board?

58

1 A. I'm not sure if it's in the middle
2 of the road or not there.
3 Q. You don't know where the sewer
4 line is?
5 A. No, they make you put it in the
6 center of the road sometimes, and sometimes it's
7 in their easement on the side of the road,
8 Mr. Morgan. I'm not sure. I think it's on the
9 easement like you said.
10 Q. So there was already an easement
11 there, was there not, for the sewer line?
12 A. I granted it to them.
13 Q. So the road doesn't have anything
14 to do with the placement of the sewer easement,
15 does it?
16 A. The sewer easement stopped right
17 there.
18 Q. Stopped right where?
19 A. Where the road was stubbed out and
20 the water line stopped there. Their easement
21 stopped there, too.
22 Q. It stopped there because that's
23 where you stopped it.

59

1 A. Well, I'm not sure, to be honest
2 with you, if that's why it stopped there or
3 not. I don't know. I can't recollect why it
4 was stopped right there. I don't know if the
5 easement went all the way to the end of the
6 property or not when I first signed the easement
7 over to them.
8 Q. When you sold that lot to Allen
9 Bush --
10 A. Well, that's right -- he owned
11 that property, so I guess it did stop right
12 there -- the easement.
13 Q. Was that plat recorded and
14 approved when you sold that lot to him?
15 A. Well, I sold the property on metes
16 and bounds. I don't know if the plat had been
17 approved or not, I think it had been submitted
18 though.
19 Q. Wasn't Forest Glen required to put
20 in utilities within so many months after you
21 sold it to Allen Bush?
22 A. I think so.
23 Q. Did anybody require that a water

60

49

1    Q.   (Mr. Morgan)  I represent the
2  Water Board, and I want to be clear, as you
3  understand it the access management plan was
4  adopted by the City of Montgomery and not the
5  Water Board; is that correct?
6    A.   I don't know -- I think that was
7  my understanding, yes.
8    Q.   Do you understand that the Water
9  Board has nothing to do with the access
10  management plan?
11    A.   I don't know that to be a fact,
12  but if you say so.
13    Q.   Have you heard otherwise or have
14  any facts different from that?
15    A.   No, I don't.
16    Q.   Do you make any claim that
17  anything the Water Board did or required is the
18  reason that Allen Bush wanted to sell his lot?
19    A.   They wouldn't approve his
20  development plan either.
21    Q.   Anything else other than the Water
22  Board would not approve Allen Bush's development
23  plan?

50

1    A.   Are you asking me if that's what I
2  think?
3    Q.   Yeah, is that what you think?
4    A.   I think, because they kind of
5  don't particularly care for Mr. Ingram is one of
6  the reasons absolutely.
7    Q.   Did Mr. Bush tell you that he had
8  submitted a development plan to the Water Board?
9    A.   Yes, and the City at the same time
10  was my understanding.
11    Q.   And that the Water Board would not
12  approve the plan that Mr. Bush submitted?
13    A.   That was my understanding.
14    Q.   What did Mr. Bush tell you was the
15  reason that the Water Board would not approve?
16    A.   You know, I really don't know
17  exactly what they told him why, but I know what
18  he told me.
19    Q.   What did he tell you?
20    A.   He told me that he didn't think I
21  could get anything approved over there, was what
22  he told me at time.
23    Q.   That he didn't think he could get

51

1  anything approved?
2    A.   That if it had anything to do with
3  me.
4    Q.   Did he give you an official reason
5  why the Water Board wouldn't approve the
6  development?
7    A.   Because the City wouldn't.
8    Q.   Have you had any conversations
9  with the Water Board yourself or anybody with
10  the Water Board about extending the sewer line
11  that extra, I think it turned out to be 140
12  feet?
13    A.   Would you repeat it?
14    Q.   Have you had any conversations
15  with anybody at the Water Board about having to
16  extend the sewer line from where it was stubbed
17  out that 140 feet to the end of the property
18  line?  Did you ever talk to anybody at the Water
19  Board about it?
20    A.   Personally, I didn't -- my
21  engineer did.
22    Q.   What did your engineer tell you
23  that the Water Board said?

52

1    A.   That I'm going to have to extend
2  it to the end of the property.
3    Q.   Did he tell you why?
4    A.   Because the road was going to be
5  contiguous, same thing everybody else said, that
6  the road was going to go all the way through to
7  Vaughn Road.
8    Q.   Is Greg Gillian the one that told
9  you that?
10    A.   Yes.
11    Q.   Did he ever tell you that anybody
12  at the Water Board said they were going to
13  require this adjoining property owner to extend
14  his sewer line to the end of his property?
15    A.   Yes.
16    Q.   Mr. Gillian told you that?
17    A.   Yes.
18    Q.   Did he tell you who he got that
19  information from?
20    A.   No -- from Montgomery Water and
21  Sewer Board or their representative.
22    Q.   But he didn't tell you --
23    A.   No.

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA,

3                  NORTHERN DIVISION

4

5    CIVIL ACTION NUMBER

6    2:07-CV-836

7

8    FOREST GLEN, LLC AND TIMBER CREEK, LLC,

9              Plaintiff(s),

10   vs.

11   CITY OF MONTGOMERY, AND THE

12   WATER WORKS AND SANITARY SEWER

13   BOARD FOR THE CITY OF MONTGOMERY,

14              Defendant(s).

15

16

17          DEPOSITION TESTIMONY OF:

18                  ALLEN BUSH

19

20   March 12, 2008

21   9:03 AM

22   SELAH M. DRYER, CCR

23   ACCR #: 393

**EXHIBIT**

D

5

```
 1              A P P E A R A N C E S
 2  FOR THE PLAINTIFF(S):
 3      Harold Dean Mooty, Jr., Esq.
 4      MOOTY & ASSOCIATES
 5      600 Clay Street
 6      Montgomery, Alabama  36104
 7  FOR THE DEFENDANT(S):
 8      REPRESENTING THE CITY OF MONTGOMERY:
 9      Wallace D. Mills, Esq.
10      CITY OF MONTGOMERY
11      Legal Department
12      103 N. Perry Street
13      Suite 200
14      Montgomery, Alabama  36104
15
16      REPRESENTING THE WATER BOARD:
17      Randall Morgan, Esq.
18      HILL, HILL, CARTER, FRANCO,
19          COLE & BLACK, P.C.
20      425 South Perry Street
21      Montgomery, Alabama  36104
22  ALSO PRESENT:
23      Keverly F. Daniel
```

6

```
 1      I, Selah M. Dryer, a Notary Public for
 2  the State of Alabama at Large, acting as
 3  Commissioner, certify that on this date,
 4  pursuant to the Alabama Rules of Civil
 5  Procedure, and the foregoing stipulation of
 6  counsel, there came before me at the law
 7  office(s) of Mooty & Associates, 600 Clay
 8  Street, Montgomery, Alabama  36104, commencing
 9  at approximately 9:03 AM on March 12, 2008,
10  ALLEN BUSH, witness in the above cause, for oral
11  examination, whereupon the following proceedings
12  were had:
13
14              ALLEN BUSH,
15  being first duly sworn, was examined and
16  testified as follows:
17
18          COURT REPORTER:  Usual
19  stipulations?
20          MR. MORGAN:  Sure.
21          MR. MOOTY:  Yeah.
22          MR. MILLS:  Yes.
23
```

7

```
 1  EXAMINATION BY MR. MILLS:
 2      Q.    Mr. Bush, my name is Wallace Mills
 3  and I represent the City of Montgomery in a
 4  lawsuit filed against both of City and the Water
 5  Works Board by a Mr. Merrill Ingram -- actually,
 6  by Forest Glen, LLC and Timber Creek, LLC.
 7  First of all, would you give me your name
 8  please.
 9      A.    Walter Alan Bush.
10      Q.    Spell your middle name for me.
11      A.    A-L-A-N.
12      Q.    What is your address?
13      A.    281 M-I-S-K-O Road Matthews,
14  Alabama 36052.
15      Q.    Did you have an occasion within
16  the last five years to purchase a commercial lot
17  from Forest Glen, LLC by and through either
18  Merrill Ingram or Phyllis Ingram?
19      A.    Merrill.
20      Q.    Can you tell me, roughly, when you
21  purchased that?  First of all, tell me and
22  identify for me where that lot was, if you can?
23      A.    It's on Chantilly Parkway at the
```

8

```
 1  very end, or I would say at the far south end of
 2  Merrill Ingram's development on Chantilly
 3  Parkway.  And I bought it -- I mean, I made the
 4  deal and I think we still -- we closed on it
 5  towards the end of 2003, I think.
 6      Q.    Do you know what the name of that
 7  development was?
 8      A.    No.
 9      Q.    And you say you closed on it
10  towards the end of 2003.  Can you tell me what
11  the purchase price was?
12      A.    Yeah.  Two hundred forty-five
13  thousand three hundred twenty dollars.
14      Q.    All right, I'm going to show you
15  what I'm going to mark as Defendant's Exhibit
16  C-1.  And I'm going to ask you if you recognize
17  that document -- this is the first purchase
18  contract.
19          (WHEREUPON, a document was marked
20          as Defendant's Exhibit No. 1 and
21          is attached to the original
22          transcript.)
23      A.    Yes, sir.
```

9

1    Q.   Tell me what that is.

2    A.   That's the first purchase of

3  contract.

4    Q.   Is that the contract whereby you

5  purchased this lot from Merrill Ingram?

6    A.   Yes, sir.

7    Q.   On the last page is that your

8  signature?

9    A.   Yes, sir.

10    Q.   Along with someone else, I

11  presume?

12    A.   My wife.

13    Q.   This contract does not appear to

14  be dated on the signature line, but I've noticed

15  a couple of dates on here.  And one, that I'm

16  pointing to on the first page just above the

17  witness, it's got August 15th of '03.  Do you

18  know what that date represents?

19    A.   No.  I would assume it's the date

20  we did the contract -- maybe not -- I don't

21  know.

22    Q.   Based on your recollection, would

23  August 15th of '03 be about the time you entered

10

1  that contract?

2    A.   Yes, sir -- close, if that's not

3  it.

4    Q.   I also notice on this contract

5  handwritten just next to the witnesseth is

6  written lot one, and then there is an arrow and

7  then there is a lot two or something else

8  scratched out, can you tell me what exactly you

9  bought -- does that reference what you bought?

10    A.   Well, there were two lots down on

11  the end -- really, I think three down on the

12  very end of Merrill Ingram's property and I

13  wanted to buy a hundred thousand square feet --

14  that was the easiest way for me to tell it --

15  because that was at two dollars and fifty cents

16  a foot, so I asked him to draw out -- to show me

17  where a hundred thousand square feet is, and he

18  did.  And it included a ditch and I really

19  didn't want to buy both sides of the ditch, it

20  wasn't going to do me any good.  So I said

21  Merrill -- so we worked it out where I bought

22  just under a hundred thousand square feet

23  because of the amount of money that I wanted to

11

1  invest and it was easy -- two dollars and fifty

2  cents a foot, hundred thousand square feet, two

3  hundred fifty thousand dollars -- so that's what

4  I was going to buy.  But when the ditch got

5  involved, I didn't want -- obviously, I couldn't

6  use the ditch.  And I wasn't sure about the

7  liability of the ditch either, so I got him to

8  scoot it over a little and however many square

9  feet I ended up buying was what we had finally

10  agreed on.  We made some adjustments on the

11  piece of property I was buying, and that had

12  included -- to begin with, he had had it

13  platted -- but we sort of threw the plat out and

14  made it a hundred thousand.

15    Q.   I noticed on here that lot two and

16  three are scratched out, and then lot one is

17  written.  Was there more than one parcel in that

18  development for sale at that point that he

19  offered you?

20    A.   Sure -- it was all the way down,

21  but I wasn't interested in buying this parcel.

22  I wanted to buy all that I had to invest at that

23  time, and that was around two hundred and fifty

12

1  thousand dollars.

2    Q.   Did you see any kind of map,

3  plat -- did he show you anything to show you?

4    A.   Sure.

5    Q.   He did?

6    A.   Yes.

7    Q.   Would you care to guess how many

8  lots or parcels he had mapped out on this

9  particular map?

10    A.   Just a guess I would say 25 -- and

11  I stand to be corrected -- I really don't know.

12    Q.   Were there any particular terms or

13  conditions to this sales contract that might

14  have been out of the ordinary for you?  And I

15  ask this question, because the last page of the

16  contract has quite a bit of written terms that

17  have been added.  Is there anything that stands

18  out in your memory as being exceptional for this

19  contract?

20    A.   Not really.  The last article on

21  the contract I didn't want -- just in case I had

22  some kind of problem with Merrill Ingram, I

23  didn't want him making the decision on what kind

13

1  of building -- I wanted an out.  In other words,
2  he and whoever owned the rest of that, made the
3  decision what kind of building you built out
4  there, and I wanted something in there -- that
5  was maybe in the deed or the plat restriction --
6  and I wanted some sort of an out in case he and
7  I got crossed up somewhere along the way and he
8  could -- he or somebody else or whoever he sold
9  that thing to could hold it over my head -- so I
10  wanted an out to the extent we could go to an
11  arbitrator -- if we got crossed up on the
12  building.  The particular building I wanted to
13  build -- I wanted it with no restrictions, but
14  he wouldn't do that, so that was sort of a --
15      Q.   So if I understand this right, you
16  originally were going to buy lots two and three
17  -- two different lots -- but then because of
18  this ditch --
19      A.   Two and a little bit of three, I
20  think.
21      Q.   So he was going to redraw the
22  lines that he had to accommodate how much you
23  wanted to buy, correct?

14

1      A.   I guess that's a good way to put
2  it.
3      Q.   Okay.  Do you remember the name of
4  the company that actually held this property
5  that you bought it from?
6      A.   Forest Glen, LLC -- I think.
7      Q.   I'm going to show you a map --
8          MR. MILLS:  And I would offer
9  Defendant's Exhibit C-1 as an attachment.
10      Q.   (Mr. Mills) -- what I'm going to
11  mark as Defendant's Exhibit C-2.  And this is a
12  map and a portion of this map is in red and I'm
13  going to ask you:  Is that the development and
14  the lot laid out in the area where you
15  purchased, or does it look reasonably like what
16  you saw?  And if it doesn't, that's okay.  You
17  can tell me it doesn't.
18          (WHEREUPON, a document was marked
19          as Defendant's Exhibit No. 2 and
20          is attached to the original
21          transcript.)
22      A.   Well, what point in time?
23      Q.   When you made your first

15

1  purchase.  And I guess what I'm trying to ask
2  is:  Is this the piece of land that Merrill
3  Ingram owned a part of which he was trying to
4  sell to you?
5      A.   Yes, but I don't remember how it
6  was cut up -- if it was cut up like that, to be
7  honest.
8      Q.   That's fine.  Did you at some
9  point apply for a building permit while you held
10  that property?
11      A.   No, sir.
12      Q.   Did you at some point resell that
13  property?
14      A.   Yes, sir.
15      Q.   To whom did you resell it?
16      A.   Merrill Ingram's company.
17      Q.   Forest Glen?
18      A.   Yes, sir.
19      Q.   Can you tell me why you sold that
20  back to him?
21      A.   He offered -- he called me and
22  asked me to meet him on the property, and I
23  did.  And he first tried to put a spin on it

16

1  that I -- it was going to work out good for me,
2  it was going to give me more road frontage --
3      Q.   Are you saying he wanted to buy it
4  back from you?
5      A.   No.  He wanted me to give him the
6  property.  He was going to go ahead and run the
7  road right out the end of the property.  And I
8  told him I really wasn't interested in him doing
9  that, it would mess up what I -- if I didn't
10  sell it, what I had planned.  And he said well,
11  I'm going to have to buy it -- or the City is
12  going to require -- I thought he said the State
13  to be honest with you.  I don't really recall
14  the City being mentioned -- but the State or the
15  City is going to require this road to go to the
16  end of this property and the water.  And I told
17  him, you know -- and would I sell him just that
18  piece, and I said no.
19      Q.   How far down did he --
20      A.   And he told me to think about it,
21  so I left and thought about it a little bit --
22  did a little bit of research.
23      Q.   So was there a road already in

17

1  front of the parcel that you had purchased?
2      A.    Yes, sir, I believe so.
3      Q.    Was the road already in or had it
4  yet to be built?
5      A.    I believe it was in, now I'm not
6  sure -- those days sort of run together, but I
7  think it was in.
8      Q.    Did part of your lot front on
9  Chantilly Parkway itself?
10     A.    Yes.
11     Q.    And did part of it front on this
12 road that Mr. Ingram's company had put it?
13     A.    Yes.
14     Q.    How much of your lot in terms of
15 percentage of road frontage was on Chantilly
16 Parkway and how much of it was on Mr. Ingram's
17 company road?
18     A.    This is just a guess.
19     Q.    Okay.
20     A.    Because it's been a long time
21 since I've looked at that plat, I don't know --
22 or the drawings or anything -- it's just a
23 guess -- I would say maybe 30 percent on the

18

1  service road and 70 percent on Chantilly -- now
2  that's just a guess.
3      Q.    If I understand what you are
4  saying, Mr. Ingram wanted to change the layout
5  of this service road.  How did he want to change
6  it?
7      A.    Run it on -- well, he didn't want
8  to do it.  He made it sound like his hands were
9  tied to run it on the end of that property.
10     Q.    So that the lot that you owned
11 then would not have any frontage on Chantilly
12 Parkway?
13     A.    Right.
14     Q.    In other words, it would run all
15 the way across this lot that you had purchased,
16 correct?
17     A.    That's correct.
18     Q.    So did he then make some kind of
19 offer to purchase this from you -- this land
20 frontage?
21     A.    Not that day.
22     Q.    Okay.
23     A.    Well, he may have -- he offered to

19

1  buy just the piece that he wanted -- that he
2  needed.
3      Q.    For the road?
4      A.    Yeah, for the road.
5      Q.    And I'm going to call it a service
6  road.
7      A.    Service road is fine -- I think
8  that's what it is.
9      Q.    Do you remember when this
10 conversation between you and him occurred?  And
11 you can tell me in relative terms too when you
12 bought it.
13     A.    Well, just about two days before
14 we signed the next contract to sell it -- for me
15 to sell it back to him.  I mean, it was a
16 short -- very short duration and I sold it back
17 to him.
18     Q.    Before we get to that, I'm going
19 to mark this as Defendant's Exhibit C-3 -- it's
20 a settlement statement that's in my package.
21 Can you tell me what that is?
22          (WHEREUPON, a document was marked
23          as Defendant's Exhibit No. 3 and

20

1          is attached to the original
2          transcript.)
3      A.    It looks like the HUD -- or the
4  settlement statement when I bought the property.
5      Q.    Is that dated August the 22nd of
6  2003?
7      A.    Yes, sir.
8      Q.    And based on your recollection, is
9  that about the approximate time that you closed
10 that deal?
11     A.    Yes, sir.
12     Q.    And I believe the settlement
13 statement shows that cash from the borrower,
14 which I assume would have been you, is two
15 hundred forty-five thousand three hundred and
16 twenty dollars.  Does that sound right?
17     A.    Yes, sir.
18     Q.    Okay.
19          MR. MILLS:  I offer
20 Defendant's Exhibit C-3 as an exhibit.
21     A.    It was a cash sale.
22     Q.    (Mr. Mills)  I'm going to you show
23 you what I'm going to mark as C-4 -- this is a

21

1  second sales contract and ask if you recognize
2  that?
3          (WHEREUPON, a document was marked
4          as Defendant's Exhibit No. 4 and
5          is attached to the original
6          transcript.)
7      A.   Yes, sir.  This is the contract
8  where Merrill Ingram's company bought it back --
9  Timber Creek, LLC bought it back.
10     Q.   Do you have a recollection of what
11 the purchase price was?
12     A.   Three dollars and fifty cents a
13 foot I believe -- dollar more a foot.
14     Q.   Do you remember what the total
15 was?
16          MR. MORGAN:  He's got a
17 closing statement.
18     A.   I've got a closing statement.
19     Q.   (Mr. Mills)  You can look at that.
20     A.   Gross amount is three fifty-six
21 one ninety-one fifty -- it's actually -- well,
22 actually there is an extra ten thousand dollars
23 in there.  I had given somebody else my word

22

1  that I would give them first option on that
2  property -- give them first shot at it if I got
3  ready to sell it, but we both thought it would
4  be a couple of years down the road and we hadn't
5  set on a price.  But I'd given him my word that
6  I would let him have the first shot at the
7  property, so I told Merrill that I couldn't sell
8  it without calling this guy and I called him,
9  and he said tell Merrill he would take ten
10 grand, or he would buy the property.  And so
11 Merrill paid the extra ten grand at closing and
12 I had them cut that guy a check for ten grand.
13     Q.   In this particular case you sold
14 this property back to which company?  Do you
15 remember?
16     A.   It didn't really matter to me -- I
17 was selling it to Merrill Ingram -- but it looks
18 like the company that he put in there was Timber
19 Creek.
20     Q.   So you sold it back for
21 approximately a little less than a hundred and
22 eleven thousand more than you purchased it for,
23 correct?

23

1      A.   Right.
2      Q.   Do you remember the date of this
3  contract?  And you are welcome to look at it if
4  want.
5      A.   No, not exactly, but it closed on
6  2/25/04.
7      Q.   February 25th?
8      A.   Right.
9      Q.   And if I represent to you that
10 this contract was signed around February 5th of
11 2004, would that sound right to you?
12     A.   Yes, sir, it was a pretty quick
13 closing.
14          MR. MILLS:  We offer to attach
15 Defendant's Exhibit C-4.
16     Q.   (Mr. Mills)  And you have, if I
17 understand it correctly, a settlement statement
18 in front of you, is that right, from this sale?
19     A.   Yes, sir, both sales.
20     Q.   Would you mind if we got copies of
21 those to attach to the deposition?
22     A.   No, that's fine.
23     Q.   One of them we have actually

24

1  already looked at.
2          MR. MILLS:  After we make
3  copies, I'm going to mark this as Defendant's
4  Exhibit C-5.
5      Q.   (Mr. Mills)  What I'm showing you
6  that I'm going to mark as C-5, is that the
7  settlement statement from February 2004 where
8  you closed the resale of that property back to
9  Mr. Ingram's company?
10     A.   Yes, sir.
11     Q.   You can hold on to that and we
12 will get a copy of that in a little bit.
13          MR. MORGAN:  Can I see that?
14          MR. MILLS:  Sure.
15     Q.   (Mr. Mills)  Did you have any
16 other discussions with Mr. Ingram other than
17 the one you had out on the property that day when he
18 first told you he was going to have to build
19 this service road?
20     A.   Well, I met him back out there and
21 we signed a contract -- that was a couple of
22 days later.  I did some research to find out
23 exactly how much -- well, to be blunt, to find

25

1 out how much I thought I could make on that
2 property and how bad he needed it.
3     Q.   Right.  Tell me again so that I've
4 got it straight in my mind.  Did you feel like
5 he was in a bind on having to buy this back?
6     A.   Yeah.
7     Q.   And he conveyed to you that he was
8 in a bind because of what exactly?
9     A.   No, he didn't convey he was in a
10 bind -- no.  I did some research and from the
11 things other people told me, I found out he was
12 in a bind.
13     Q.   Who did you talk to?
14     A.   He did his best to let me know
15 that he wasn't in a bind, that this was -- he
16 tried to -- you know everybody tries to do -- in
17 business tries to put their own spin on things
18 for their own advantage.  He was no exception.
19 He tried to tell me that this was going to be a
20 good thing for me, but I just -- that's why I
21 wanted a couple of days to dig into it and see.
22 I suspected at that point, in our initial
23 meeting, that maybe he was in a serious bind

26

1 over this piece of property.  And I really
2 wanted to keep the property a couple of years
3 and try to double my money on it.  I really
4 didn't want to sell it within four months or
5 whatever.
6     Q.   You mentioned that you got
7 information from other people.  Do you remember
8 who you talked to about this?
9     A.   Sure.
10     Q.   Who?
11     A.   I went to the City and I talked
12 to -- they passed me around to just about
13 everybody there -- but the guy that gave me
14 probably the best information with the City --
15 well, I think I started at the Water Works and I
16 and I don't remember if I went in Buddy Morgan's
17 office -- Buddy Morgan used to be my neighbor,
18 but if he was in this room he wouldn't know me.
19 He lived right across the street from me when I
20 first got married.  I know him, but he don't
21 know me.  But I called him and I had a copy of
22 that print -- the thing I was going in with --
23 and it seems like I caught him outside -- it's

27

1 been '03 -- but anyway, I asked him about the
2 water.  You know Merrill Ingram had told me that
3 they weren't going to run the water on out the
4 end and he -- he don't like Merrill Ingram, I
5 don't think.  Anyway he told me that that was
6 right, that the water had to go to the end of
7 that property.  And I told him -- and he really
8 didn't want to take the time to talk to me until
9 I let him know I wasn't Merrill Ingram's buddy.
10 I mean, I have nothing against Merrill Ingram,
11 but I wasn't in business with Merrill Ingram.
12 And he -- he made the comment that -- or let me
13 know -- Merrill Ingram is just about every other
14 word sometimes out there on that property is a
15 cuss word -- and he had said something about
16 nobody was going to get water out there if
17 Merrill Ingram kept cussing his people.
18     Q.   Buddy Morgan told you that?
19     A.   Buddy Morgan told me that.  And I
20 said, wait a minute man, I'm not in this deal.
21 I just bought a piece of property from Merrill
22 Ingram, I probably don't like him anymore than
23 you.  But he warmed up to me a little bit then,

28

1 and he told me water has got to go to the end of
2 that lot before they are going to turn it on or
3 whatever or let me attach to it.  So anyway, I
4 understood that the water had to go across the
5 piece of property that I wanted -- that I had
6 bought.  And one reason that I bought that piece
7 of property when I bought it, one of the
8 advantages I saw was the next guy down.  And
9 Merrill, for whatever reason, had stopped that
10 road short and stopped the water short.  And
11 Merrill said, that guy, David Brewer, he wants
12 me to run this road to the end of this property,
13 but I'm not going to do it.  And I was thinking
14 the whole time well, I will be glad to let him
15 have this road.  I was thinking maybe I could
16 work out a deal where he paved my parking lot
17 and I let him -- I mean, if I could see a deal
18 to be worked out, I try to work out a deal with
19 somebody.
20     Q.   When did Mr. Ingram tell you that
21 about he wasn't going to run that road out
22 there?
23     A.   That was when I was first was

**29**

```
 1  buying that property, before I had even bought
 2  it.  He said we are going to put a road in but
 3  it's going to stop right here.  And I said what
 4  are you going to put at the end of it and he
 5  said a barricade.  So I have to have a
 6  barricade.  And I didn't like the end of a
 7  barricade, but I said I can tie my parking lot.
 8  And he said sure you can tie one in, you can do
 9  whatever you would to your property and I said
10  okay, fine.  So at that point I was thinking
11  about working out a deal with the next man down
12  and let him tie to that road, and water or
13  whatever else in exchange for something of value
14  to me -- it didn't matter to me.
15       Q.  And was it your understanding
16  based on that conversation that David Brewer
17  owned that next property down?
18       A.  Well, with David Brewer -- I had
19  called David Brewer -- he had a sign on it.  He
20  may not have owned it, but he was somehow
21  involved with it.  So I had talked with David
22  Brewer about that property shortly after that.
23       Q.  Before or after you purchased it?
```

**30**

```
 1       A.  I think before and after.  Merrill
 2  Ingram, I believe, mentioned David Brewer about
 3  this property in that conversation -- in one of
 4  our conversations before I purchased that
 5  property and not being willing to run that road
 6  on down.
 7       Q.  So did you understand from your
 8  conversation with Mr. Ingram that he and
 9  somebody associated with that neighboring
10  property had had some discussion about running
11  that road out?
12       A.  Yes.
13       Q.  And that Mr. Ingram was not going
14  to run it to the property line?
15       A.  Well if he did, that would be less
16  square footage for him to sell me, so I saw the
17  reason why he wasn't going to do it.  But once I
18  bought that property and I owned it, then, you
19  know, unless David Brewer was willing to pay
20  him -- and I don't know whether he was or not --
21  I was more than willing to negotiate.  And
22  really I thought instead of selling it back to
23  Merrill Ingram I figured I might end up selling
```

**31**

```
 1  it to David Brewer, the whole property.
 2       Q.  Besides Buddy Morgan, did you have
 3  any conversations with anybody else between the
 4  time you bought and sold this property?
 5       A.  Yes, sir.  I went to the City and
 6  I think I went to every department in the City.
 7       Q.  Do you remember anybody specific
 8  that you talked to?
 9       A.  The city engineer's name was Cecil
10  Court or Cork -- I don't remember his last name,
11  but it was close to that -- you may know who you
12  I'm talking about.
13       Q.  I do.
14       A.  We talked about -- I found out
15  from talking to Buddy Morgan -- well, I figured
16  out from talking to Buddy Morgan the best way to
17  go in and approach people at the City is to let
18  them go ahead and know that Merrill Ingram
19  wasn't my favorite guy either, so that's the way
20  I approached everybody because I was asking
21  about this piece of property.  And he told me
22  about some reasons why he didn't like Merrill
23  Ingram.  And the reason I'm telling you this or
```

**32**

```
 1  mention this is I probably told the story 10
 2  times to different people and, you know, it
 3  would be hard to lie about it.  I told a lot of
 4  my friends about this whole deal.  But anyway he
 5  said that Merrill had been down to a planning
 6  commission meeting and really showed him -- kind
 7  of acted up, and he was not interested in
 8  helping Merrill Ingram do anything out there,
 9  you know, but he was very helpful to me.
10       Q.  In what way?
11       A.  Well, he told me he -- he let me
12  know that they had Merrill Ingram in a bind.
13       Q.  How so?
14       A.  That they were going to make him
15  run that road out, and he knew that he had sold
16  that property to me.  And that he said -- I
17  don't remember exactly the word, but close to
18  what he said -- but the hardest thing you need
19  to make up your mind about is how much money you
20  want to make off this deal.  And I wanted to
21  see -- I kind of wanted to feel out -- you know,
22  I wanted to make a fair -- I told you I wanted
23  to keep the property a couple of years and try
```

49

```
1  Parkway?
2      A.   No, sir.  It was on the
3  proposed -- some of it was on the proposed road
4  that Merrill was going to finish within 18
5  months, and the other was -- went all the way to
6  Chantilly.
7      Q.   And you talked about the road --
8  and did you say water or sewage -- you said
9  something was going to be short of the property
10 line -- the road?
11     A.   All of it.
12     Q.   Road, sewer, and water would be
13 short of the property line?
14     A.   Yes, sir.
15     Q.   But it would be on your property?
16     A.   Yes, sir.  It would dead-end on my
17 property.
18     Q.   And then it would be short of the
19 next developer?
20     A.   Right.
21     Q.   And that's where you thought you
22 might could work out something where you could
23 get some benefit by letting this next developer
```

50

```
1  tie on?
2      A.   Sure.
3      Q.   Did your deed or the plat that you
4  had show that this was a utility or water board
5  easement there that fronted on Chantilly
6  Parkway?
7      A.   I don't recall.  I feel like it
8  would have shown that.
9      Q.   Do you know why the company that
10 it sold was back to, was different from the one
11 that you purchased it from?
12     A.   No, all of my dealings was with
13 Merrill Ingram -- bought and sold -- well, his
14 wife sat at the table when I bought it and did
15 the paperwork.
16     Q.   And just from your testimony it
17 sounds like you really were buying that property
18 to sort of hold on to it and sell in a couple of
19 years?
20     A.   Yes, sir.  And short of that, I
21 had -- well, I was -- I was also thinking about
22 building something on it, a retail strip in the
23 front, and then a storage for the retail center
```

51

```
1  behind it.
2      Q.   Had you had any other professional
3  dealings with Merrill Ingram regarding any other
4  property before this?
5      A.   No, sir.
6      Q.   Have you had any since?
7      A.   No, sir.
8      Q.   Do you have any personal
9  relationship with him?
10     A.   No, sir.
11     Q.   Good friends, entertain, been to
12 your house?
13     A.   No, sir.
14     Q.   Have you developed any property
15 since buying this commercial?  You said this was
16 the first commercial --
17     A.   No, sir.  I've bought some, but
18 I've never developed any -- I'm thinking about
19 it.
20     Q.   Generally, what you do is to buy
21 it and hold it and try to turn it over?
22     A.   Yes, sir.
23     Q.   Have you ever submitted a
```

52

```
1  development plan to the City or to the Water
2  Board?
3      A.   No, sir.
4      Q.   I want to be clear:  Mr. Ingram
5  comes to you and tells you that a service road
6  is going to be required.  And you think he said
7  by the State, or your impression is it was the
8  State?
9      A.   I don't know if I got that from
10 Merrill or from the City -- I don't know where I
11 formed that -- I don't know where I got that
12 impression.  I may have just thought that the
13 State had the control of everything out there
14 and I thought they did of that road and such.
15     Q.   But he never told you, Mr. Ingram,
16 that he wanted to repurchase some or all of that
17 property because of anything that the Water
18 Board was requiring, did he?
19     A.   Well, he wanted me to give it to
20 him, and then short of that, he wanted me to
21 sell him just as much property as he needed.
22     Q.   But as to your understanding that
23 was for an access or service road?
```

1

1        IN THE UNITED STATES DISTRICT COURT FOR

2           THE MIDDLE DISTRICT OF ALABAMA,

3               NORTHERN DIVISION

4

5    CIVIL ACTION NUMBER

6    2:07-CV-836

7

8    FOREST GLEN, LLC AND TIMBER CREEK, LLC,

9        Plaintiff(s),

10   vs.

11   CITY OF MONTGOMERY, AND THE

12   WATER WORKS AND SANITARY SEWER

13   BOARD FOR THE CITY OF MONTGOMERY,

14       Defendant(s).

15

16           DEPOSITION TESTIMONY OF:

17               GREG GILLIAN

18

19

20   March 12, 2008

21   10:29 AM

22   SELAH M. DRYER, CCR

23   ACCR #: 393

EXHIBIT

E

                                                                    5

```
 1           A P P E A R A N C E S
 2  FOR THE PLAINTIFF(S):
 3      Harold Dean Mooty, Jr., Esq.
 4      MOOTY & ASSOCIATES
 5      600 Clay Street
 6      Montgomery, Alabama  36104
 7  FOR THE DEFENDANT(S):
 8        REPRESENTING THE CITY OF MONTGOMERY:
 9      Wallace D. Mills, Esq.
10      CITY OF MONTGOMERY
11      Legal Department
12      103 N. Perry Street
13      Suite 200
14      Montgomery, Alabama  36104
15
16        REPRESENTING THE WATER BOARD:
17      Randall Morgan, Esq.
18      HILL, HILL, CARTER, FRANCO,
19          COLE & BLACK, P.C.
20      425 South Perry Street
21      Montgomery, Alabama  36104
22  ALSO PRESENT:
23      Keverly F. Daniel
```

                                                                    6

```
 1       I, Selah M. Dryer, a Notary Public for
 2  the State of Alabama at Large, acting as
 3  Commissioner, certify that on this date,
 4  pursuant to the Alabama Rules of Civil
 5  Procedure, and the foregoing stipulation of
 6  counsel, there came before me at the law
 7  office(s) of Mooty & Associates, 600 Clay
 8  Street, Montgomery, Alabama  36104, commencing
 9  at approximately 10:29 AM on March 12, 2008,
10  GREG GILLIAN, witness in the above cause, for
11  oral examination, whereupon the following
12  proceedings were had:
13
14            GREG GILLIAN,
15  being first duly sworn, was examined and
16  testified as follows:
17
18            COURT REPORTER:  Usual
19  stipulations?
20            MR. MILLS:  Yes.
21            MR. MOOTY:  Yes.
22            MR. MORGAN:  Yes.
23
```

                                                                    7

```
 1  EXAMINATION BY MR. MILLS:
 2       Q.   Mr. Gillian, my name is Wallace
 3  Mills.  I represent the City of Montgomery in a
 4  lawsuit filed against the City and the Water
 5  Board by some companies owned by Mr. Merrill
 6  Ingram, Forest Glen LLC and Timber Creek LLC.
 7  Could you tell me your name, please?
 8       A.   My name is Gregory Mark Gillian.
 9       Q.   Spell your last name for me.
10       A.   G-I-L-L-I-A-N.
11       Q.   Let me tell you this before we
12  start.  If I ask you a question that you don't
13  understand, just ask me to restate it.
14  Otherwise I'll assume that you understood the
15  question.  If you need to take a break or
16  anything like that, just tell me.  Okay?
17       A.   Okay.
18       Q.   What do you do for a living,
19  Mr. Gillian?
20       A.   Land surveyor, engineer.
21       Q.   A licensed professional engineer?
22       A.   Yes.
23       Q.   Have you done any work in the last
```

                                                                    8

```
 1  few years for either Forest Glen LLC, Timber
 2  Creek LLC or Merrill Ingram?
 3       A.   Yes.
 4       Q.   Specifically did you do any work
 5  on a development which when the plat was filed,
 6  I believe the plat name was Chantilly Place East
 7  Plat No. 1.  Did you work on that?
 8       A.   Yes.
 9       Q.   Tell me what work you did on that
10  development.
11       A.   Everything.
12       Q.   Surveying?
13       A.   Surveying, engineering design --
14  the whole nine yards.
15       Q.   Did you draw up the plat that was
16  submitted to the planning commission?
17       A.   Yeah, I had people in the office
18  draw up the plat.
19       Q.   Did you represent Mr. Ingram or
20  his companies at the planning commissions?
21       A.   Yes.
22       Q.   When did Mr. Ingram engage you to
23  draw up the plat?  He may have engaged you prior
```

**21**

Q.   Any other exception other than depending on where drainage basins are set up, that you know of, about taking it to the property line -- are there any other exceptions other than that?

A.   Whatever the Water and Sewer Board dreams of -- there are exceptions there.  There are exceptions that we deal with, so that's basically up to engineering.

Q.   Up to the Board of Engineering?

A.   Yes.

Q.   What percentage of the developments that you are involved in has the Water Board not required the sewer line to be carried to the property line?

A.   I don't have an answer for that.  I don't know.

Q.   Did you have any conversations with Ms. Daniel about that, or did you just submit the plans and those are the notes that you got back?

A.   I don't recall a conversation with Keverly, specifically.  Me and Keverly, as we

**22**

were working on projects and plans, we talk about a lot of things, so I don't recall a specific conversation.

Q.   Do you recall discussing it with anyone else at the Water Board other than possibly Keverly?

A.   I believe we discussed everything with Keverly basically, if I'm not mistaken between me and Wes Fulmer.

Q.   Is he with Larry Speaks as well?

A.   Yes.

Q.   Was there ever any discussion with Keverly about development requirements in terms of sewer line for the property that's east of Chantilly Place East Plat No. 1?

A.   Specifically, I don't recall one.  But again, these are the notes that we generally get back from the Water and Sewer Board right here.

Q.   I understand -- and I'm not asking about the Merrill Ingram property.  I'm asking about the property to the east.  Did she ever tell you that it would or would not be required

**23**

to take the sewer line to the end of his property?  Did you ever have such a conversation with her?

A.   Well, on October the 3rd of 2003, she wrote me a letter saying that it was required.  The specific conversations that you're asking me to remember, I'm not remembering any conversations -- I'm not saying there weren't any.

Q.   I understand that in October of 2003, you received this back from her, and it said that you were to take this to --

A.   -- the adjacent property.

Q.   -- Merrill Ingram's property line.  Did she ever tell you anything about the property that was east of Merrill Ingram, how it would be developed or if there would be any similar requirements?  Did you ever discuss that piece of property with her?

A.   I don't recall discussing it, no.

Q.   I assume when you received these notes indicating that you had to take it to the property line, you redrew the plans accordingly?

**24**

A.   After discussions with Mr. Ingram, yes.

Q.   What discussions did you have with Mr. Ingram about that?

A.   Specifically, that the Water and Sewer Board was requiring the sewer line to be extended.

Q.   What was his response?

A.   He didn't like the idea of having to pay for it since he had already gotten to the point where he needed it.  At that point he said, we'll have to put it in the plans to get it approved, and said that's what we'll have to do at this point.

Q.   So that change would have been made and that conversation with Mr. Ingram would have occurred then before that plat was presented back to the Water Board for its final approval?

A.   Yes, sir.

Q.   And would have occurred before it was final approved and recorded, plat recorded -- all of that would have occurred

**25**

1 before that?

2    A.    Yes, absolutely.

3    Q.    I know you don't have your notes

4 and are talking from memory, but what I'm

5 understanding you to say is that in terms of

6 your work there for Mr. Ingram and whatever

7 companies he might have on this Chantilly

8 Parkway developments, your dealings with the

9 Water Board would have been through Keverly?

10    A.    Ninety-nine percent of the time,

11 that's correct.

12    Q.    Is there anybody else that you

13 recall dealing with at the Water Board other

14 than her on the Chantilly Parkway development?

15    A.    2003 -- any time we butt heads

16 with Keverly, and we get tired of butting heads

17 with Keverly, we talk to Enrique or Bill

18 Henderson or Brian.

19    Q.    Do you recall any conversation --

20    A.    I don't recall any specific

21 conversation.

22    Q.    -- about extending the sewer line?

23    A.    No, but usually when we're dealing

**26**

1 with Keverly -- and we have a problem with

2 Keverly on whatever subject it is -- we end up

3 talking with somebody -- I guess we call it

4 going over your head a little bit sometimes.

5    Q.    Just so I'm clear, what I've

6 understood you to say in this deposition and you

7 can certainly correct me, is that you submitted

8 a plan, I guess, a preliminary plan.  You

9 received back these comments and revisions and

10 you didn't actually have any conversations with

11 Keverly about the requirement to take it to the

12 end of the property line.  Is that what you

13 said?

14    A.    I didn't recall having a specific

15 conversation.  I'm sure we did, but you're

16 asking me if I recall these conversations, and I

17 don't know.

18    Q.    As we sit here today, you can't

19 recall any specific conversation you had with

20 her or anybody else about that?

21    A.    No.

22    Q.    Can you remember specifically any

23 development or preliminary plans that you

**27**

1 submitted to the Water Board that the Board did

2 not require the sewer line to go to the end of

3 the property?

4    A.    Tom Cruz's property.

5    Q.    Who?

6    A.    Tom Cruz.

7    Q.    How do you spell Cruz?

8    A.    I don't recall that.  North Chase.

9 We put a pump station in.  We didn't try sewer,

10 anything else outside his property.

11 Mr. Ingram's property over here on the south

12 side of Chantilly, we ran a line all the way up

13 to Mr. Ingram's property at the intersection of

14 Ryan Road.  We stopped at -- again, we were

15 running it along the right of way, and we

16 stopped at Mr. Ingram's property and we are not

17 required to send it on up to the north for any

18 reason.  I mean, these are just -- I don't know

19 how you want to look at it -- the way you want

20 to look at it.  That's all I can recall at the

21 moment.

22    Q.    We were presented with estimate

23 quantities, and I'll mark it Defendant's Exhibit

**28**

1 No. 9.  Is this something that you had any input

2 in?

3            (WHEREUPON, a document was marked

4            as Defendant's Exhibit No. 9 and

5            is attached to the original

6            transcript.)

7    A.    Yes.

8    Q.    And it shows the cost of extending

9 the sewer line another, what, 140 feet?

10    A.    No.  These first two pages are an

11 estimate that gets you from Emma Court to the

12 point where the extension began in the first

13 one.  Now the third page is the estimate from

14 where he originally had the roadway stop and we

15 had to extend the road, the remaining portion,

16 to the end of the property line.

17    Q.    Doesn't it show the sewer line to

18 be about 140 feet, requiring an additional

19 extension?

20    A.    Yes.

21    Q.    That's about, what, $5,290 to

22 extend that 140 feet?

23    A.    That's correct.

STATE OF ALABAMA

COUNTY OF MONTGOMERY

PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement ("Agreement") is made and entered into by and
between:

_Timber Creek LLC_____ (hereinafter referred to as "Purchaser"),

**and**

**Alan and/or Ann J. Bush**_____ (hereinafter referred to as "Seller").

WITNESSETH:

1. Property. Seller hereby agrees to sell and convey to Purchaser, and Purchaser
hereby agrees to purchase and take from Seller, under and subject to the terms, conditions
and provisions hereof, that certain real property consisting of _(Parcel 1 )_, _2.25_
acres lying in Montgomery County, Alabama and which for ad valorem tax purposes is
described as Parcel No. _(Parcel 1, Metes & Bounds)_ and more particularly described
or shown on Exhibit "A" attached hereto and made a part hereof by reference as if set out
in full (hereinafter the "Property"), together with all appurtenances, rights of way,
privileges, easements, appurtenances and other rights benefiting or pertaining to the
Property and all right, title and interest of the Seller in and to any and lying in the right-
of-way in front or adjoining the Property to the centerline thereof. An exact legal
description of the Property shall be based on the survey to be obtained or furnished
pursuant to Paragraph 6 hereof.

2. Purchase Price. The purchase price for the Property shall be_ **$3.50 per**
**square foot.**
The purchase price shall be payable as follows: _10,000 ⁰⁰_  _MK1 - Non-Refundable_
a. The sum of _$1000_ as the "Earnest Money", is to be deposited with
**Alan and/or Ann J. Bush**_____, after Purchaser's receipt fully executed copy of this
agreement; and  _10,000 Ernest Money + 3.50 per Ft. AB_
b. The balance of the purchase price, after deductions for credits and
prorations as herein provided, shall be paid in full at the Closing herein provided by
check or cash on the day of Closing. The Earnest Money shall be credited against the
purchase price at Closing

c. The seller agrees to pay a _n/a_ commission fee of the total Sales
Price to _n/a_ in full at the time of Closing.

3. Feasibility Period. Within _10_ days after the Effective Date of this
Agreement, Seller shall furnish to Purchaser a copy of all the following pertaining to the
Property which are in Seller's possession or which Seller has reasonably available to
Seller; survey, soils report, environmental report, title report or policy, drainage and
utility studies pertaining to the physical condition of the Property, and all documents or
instruments pertaining to the physical condition of the Property or that might affect
Purchaser's intended use or development of the Property. Purchaser shall have a period
of _30 days_ after the Effective Date of this Agreement (the "Feasibility
Period") to satisfy itself as to intended use and development thereof. During the
Feasibility Period, Purchaser shall have the right to inspect the Property, to conduct a
market analysis of the Property and the intended use thereof, to confirm and seek, as
necessary, zoning and other governmental land use approvals, permits and licenses with
respect to the Property and the intended use thereof, and to otherwise conduct a
feasibility review analysis with respect to the Property and the intended use and

1

EXHIBIT
F

development thereof. Not withstanding anything contained herein to the contrary, in the event that Purchaser determines, in its sole right to terminate this Agreement at any time on or before the expiration of the Feasibility Period hereunder, this Contract shall cease and terminate and earnest money is to be refunded to Purchaser. Notwithstanding anything herein stated to the contrary, in the event Purchaser desires to extend the Feasibility Period, Purchaser may do so for an additional _____**n/a**_____ period by paying to seller within the feasibility Period the sum of _____**n/a**_____.    If Purchaser elects to close during the extended Feasibility Period, said sum shall be applied to the Purchase Price herein.

In the event that Purchaser determines, in its sole and absolute discretion, that the property is not satisfactory for any reason, Purchaser shall have the sole right to terminate this agreement at any time on or before the expiration of the Feasibility Period provided however, the additional earnest money shall not be refunded to Purchaser, although all other rights and obligations under the contract shall cease and terminate.

4. <u>Governmental Approvals</u>. Purchaser is hereby authorized to seek and obtain any and all permits, licenses, site and development plan approvals, permits and authorizations, zoning approvals, curb-cut approvals, and any and all other approvals or consents as Purchaser may deem necessary in connection with its proposed acquisition, development and use of the Property and Seller agrees to cooperate with Purchaser in such endeavor. If any such applications, approvals or permits are required to be sought in Seller's name, seller shall upon Purchaser's request seek same without cost to Seller. As part of the consideration for Purchaser's payment of the purchase price, Seller shall assign, transfer and convey to Purchaser at Closing all permits, approvals, licenses, site and development plans affecting the Property which Purchaser requests Seller to assign to Purchaser and shall deliver such originals to Purchaser at Closing.

5. <u>Entry Upon Property</u>. Upon execution of this Agreement, Purchaser, its agents, employees and all other persons authorized by it, or any of them, are permitted to enter upon the Property and to obtain and perform such tests, studies and maps as Purchaser may deem necessary or advisable including, but not limited to, percolation, soils, hazardous waste, environmental, and geological tests and studies

6. <u>Survey</u>. Seller shall at Sellers expense procure within thirty (30) days after the Effective Date of this Agreement a current on-site survey and topographical report on the Property prepared by Sellers engineer (the "Surveyor"). The Surveyor and their respective agents, employees and contractors, shall have the right to enter upon the Property for the purposes thereof and also may perform thereon such topographical and soil studies and related engineering tests as Purchaser deems necessary to evaluate its proposed use of the Property. The Surveyor shall also determine the extent and scope of any easements that now affect or benefit the Property. Notwithstanding anything herein stated to the contrary, in the event that Purchaser elects to purchase the property, Purchaser shall be entitled to a credit against the Purchase Price for the reasonable cost of the boundary survey of the Property prepared pursuant to paragraph 6 of the Contract.

7. <u>Abstract of Title</u>. Seller agrees at its cost to furnish to Purchaser within thirty (30) days after the Effective Date of this Agreement, an up-to-date abstract of title of the Property extending back at least sixty (60) years and disclosing good and merchantable fee simple title thereon vested in Seller. Purchaser shall have its attorney examine the abstract of title; provided, however, is Purchaser's requirement that the abstract of title disclose Seller as present owner of fee simple title to the Property without exception except for ad valorem taxes not yet due and payable, any existing mortgage (from which the property shall be released at closing) and such other easements and exceptions as Purchaser may, in its sole and absolute discretion, waive in writing (the "Permitted Exceptions"). If the abstract of title discloses a defect or defects in title to either the Property or discloses easements or other exceptions that Purchaser is unwilling to waive, then Purchaser agrees to notify Seller of such matters and Seller shall proceed to cure such matters at Seller's expense.    If said matters are not cured within twenty (20) days after notice, then Purchaser may grant Seller additional time to cure the defects and, further Purchaser may, at any time thereafter, at is option in writing waive such defect or unacceptable easements or other exceptions or cancel this Agreement, in which case of the latter event, Seller shall immediately refund to Purchaser the Earnest Money paid hereunder. Seller represents that it presently owns fee simple title to the Property, except for any existing mortgage which Seller covenants to have released with respect to the

Property at the time of closing, and will not permit any change in the status of the title to the Property until this Agreement has been consummated or otherwise terminated in accordance with the terms hereof. Risk of loss prior to closing shall be borne by Seller.

8. Closing. Subject to the satisfaction of all the conditions hereof or the waiver in writing thereof by Purchaser, the date of Closing shall be the date that is ___1___ days after the end of the Feasibility Period unless such date is a Saturday, Sunday or legal holiday, in which event the date shall be extended to the next business day. The sale shall be closed in Montgomery County, Alabama at the office of Purchaser's attorney. At Closing Seller shall deliver to Purchaser a Warranty Deed containing the usual and customary full covenants utilized in general warranty deeds in Montgomery County, Alabama, conveying a good and merchantable, indefeasible fee simple title in and to the Property subject only to Permitted Exceptions, and Purchaser shall be surrogate to all rights and actions of Seller against all former owners and vendors. The description used in the Deed shall be one and the same and shall coincide with the survey. Seller shall pay at closing, by deduction from the purchase price, any and all expenses herein provided to be paid by Seller and the cost of preparing the Deed. Purchaser shall pay to record its Deed. Ad Valorem taxes and utilities, if may, shall be prorated as of Closing.

Any assessments whether due or not, levied against the Property shall be paid in full by Seller at Closing. At Closing, Purchaser shall pay the balance of the purchase price, subject to adjustments and credits as herein provided, and the Earnest Money shall be applied and credited to the purchase price. Each party shall bear its own attorney's fees. Seller shall also execute and deliver at Closing such affidavits of title, lien and possession as may be required by Purchaser, a FIRPTA Affidavit, and appropriate 1099 forms. Except for the right of entry granted herein, possession shall be given to Purchaser on the Closing Date, free and clear of all tenancies and parties in possession.

9. Default: Remedies. Seller has complied with all of its obligations herein contained and all of Seller's representations and warranties are true and correct, and all of the conditions herein have been met to Purchaser's satisfaction or waived in writing by Purchaser, but Purchaser fails to proceed with the purchase of said Property, then Seller shall have the right of specific performance or any other right or remedy on account of a default by Purchaser and shall have the right to declare the Earnest Money forfeited to Seller as liquidated damages. If Seller defaults, violates, or breaches any of its warranties, covenants, obligations and representations and warranties herein provided, then in such event Purchaser may declare this Agreement canceled and of no further force and effect and promptly receive a return of the Earnest Money, or Purchaser shall have the right of specific performance or any other right or remedy on account of a default by Seller.

10. Assignment. This Agreement may be assigned by Purchaser and all powers, rights, and privileges herein reserved and given to Purchaser or the Seller shall inure to the benefit of and be held by the respective successors and assigns of the parties, and all liabilities or obligations imposed on each shall be binding upon the respective heirs, successors and assigns of the parties. The Purchaser will notify the Seller in writing of any Assignment of this contract.

11. Environmental Concerns. Notwithstanding anything contained in this Agreement to the contrary in the event that, as a result of Purchaser's investigation, "hazardous substances(s)", hazardous waste (s)" or hazardous material(s)", as defined under applicable federal or state law, or both, are found on the Property, then Purchaser shall have the right, at its option and election at any time, to terminate this Agreement and to receive a return of the Earnest Money; it being a condition precedent to Purchaser's obligation to purchase the Property that the results of Purchaser's environmental studies, reveal that the Property is free from any and all `hazardous substance(s)", "hazardous waste(s)" or "hazardous material (s)", as defined under applicable federal or state law, or both, provided such environmental studies are performed during the Feasibility Period. Purchaser, its agents and representatives, are hereby authorized to perform any and all studies, tests and inquiries as it may deem appropriate or necessary in furtherance of the foregoing, including entering upon the Property and performing tests and studies thereon. Seller agrees that Purchaser may make inquiry of pertinent governmental and administrative bodies and agencies concerning environmental violations or citations regarding the Property.

12. <u>Condemnation</u>. Seller covenants and agrees there is no pending or threatened condemnation or similar proceeding affecting the Property or any portion thereof, nor has Seller acknowledged that any such action is presently contemplated. Should any entity having the power of condemnation decide prior to the time of Closing to acquire any portion of or interest in the Property, Purchaser, at Purchaser's sole option, may elect to (a) terminate Purchaser's obligation to purchase the Property, by giving written notice to Seller at any time prior to the time of Closing and receive back all sums paid hereunder, or (b) complete the purchase of the Property with Seller immediately appointing Purchaser its attorney in fact to negotiate with said condemning entity and assigning to Purchaser all sums to be awarded.

13.    <u>Notices.</u>  Any notice permitted or required to be given hereunder shall be made in writing and sent to receiving party at the address set forth below by Certified Mail, *return receipt requested*, and shall be deemed given by either party to the other when the same is deposited in the United States Mail as certified, return receipt requested with postage prepaid sufficient to deliver to its addressed destination whether or not the receiving party receives the same. The address of the parties is as follows:

<u>**SELLER:**</u>                                      <u>**PURCHASER:**</u>
Alan and/or Ann J. Bush

                                            Timber Creek  LLC

14. <u>Agency Disclosure.</u>

<u>AGENCY DISCLOSURE</u> (Required per Code of Alabama 34-27-8c)

<u>Print Name of Listing Company:</u>

The Listing Company is:                    **(Two blocks may be checked)**
   o   An agent of the Seller
   o   An agent of Purchaser
   o   An agent of both the Seller and The Purchaser as is acting as a limited
       consensual dual agent
   o   Assisting the Purchaser Seller as a transaction broker

<u>Print Name of Selling Company:</u>

The Selling Company is:                    **(Two blocks may be checked)**
   o   An agent of the Seller
   o   An agent of Purchaser
   o   An agent of both the Seller and The Purchaser as is acting as a limited
       consensual dual agent
   o   Assisting the Purchaser Seller as a transaction broker

Seller(s) initials  AB                Purchaser(s) initials  MV

15. <u>Miscellaneous.</u>

    (a) Seller warrants and represents to Purchaser as follows, which representations and warranties shall expressly service hereunder:

    That Seller owns fee simple title to the Property and has the power and authority to enter into this Agreement, and the entering into of this Agreement and the performance of Seller's obligations hereunder shall not violate the terms or conditions of any applicable law, rule or regulation pertaining to Seller or the Property.

    (b) In the event it becomes necessary for either Seller or Purchaser to employ the services of an attorney to enforce any term, covenant or provisions of this Agreement, then each party agrees that the non-prevailing party shall pay the reasonable attorney's fees incurred by the prevailing party in enforcing this Agreement.

4

(c) This Agreement constitutes the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties with respect to the Property. It is expressly agreed that there are no verbal understandings or agreements which in any way change the terms, covenants, and conditions herein set forth, and that no modification of this Agreement and no waiver of any of its terms and conditions shall be effective unless made in writing and duly executed by the parties hereto.

(d) All personal pronouns used in this Agreement whether used in masculine, feminine, or neuter gender, shall include all other genders, the singular shall include the plural, and vice versa.

(e) Any provision of this Agreement or any paragraph, sentence, clause, phrase or wording appearing herein which shall prove to be invalid, void or illegal for any reason shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions, paragraphs, sentences, clauses, phrases and words hereof shall nevertheless remain in full force and effect.

(f) Contract is contingent upon the purchaser obtaining the financing he/she is seeking. If these conditions are not met, the purchaser has the sole right to terminate this contract, and all monies returned immediately with the purchaser having no further obligations or liabilities. The Purchaser will secure financing during the feasibility period.

(g) This Agreement shall be construed and enforced in accordance with the laws of the Sate of Alabama.

(h) The submission of this Agreement, executed by Purchaser, shall not be deemed a continuing offer to enter into this Agreement shall be effective only upon the execution and delivery thereof by both Seller and Purchaser on or before as used herein the "Effective Date of this Agreement" shall be the last date of execution of this agreement by the parties comprising Seller and the Purchaser.

(i) It is understood and agreed between the Seller and the Purchaser that, in order to facilitate a tax-free exchange acquisition of the Property for the benefit of the Purchaser, the Seller will cooperate fully with the Purchaser in making such exchange, and execute such documents as may be required. Provided, however, that in no event shall the Seller be requested or required to incur any additional cost or expense, risk or liability, in assisting the Purchaser in effecting an exchange of property.

(j) This offer expires at _____, _N/A_____.

IN WITNESS WHEREOF, the parties have hereunto executed this Agreement on this _____5TH_____ Day of __FEBRUARY, 2004_____.

WITNESS:                                PURCHASER:

_____        By _____Timber Creek LLC___

                                        Its: ___As Its Manager___

WITNESS:                                SELLER:

_____        Alan and/or Ann J. Bush

                                        _____