IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

| | | |
|---|---|---|
| FOREST GLEN, L.L.C. and TIMBER CREEK, L.L.C., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 2:07-CV-836 |
| | ) | |
| CITY OF MONTGOMERY and THE WATER WORKS AND SANITARY SEWER BOARD FOR THE CITY OF MONTGOMERY, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO CITY OF MONTGOMERY'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Forest Glen, L.L.C. and TimberCreek, L.L.C. (sometimes collectively referred to herein as "Plaintiffs"), file this Response in Opposition to the Motion for Summary Judgment filed in this matter by the City of Montgomery. Based on the following, Plaintiffs assert that the City's Motion for Summary Judgment is due to be denied in its entirety.

The City's Motion for Summary Judgment may be capsulated into two main arguments:

1.    The City's apparent "linchpin" argument is that the claims of the Plaintiffs are barred by the statute of limitations; and

2.    Even if the City did represent to Plaintiffs that the access road at issue would be extended beyond Plaintiffs' property line along Chantilly Parkway, the annexation of the adjoining property into the City of Pike Road, Alabama, makes such extension impossible (at least as to the City of Montgomery) and therefore, it's just "tough luck" for the Plaintiffs.

### *Standard of Review on Summary Judgment*

Rule 56 of the *Federal Rules of Civil Procedure* provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Where the issues before the Court are primarily factual, "summary judgment is appropriate only when there is no genuine issue of material fact and movant is entitled to judgment as a matter of law." Turnes v. AmSouth Bank N.A., 36 F.3d 1057, 1061 (11th Cir. 1999). The party seeking summary judgment bears the initial burden of showing that no genuine issue of material fact exists. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). There is a genuine issue of fact when "the evidence is such that a reasonable jury [fact finder] could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The evidence of a non-movant is to be believed and all justifiable inferences are to be drawn in its favor." *Id.* at 255. Such justifiable inferences "may create disputes regarding basic facts or regarding facts to be inferred from such facts." Ala. Farm Bureau Mutual Casual. Co. v. American Fidelity Life Insurance Co., 666 F.2d 602, 609 (5th Cir. 1979). The evidence before the Court demonstrates that there are clearly genuine issues of material fact precluding summary judgment.

### *Background*

Plaintiffs, Forest Glen, L.L.C. and TimberCreek, L.L.C., are Alabama limited liability companies with their principal places of business in Montgomery County, Alabama. They each are in the real estate development business, and both are Plaintiffs herein as each owns or has owned at material times herein portions of the property consisting of a commercial real estate

2

development in East Montgomery known as Chantilly Place, located on the North side of Chantilly Parkway between Interstate 85 and Vaughn Road.    Merrill Ingram is the principal/Managing Member of each of the Plaintiff companies.

Plaintiffs have been developing Chantilly Place over the past number of years in various stages.  That portion at issue in this matter is sometimes referred to as Chantilly Place East Plat No. 1, a copy of which plat is attached hereto as Exhibit A.  As a part of the Chantilly Place development, the City of Montgomery required Plaintiffs to build and construct, at Plaintiffs' expense an access or service road along Plaintiffs' property boundaries running parallel to Chantilly Parkway.  This is shown on the attached plat, Exhibit A, as "Emma Lane" which runs from Emma Court as shown the length and breadth of Chantilly Place East Plat No. 1.  However, the service road – Emma Lane – was originally extended to only the first portion of what is shown as Lot 1 on the East end of Chantilly Place East Plat No. 1.  *See* Exhibit B.  It did not, nor was it required to be extended to the end of Plaintiffs' property line on the East.

On or about August 22, 2003, Plaintiff Forest Glen sold 2.25 acres in this development to Alan and Ann Bush.  At that point, the plat was only in preliminary stages and thus the property was sold in metes and bounds.  Said 2.25 acres became what is shown on the attached Exhibit A as Lot 1.

Soon after the sale of this property to Mr. Bush, Merrill Ingram testifies that Mr. Bush advised him that the City had informed him that he – Mr. Bush - would not be able to get a building permit and/or development plan unless the service road was extended all the way to the East boundary line of Plaintiffs' property.  (Ingram Depo., pp. 19-21).[1]  Mr. Bush tells a slightly different version, that Mr. Ingram approached him and advised that he, Mr. Ingram, was going to be required to extend the service road before there could be any plat approval.  *See* Bush Depo.,

_____
[1]Excerpts attached of all deposition references.

3

pp. 15-16. Regardless, it became clear and known to all parties that the City was going to require the service road to be extended the length and breadth of the subject property all the way to the property line to the East on Chantilly Parkway.

Moreover, by letter dated January 20, 2004, the City of Montgomery per Stuart Manson in the Traffic Engineering Department, issued this directive in writing. *See* Item 2 of said letter attached hereto as Exhibit C. That requirement says:

> 2.    The access agreement parallel to Chantilly Parkway (Al Highway 110) must be extended along the entire length of Lot 1.

This would be a specific condition to the City approving Plaintiffs' proposed Chantilly Place East Plat No. 1.

As a result, Merrill Ingram was forced to approach Alan Bush, first in an attempt to get Mr. Bush to sell or give Mr. Ingram the frontage property necessary to extend the service road as required by the City. At this point, Mr. Bush candidly testifies that he wanted to know just how bad Mr. Ingram needed this property, or he wanted to know just how big of a "bind" he had Mr. Ingram in and therefore how much money Mr. Bush could make off of it. (Bush Depo., pp. 24-26). Mr. Bush recounts going to the City and Sewer Board and speaking with at least "10 different people," all of whom were extremely helpful once they found out that Merrill Ingram was on the other side of this issue. Mr. Bush testifies that Cecil Cork in the City's Engineering Department told him that they (the City) had Merrill in a bind. (Bush Depo. pp. 32-33), and that they (the City) was going to "get" Merrill Ingram. (Bush Depo., p. 34). Mr. Bush says it was quite clear the City had it in for Merrill Ingram. Mr. Cork, the City Engineer, told Mr. Bush that he wasn't interested in helping Merrill Ingram do anything out there [at Chantilly Place].

Q.    In what way?[2]

---

[2] Questioning is by the City's attorney.

4

A.    Well, he told me – he let me know that they had Merrill Ingram in a bind.

Q.    How so?

A.    That they were going to make him run that road out, and he [Mr. Cork] knew that he had sold that property to me. And that he said – I don't remember exactly the word, but close to what he said – but the hardest thing you [Mr. Bush] need to make up your mind about is how much money you want to make off this deal…

…And Mr. Court [Cork] – Cecil – I know his first name is Cecil – Cecil made it clear to me that I had him about where I hoped I had him and that he certainly didn't have anything for Mr. Ingram.

(Bush Depo., pp. 32-33).

With that leverage, Mr. Bush sold the subject property back to Mr. Ingram, or specifically to TimberCreek, on February 25, 2004, for approximately $111,000 more than he had bought it from Mr. Ingram just six months prior.    (Bush Depo., pp. 22-23). TimberCreek then subsequently sold the property to one Norris Watson on or about April 12, 2004, for approximately $28,000 more than it had repurchased the property from Mr. Bush. At a minimum then, the requirement to extend the service road to the end of Plaintiffs' property cost Plaintiffs $60,000 in having to repurchase the property from Mr. Bush and as mitigated by the resale of the property to Mr. Watson. In addition of course, Plaintiffs incurred $30,000 in the actual cost of extending the service road.[3]  *See* Exhibit 9 to Depo. of Greg Gillian; also Gillian Depo. p. 28.

---

[3] These damages don't consider the value of Plaintiffs' frontage property on Chantilly Parkway it was required to use extending the access road.

5

As to why the service road had to be extended, Merrill Ingram testified that the City told him that the access road he had in place before building the extension, would be required to run all the way along Chantilly Parkway to Vaughn Road. (Ingram Depo., p. 18, 24). The City also told Mr. Ingram that the City was not going to have another "Atlanta Highway;" referring to the Atlanta Highway in Montgomery, Alabama, that does not have a network of service roads.[4] The Plaintiffs were told that all properties along Chantilly Parkway would be required to have service roads. *See* Affidavit of Merrill Ingram attached hereto as Exhibit D. In fact, Plaintiffs were assured that the service road the City was requiring Plaintiffs to extend to the end of their property line to the East would be extended on along Chantilly Parkway toward Vaughn Road. While there is some confusion as to whether it was to be extended all the way to Vaughn Road or just to the next median crossover, it was clear from the City's representations that the service road would be extended beyond Plaintiffs' properties to the East which would give Plaintiffs an outlet onto Chantilly Parkway to the East of its own property.

Curiously, even Alan Bush, who is shown above to be clearly not an ally of Plaintiffs and Merrill Ingram, testifies that the City of Montgomery, and specifically Cecil Cork, showed him a map that showed the subject service road being extended all the way to Vaughn Road, consistent with the City's representations to Plaintiffs. (Bush Depo., p. 35).[5]

While Plaintiffs disagreed with the requirement to extend the service road to the property line, as it was absolutely unnecessary to the development of Chantilly Place East Plat No. 1 and its lot owners, Plaintiffs extended the service road as required by the City, as frankly it had no

---

[4] Alan Bush said Cecil Cork used the service road near Lagoon Park in Montgomery as an example of the benefits of a service road. (Bush Depo., p. 35).

[5] The City now disavows any knowledge of such a map and has failed to produce the map Mr. Bush has testified under oath he was provided and shown by the City setting out the extension of the service road all the way along Chantilly Parkway to Vaughn Road.

choice since the City was refusing to approve its plat unless Plaintiffs did so.  Chantilly Place

East Plat No. 1 was approved by the City on or about February 10, 2005, per Exhibit A hereto.

On or about May, 2006, Plaintiffs observed the construction and placement of a large

billboard on the property just to the East of Plaintiffs' eastern boundary and essentially "in the

way of" the service road and accompanying sidewalk which Plaintiffs had completed to the

property line as required by the City.  That billboard exists today.  The adjoining property is

sometimes referred to as the "Georgetown Development," although at present it remains

undeveloped.  The owners and/or developers are Andrew Hall and David Webb.  While the

Georgetown Development property that adjoins Plaintiffs' property has never been in the City of

Montgomery, it was at the time the billboard was constructed within the City of Montgomery

police jurisdiction and, therefore, the City of Montgomery maintained permitting authority over

any such billboard on that property.  The City did in fact approve the permit for said billboard at

its then, and present, location.  *See* Affidavit of Merrill Ingram.

It became clear to Plaintiffs at that time that the City of Montgomery was not going to

require the extension of the service road beyond Plaintiffs' property contrary to their repeated

assurances and representations to Plaintiffs.  A visual examination of this service road shows that

it is simply "stubbed out" at the property line and by its not being extended beyond that property

line means the extension required by the City of Plaintiffs was absolutely meaningless and

required Plaintiffs to incur an unnecessary expense as noted above.

### *Issues Presented*

I.      The City's principal argument, in fact their "linchpin" argument is that the claims

of Plaintiffs are barred by the applicable two-year statute of limitations based principally on the

January 20, 2004 letter from Stuart Manson requiring the extension of the service road.  Such

letter is not the accrual date for Plaintiffs' claims. As shown below, Plaintiffs' Complaint filed on August 8, 2007 was filed within two years of any actionable claim.

II.    With the annexation of the adjoining property into Pike Road, the City contends it now can't require the extension of the service road over the adjoining land even if it wanted to, and even if it had in fact assured Plaintiffs it would be extended, when it required Plaintiffs to extend it to the property line. As shown below, it is clear the City wasn't going to require the extension of the service road across the adjoining land long before said adjoining land was annexed into Pike Road.

III.    Given the City's "motives" in requiring the extension of the service road (as explained in detail by Mr. Bush), it is clear there was no substantive or legitimate reason for requiring Plaintiffs to extend the service road.

### *Argument*

I.    It is noteworthy that the City in its Motion and submission fails entirely to even address the substantive factual allegations made by Plaintiffs as a basis for their Complaint and as set forth hereinabove. Nor does it even deny having represented to Plaintiffs that the access road would be extended beyond Plaintiffs' property boundaries along Chantilly Parkway. Moreover, the City's argument that Plaintiffs' claims are barred by the applicable two-year statute of limitations is simply incorrect. Frankly, the City's argument on this issue misses the point entirely. The City contends that the Plaintiffs had a claim and, therefore, a right to sue – if at all – beginning with the City's letter dated January 20, 2004 referenced above and attached hereto which, among other things, expressly required the extension of the subject service road to the East property line. That is simply not correct. Plaintiffs do not contend that the requirement that the service road be extended to the property line was actionable. Plaintiffs didn't like it;

8

believed and still believe it was unnecessary, certainly to the proper development and approval of the Chantilly Place East Plat No. 1; but did not contend then, nor do they contend now, that that requirement in and of itself was actionable.

Plaintiffs' claims arise in this case and its rights of action began to accrue in this case when Plaintiffs learned that the City of Montgomery was not going to require the adjoining landowners along Chantilly Parkway to continue the service road Plaintiffs were required to construct and then extend to their property line. It is at that point that any claims and causes of action of Plaintiffs began to accrue. Plaintiffs first became aware of that position, or at least first had some indication that the City had flip-flopped on their earlier representations, when the City approved the placement of the subject billboard discussed above just off of Plaintiffs' property on the property of the adjoining landowner, but in the way of the service road and sidewalk should it have been extended beyond Plaintiffs' boundary line. Mr. Ingram, in reaction to that information, began to inquire of the City and learned at that time that contrary to the City's numerous, consistent and insistent representations that the service road would be required to be extended by the adjoining landowners, that that was no longer the case. This knowledge began on or about May, 2006 with the construction of the billboard and thus, Plaintiffs' Complaint filed on August 8, 2007 was filed well within any applicable two-year statute of limitations.

Since the City has "missed the point" here, its submissions from Stuart Manson by Affidavit and Thomas M. Tyson by Affidavit, are simply irrelevant to the actual issues before the Court on the City's Motion.

II.    Finally, the City of Montgomery has essentially claimed a "golden parachute" with the annexation of the Georgetown Development to the East of Plaintiffs' property into Pike Road, Alabama, on or about July 2, 2007. The City of Montgomery now says (*see* pp. 6 and 7 of

its Brief), that it probably did assure Plaintiffs and Mr. Ingram that the service road he was being required to extend to their property line would be extended on across the adjoining property owners' lands along Chantilly Parkway. The City now says, however, that with the annexation of the adjoining property into the City of Pike Road, it has lost the authority to require that of the adjoining property owner. While it cannot be disputed that the City of Montgomery cannot NOW require the adjoining property owner whose land is now in the City of Pike Road to extend the service road, or to do anything else for that matter, it is clear from the facts and representations of the City that it had no intention of requiring the adjoining landowner to do so, or if it did at some point in time, it changed its mind and did so long before the adjoining property owner was annexed into Pike Road, which as noted, did not occur until July, 2007. The permitting of the billboard occurred long before, over a year before, the adjoining land on which the billboard now sits was annexed into Pike Road. The City represented to Mr. Ingram after he completed the extension of the service road, but before the annexation of the adjoining property into Pike Road, that it was not going to require the extension of the service road beyond Mr. Ingram's property.

III.     Alan Bush's deposition testimony regarding his communications with the City of Montgomery – specifically the City Engineer, Cecil Cork – is alarming. Mr. Cork made it absolutely clear to Mr. Bush that he and the City didn't like Merrill Ingram, and they had found an opportunity to stick it to him with requiring the extension of this service road. (Bush Depo., p.34). Mr. Cork described no other rationale for requiring the extension of this service road to Plaintiffs' eastern boundary other than they had been waiting for an opportunity of "getting" [Mr. Ingram], and this was their opportunity. And the worst may very well be Mr. Cork's comments to Mr. Bush, gleefully assuring him that Mr. Bush had Mr. Ingram exactly where he

wanted him, and that the most difficult decision Mr. Bush had to make was how much money he wanted to make off Mr. Ingram.  (Bush Depo., p. 32).

Such testimony standing alone suggests a basis for the City's requiring the extension of the service road which is more than simply arbitrary and irrational, but offensive.   It is inconceivable that a City of Montgomery official, albeit the City Engineer, would make such comments to ANYONE, and in particular to Alan Bush, someone he didn't even know.  It is difficult, if not impossible to infer anything from Mr. Cork's comments other than the City was prepared to – and did – abuse its power requiring a citizen, business, and taxpayer to extend this road at significant expense to Plaintiffs, BECAUSE THEY DIDN'T LIKE HIM!  It further explains why Mr. Ingram's service road is the only one along the entire length of Chantilly Parkway.  Nothing in the City's submission even attempts to explain why the extension of the service road was necessary, and thus, given Mr. Cork's comments, the only basis for such becomes an inappropriate one.

Plaintiffs and Merrill Ingram were required to do something, i.e. construct a service road and more specifically, extend the service road to their property boundary, which is now apparent no other landowner on Chantilly Parkway has been or apparently will be required to do.  Given the testimony of Alan Bush in connection with his communications with Cecil Cork, Stuart Manson and others with the City, one can clearly infer that the City's motives with regard to Mr. Ingram's properties were not pure, and as Mr. Bush testified, the City was going to "get Merrill Ingram," and used this as an opportunity to do so.

11

*Conclusion*

Based on the foregoing, Plaintiffs contend summary judgment is inappropriate, and the

City's Motion is due to be denied.

Respectfully submitted,

s/H. Dean Mooty, Jr.
H. Dean Mooty, Jr. (MOO018)
Attorney for Plaintiffs

OF COUNSEL:

MOOTY & ASSOCIATES, P.C.
600 Clay Street
Montgomery, Alabama 36104
Telephone:    (334)264-0400
Facsimile:    (334)264-0380
E-mail:       hdm@mooty-assoc.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of July, 2008, copies of the foregoing were served
electronically or by U.S. mail, first class postage prepaid and properly addressed, upon:

Wallace D. Mills, Esq.
City of Montgomery Attorney's Office
103 North Perry Street
Montgomery, Alabama 36104

s/H. Dean Mooty, Jr.
Of Counsel

12



**CHANTILLY PLACE EAST**
**PLAT NO. 1**
**Montgomery County, Alabama**
LOCATED IN THE SE QUARTER OF SECTION 24,
T-16-N, R-19-E, MONTGOMERY COUNTY, AL.

**LINE TABLE**

| LINE | LENGTH | BEARING |
|------|--------|---------|

**CURVE TABLE**

| CURVE | LENGTH | RADIUS |
|-------|--------|--------|
| C1 | 39.27 | 50.00 |
| C2 | 39.57 | 363.26 |
| C3 | 99.92 | 50.00 |
| C4 | 22.74 | 50.00 |
| C5 | 21.41 | 50.00 |
| C6 | 43.36 | 50.00 |
| C7 | | |
| C8 | 49.88 | 50.00 |
| C9 | | |
| C10 | 35.28 | 50.00 |
| C11 | 25.43 | 50.00 |

**PLAINTIFF'S EXHIBIT**
**A**

**LOCATION MAP**

**GRAPHIC SCALE**



PLAINTIFF'S
EXHIBIT
C



**City of
Montgomery, Alabama**

BOBBY N. BRIGHT
Mayor

MONTGOMERY CITY COUNCIL
MRS. ALICE D. REYNOLDS-Pres.
JAMES A. NUCKLES-Pres. Pro tem
WILLIE COOK
TERANCE D. DAWSON
CHARLES W. JINRIGHT

B. J. (BEN) MCNEILL
P. E. (PEP) PILGREEN
CHARLES W. SMITH

January 20, 2004

Mr. Gregory Gillian
Larry Speaks and Associates, Inc.
544 Martha Street
Montgomery, AL 36104

Dear Mr. Gillian:

This is being written in reference to the construction plans for Chantilly Place East Plat No. 1. After review of the plans, the Traffic Engineering Department has the following comments:

1. Provide to this office a completed and approved copy of the ALDOT permit.

2. The access agreement parallel to Chantilly Pkwy. (Al. Highway 110) must be extended along the entire length of lot one.

3. Define apparent easement or access on north side of lots 7 and 8, adjacent to those lots. If easement is to be used as an access by vehicles, the easement must be redefined to intersect the access road at the intersection of the access road and Al. Highway 110.

4. The developer will be responsible for providing all required street lighting, street name signs, and traffic control devices for the access road, street "A" and street "B". If decorative poles or posts are to be used in the development, then shop drawings of the poles and/or posts must be provided for review and approval. The final plat will not be approved until all required signs and street lights are installed.

5. The access road cannot extend into ALDOT R.O.W. Clearly define ALDOT R.O.W. in relation to access road.

6. Provide striping plan for development.

7. The contractor will be responsible for providing a traffic control plan according to the MUTCD during all phases of the construction.

If you have any questions or comments concerning this matter, please call at 241-2910.

Sincerely,

Stuart Manson, Assistant Director
Traffic Engineering Department

SAM/lm

cc: *Mr. Mark Waits, Third District Engineer
    ALDOT, Sixth Division*

*Mr. Cecil Cork, City Engineering*



PLAINTIFF'S
EXHIBIT
D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
### NORTHERN DIVISION

| | | |
|---|---|---|
| FOREST GLEN, L.L.C. and TIMBER CREEK, L.L.C., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 2:07-CV-528 |
| | ) | |
| CITY OF MONTGOMERY and THE WATER WORKS AND SANITARY SEWER BOARD FOR THE CITY OF MONTGOMERY, | ) | |
| | ) | |
| Defendants. | ) | |

STATE OF ALABAMA        }
                                          }
MONTGOMERY COUNTY  }

## AFFIDAVIT

BEFORE ME, the undersigned, a Notary Public in and for the State and County aforesaid, came Merrill Ingram, who, after being sworn, declared and stated:

I am Merrill Ingram.   At all material times, I was a Member and/or Managing Member of Forest Glen, LLC and TimberCreek, LLC.

As we began the development of Chantilly Place, a commercial real estate development along Chantilly Parkway in East Montgomery, the City of Montgomery per Stuart Manson and Cecil Cork, along with Mark Waites of the State Department of Transportation, told us that all properties along Chantilly Parkway would be required to have service roads.  These individuals specifically told me that the City was not going to have another "Atlanta Highway," referring to the Atlanta Highway in Montgomery, Alabama, that does not have a complete network of service roads.   Their clear intention by these comments was that the Atlanta Highway area in

Montgomery should have a network of service roads and because they don't, there are traffic problems that they intended to avoid along Chantilly Parkway with the requirement of service roads.

These three individuals further stated to me and others that the service road I was required to construct along the eastern end of my Chantilly Place property and parallel to Chantilly Parkway, had to be extended all the way to my eastern-most boundary. When initially constructed, the service road did not go all the way to the eastern-most boundary. As a part of the City requiring me to extend this service road which we call "Emma Lane" all the way to my eastern-most boundary, they assured us, and repeatedly assured us, that this service/access road would be required to be extended on along Chantilly Parkway over the adjoining landowners' property and beyond. At one point we were told that it would be extended all the way to Vaughn Road; while on another occasion we were told that it would be required to be extended to the next median crossover on Chantilly Parkway.

On or about May of 2006, I observed the construction and placement of a large billboard on the property just to the East of my property, which I understand is owned by Andrew Hall and/or David Webb, and is sometimes referred to as the "Georgetown Development." This large billboard is barely on the adjoining property and just beyond my eastern-most boundary line. Due to the fact that this billboard is in the way of any extension of the service road which I was required to extend to my boundary line, it became apparent to me at that time that the City was not going to require the further extension of the service road as previously represented. I began inquiring about that fact and learned that the City was not going to require the extension of the service road as represented. This was significantly more than a year before the adjoining landowner of the "Georgetown Development" annexed that property into Pike Road, Alabama,

2

which occurred on or about July 2, 2007.  As the Georgetown Development property would have

been in the police jurisdiction of the City of Montgomery prior to its annexation into Pike Road,

the billboard would have required the issuance by the City of Montgomery of a permit for its

construction and placement.  Such a permit was in fact sought and ultimately issued by the City

of Montgomery.

DATED this _1st_ day of _____July_____, 2008.

_____
Merrill Ingram

SWORN TO and SUBSCRIBED before me, the undersigned, on this the _1st_ day of _____July_____, 2008.

_____
Notary Public

[SEAL]                                My Commission Expires: _11/25/2009_

3

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA,

3                      NORTHERN DIVISION

4

5    CIVIL ACTION NUMBER

6    2:07-CV-836

7

8    FOREST GLEN, LLC AND TIMBER CREEK, LLC,

9              Plaintiff(s),

10   vs.

11   CITY OF MONTGOMERY, AND THE

12   WATER WORKS AND SANITARY SEWER

13   BOARD FOR THE CITY OF MONTGOMERY,

14              Defendant(s).

15

16

17              DEPOSITION TESTIMONY OF:

18                      ALLEN BUSH

19

20   March 12, 2008

21   9:03 AM

22   SELAH M. DRYER, CCR

23   ACCR #: 393



```
1    purchase.   And I guess what I'm trying to ask
2    is:   Is this the piece of land that Merrill
3    Ingram owned a part of which he was trying to
4    sell to you?
5         A.      Yes, but I don't remember how it
6    was cut up -- if it was cut up like that, to be
7    honest.
8         Q.      That's fine.  Did you at some
9    point apply for a building permit while you held
10   that property?
11        A.      No, sir.
12        Q.      Did you at some point resell that
13   property?
14        A.      Yes, sir.
15        Q.      To whom did you resell it?
16        A.      Merrill Ingram's company.
17        Q.      Forest Glen?
18        A.      Yes, sir.
19        Q.      Can you tell me why you sold that
20   back to him?
21        A.      He offered -- he called me and
22   asked me to meet him on the property, and I
23   did.   And he first tried to put a spin on it
```

16

1    that I -- it was going to work out good for me,

2    it was going to give me more road frontage --

3        Q.    Are you saying he wanted to buy it

4    back from you?

5        A.    No.  He wanted me to give him the

6    property.  He was going to go ahead and run the

7    road right out the end of the property.  And I

8    told him I really wasn't interested in him doing

9    that, it would mess up what I -- if I didn't

10   sell it, what I had planned.  And he said well,

11   I'm going to have to buy it -- or the City is

12   going to require -- I thought he said the State

13   to be honest with you.  I don't really recall

14   the City being mentioned -- but the State or the

15   City is going to require this road to go to the

16   end of this property and the water.  And I told

17   him, you know -- and would I sell him just that

18   piece, and I said no.

19       Q.    How far down did he --

20       A.    And he told me to think about it,

21   so I left and thought about it a little bit --

22   did a little bit of research.

23       Q.    So was there a road already in

1  that I would give them first option on that

2  property -- give them first shot at it if I got

3  ready to sell it, but we both thought it would

4  be a couple of years down the road and we hadn't

5  set on a price.  But I'd given him my word that

6  I would let him have the first shot at the

7  property, so I told Merrill that I couldn't sell

8  it without calling this guy and I called him,

9  and he said tell Merrill he would take ten

10  grand, or he would buy the property.  And so

11  Merrill paid the extra ten grand at closing and

12  I had them cut that guy a check for ten grand.

13       Q.     In this particular case you sold

14  this property back to which company?  Do you

15  remember?

16       A.     It didn't really matter to me -- I

17  was selling it to Merrill Ingram -- but it looks

18  like the company that he put in there was Timber

19  Creek.

20       Q.     So you sold it back for

21  approximately a little less than a hundred and

22  eleven thousand more than you purchased it for,

23  correct?

1          A.      Right.

2          Q.      Do you remember the date of this

3   contract?  And you are welcome to look at it if

4   want.

5          A.      No, not exactly, but it closed on

6   2/25/04.

7          Q.      February 25th?

8          A.      Right.

9          Q.      And if I represent to you that

10  this contract was signed around February 5th of

11  2004, would that sound right to you?

12         A.      Yes, sir, it was a pretty quick

13  closing.

14                 MR. MILLS:  We offer to attach

15  Defendant's Exhibit C-4.

16         Q.      (Mr. Mills)  And you have, if I

17  understand it correctly, a settlement statement

18  in front of you, is that right, from this sale?

19         A.      Yes, sir, both sales.

20         Q.      Would you mind if we got copies of

21  those to attach to the deposition?

22         A.      No, that's fine.

23         Q.      One of them we have actually

1    already looked at.

2                    MR. MILLS:   After we make

3    copies, I'm going to mark this as Defendant's

4    Exhibit C-5.

5        Q.      (Mr. Mills)   What I'm showing you

6    that I'm going to mark as C-5, is that the

7    settlement statement from February 2004 where

8    you closed the resale of that property back to

9    Mr. Ingram's company?

10       A.      Yes, sir.

11       Q.      You can hold on to that and we

12   will get a copy of that in a little bit.

13                    MR. MORGAN:   Can I see that?

14                    MR. MILLS:   Sure.

15       Q.      (Mr. Mills)   Did you have any

16   other discussions with Mr. Ingram other than the

17   one you had out on the property that day when he

18   first told you he was going to have to build

19   this service road?

20       A.      Well, I met him back out there and

21   we signed a contract -- that was a couple of

22   days later.  I did some research to find out

23   exactly how much -- well, to be blunt, to find

1    out how much I thought I could make on that

2    property and how bad he needed it.

3         Q.    Right.  Tell me again so that I've

4    got it straight in my mind.  Did you feel like

5    he was in a bind on having to buy this back?

6         A.    Yeah.

7         Q.    And he conveyed to you that he was

8    in a bind because of what exactly?

9         A.    No, he didn't convey he was in a

10   bind -- no.  I did some research and from the

11   things other people told me, I found out he was

12   in a bind.

13        Q.    Who did you talk to?

14        A.    He did his best to let me know

15   that he wasn't in a bind, that this was -- he

16   tried to -- you know everybody tries to do -- in

17   business tries to put their own spin on things

18   for their own advantage.  He was no exception.

19   He tried to tell me that this was going to be a

20   good thing for me, but I just -- that's why I

21   wanted a couple of days to dig into it and see.

22   I suspected at that point, in our initial

23   meeting, that maybe he was in a serious bind

1    over this piece of property.  And I really

2    wanted to keep the property a couple of years

3    and try to double my money on it.  I really

4    didn't want to sell it within four months or

5    whatever.

6         Q.      You mentioned that you got

7    information from other people.  Do you remember

8    who you talked to about this?

9         A.      Sure.

10        Q.      Who?

11        A.      I went to the City and I talked

12   to -- they passed me around to just about

13   everybody there -- but the guy that gave me

14   probably the best information with the City --

15   well, I think I started at the Water Works and I

16   and I don't remember if I went in Buddy Morgan's

17   office -- Buddy Morgan used to be my neighbor,

18   but if he was in this room he wouldn't know me.

19   He lived right across the street from me when I

20   first got married.  I know him, but he don't

21   know me.  But I called him and I had a copy of

22   that print -- the thing I was going in with --

23   and it seems like I caught him outside -- it's

1    been '03 -- but anyway, I asked him about the

2    water.  You know Merrill Ingram had told me that

3    they weren't going to run the water on out the

4    end and he -- he don't like Merrill Ingram, I

5    don't think.  Anyway he told me that that was

6    right, that the water had to go to the end of

7    that property.  And I told him -- and he really

8    didn't want to take the time to talk to me until

9    I let him know I wasn't Merrill Ingram's buddy.

10   I mean, I have nothing against Merrill Ingram,

11   but I wasn't in business with Merrill Ingram.

12   And he -- he made the comment that -- or let me

13   know -- Merrill Ingram is just about every other

14   word sometimes out there on that property is a

15   cuss word -- and he had said something about

16   nobody was going to get water out there if

17   Merrill Ingram kept cussing his people.

18        Q.    Buddy Morgan told you that?

19        A.    Buddy Morgan told me that.  And I

20   said, wait a minute man, I'm not in this deal.

21   I just bought a piece of property from Merrill

22   Ingram, I probably don't like him anymore than

23   you.  But he warmed up to me a little bit then,

1   and he told me water has got to go to the end of

2   that lot before they are going to turn it on or

3   whatever or let me attach to it.  So anyway, I

4   understood that the water had to go across the

5   piece of property that I wanted -- that I had

6   bought.  And one reason that I bought that piece

7   of property when I bought it, one of the

8   advantages I saw was the next guy down.  And

9   Merrill, for whatever reason, had stopped that

10  road short and stopped the water short.  And

11  Merrill said, that guy, David Brewer, he wants

12  me to run this road to the end of this property,

13  but I'm not going to do it.  And I was thinking

14  the whole time well, I will be glad to let him

15  have this road.  I was thinking maybe I could

16  work out a deal where he paved my parking lot

17  and I let him -- I mean, if I could see a deal

18  to be worked out, I try to work out a deal with

19  somebody.

20       Q.     When did Mr. Ingram tell you that

21  about he wasn't going to run that road out

22  there?

23       A.     That was when I was first was

1    it to David Brewer, the whole property.

2        Q.    Besides Buddy Morgan, did you have

3    any conversations with anybody else between the

4    time you bought and sold this property?

5        A.    Yes, sir.  I went to the City and

6    I think I went to every department in the City.

7        Q.    Do you remember anybody specific

8    that you talked to?

9        A.    The city engineer's name was Cecil

10   Court or Cork -- I don't remember his last name,

11   but it was close to that -- you may know who you

12   I'm talking about.

13       Q.    I do.

14       A.    We talked about -- I found out

15   from talking to Buddy Morgan -- well, I figured

16   out from talking to Buddy Morgan the best way to

17   go in and approach people at the City is to let

18   them go ahead and know that Merrill Ingram

19   wasn't my favorite guy either, so that's the way

20   I approached everybody because I was asking

21   about this piece of property.  And he told me

22   about some reasons why he didn't like Merrill

23   Ingram.  And the reason I'm telling you this or

1    mention this is I probably told the story 10

2    times to different people and, you know, it

3    would be hard to lie about it.  I told a lot of

4    my friends about this whole deal.  But anyway he

5    said that Merrill had been down to a planning

6    commission meeting and really showed him -- kind

7    of acted up, and he was not interested in

8    helping Merrill Ingram do anything out there,

9    you know, but he was very helpful to me.

10       Q.     In what way?

11       A.     Well, he told me he -- he let me

12   know that they had Merrill Ingram in a bind.

13       Q.     How so?

14       A.     That they were going to make him

15   run that road out, and he knew that he had sold

16   that property to me.  And that he said -- I

17   don't remember exactly the word, but close to

18   what he said -- but the hardest thing you need

19   to make up your mind about is how much money you

20   want to make off this deal.  And I wanted to

21   see -- I kind of wanted to feel out -- you know,

22   I wanted to make a fair -- I told you I wanted

23   to keep the property a couple of years and try

1   to double my money on it, but I really didn't

2   feel like doubling my money at that point was

3   fair to the same guy that I bought it from.  You

4   or anybody else, I wouldn't have had a problem

5   asking double what I paid for it because I felt

6   like I got a good deal when I bought it.  I felt

7   like I really bought it below market value based

8   on everything else out there.  But back to the

9   same guy, I had a little problem asking him

10  double.  But I did want to make the money and I

11  did want to sell it.  And I wanted to know how

12  far I thought I could push him until he would

13  find some other option rather than buying that

14  property from me.  Had I told him two and a half

15  million dollars, I feel like he would have found

16  another option rather than -- I wanted him to

17  have the easiest option to sell it to him -- the

18  easy way out, but me still make plenty of

19  money.  And Mr. Court -- Cecil -- I know his

20  first name is Cecil -- Cecil made it clear to me

21  that I had him about where I hoped I had him and

22  that he certainly didn't have anything for

23  Mr. Ingram.

1          Q.      Did he explain to you why

2    Mr. Ingram was in this position?  Did you ever

3    acquire to understanding of why the City was

4    making him do this?

5          A.      I formed an opinion, but at that

6    point and until this lawsuit was filed, I truly

7    thought it was the State that was requiring all

8    of this.  I didn't have any idea it was -- and

9    it may be still be the State -- but I truly

10   thought it was the State that was requiring this

11   stuff.  But my opinion was that Merrill Ingram

12   had -- he's a very confrontational guy, and that

13   he had gone down there and rubbed the wrong guy

14   the wrong way, and they sat back and found an

15   opportunity to get him and they were going to

16   get him.

17         Q.      And that was the impression that

18   Cecil Court gave you?

19         A.      Yes, absolutely.  I don't remember

20   exactly, you know, what the conversation was,

21   but that was the impression I left there with

22   that day.  And he was very helpful.  I mean, he

23   was very helpful.  He pulled out maps and things

35

1    and took all the time I needed with him, and

2    then I think he went down and walked me over to

3    the next guy.  They walked -- they either called

4    ahead for me to go to the next person or they

5    walked me over there, either one.

6         Q.    So you went down and sat down and

7    talked to them?

8         A.    Sure.

9         Q.    What kind of maps was he showing

10   you?  Do you remember?

11        A.    Yeah.  They had a map that showed

12   a service road running all the way to Vaughn

13   Road.  And they said -- in fact Cecil said that

14   you know out on Lagoon Park how the service road

15   is in front of the Honda Shop, he said that's

16   the way that -- I thought the State was going to

17   make them do it, like I said that was my

18   understanding was the State -- but anyway, that

19   service road was going to have to run the full

20   length all the way down to the Vaughn Road.

21   They weren't going to let anybody do it halfway.

22        Q.    Did he say anything to you, or did

23   you discuss with him anything about traffic

69

```
 1              C E R T I F I C A T E

 2

 3   STATE OF ALABAMA  )

 4   MONTGOMERY COUNTY )

 5        I hereby certify that the above and

 6   foregoing deposition was taken down by me in

 7   stenotype, and the questions and answers thereto

 8   were transcribed by means of computer-aided

 9   transcription, and that the foregoing represents

10   a true and correct transcript of the deposition

11   given by said witness upon said hearing.

12        I further certify that I am neither of

13   counsel nor of kin to the parties to the action,

14   nor am I in anywise interested in the result of

15   said cause.
                        COPY
16

17

18                  SELAH M. DRYER, CCR

19                  ACCR#: 393

20

21   My Commission Expires

22   June 30, 2010

23
```

```
 1              IN THE UNITED STATES DISTRICT COURT FOR

 2                THE MIDDLE DISTRICT OF ALABAMA,

 3                      NORTHERN DIVISION

 4

 5    CIVIL ACTION NUMBER

 6    2:07-CV-836

 7

 8    FOREST GLEN, LLC AND TIMBER CREEK, LLC,

 9         Plaintiff(s),

10    vs.

11    CITY OF MONTGOMERY, AND THE

12    WATER WORKS AND SANITARY SEWER

13    BOARD FOR THE CITY OF MONTGOMERY,

14         Defendant(s).

15

16              DEPOSITION TESTIMONY OF:

17                   GREG GILLIAN

18

19

20    March 12, 2008

21    10:29 AM

22    SELAH M. DRYER, CCR

23    ACCR #: 393
```


COPY

1    EXAMINATION BY MR. MILLS:

2         Q.    Mr. Gillian, my name is Wallace

3    Mills.  I represent the City of Montgomery in a

4    lawsuit filed against the City and the Water

5    Board by some companies owned by Mr. Merrill

6    Ingram, Forest Glen LLC and Timber Creek LLC.

7    Could you tell me your name, please?

8         A.    My name is Gregory Mark Gillian.

9         Q.    Spell your last name for me.

10         A.    G-I-L-L-I-A-N.

11         Q.    Let me tell you this before we

12    start.  If I ask you a question that you don't

13    understand, just ask me to restate it.

14    Otherwise I'll assume that you understood the

15    question.  If you need to take a break or

16    anything like that, just tell me.  Okay?

17         A.    Okay.

18         Q.    What do you do for a living,

19    Mr. Gillian?

20         A.    Land surveyor, engineer.

21         Q.    A licensed professional engineer?

22         A.    Yes.

23         Q.    Have you done any work in the last

1    to make?

2        A.    Well, we had a street in there one

3    time that looped back in to Emerald Court and

4    then we had to extend it to the property line.

5    We had to go back and revise that portion of it

6    at one time.

7        Q.    Do you remember why that had to be

8    done?

9        A.    It was requested or required by

10    the City.

11        Q.    Who in particular at the City

12    communicated to you that that had to be done?

13        A.    If I'm correct, I believe that was

14    Stewart Manson.

15        Q.    Do you remember the substance of

16    what he told you?

17        A.    The exact substance, I really

18    don't.  My recollection is that we extended the

19    sewers to the property line and he came back and

20    said since you are extending the sewer why don't

21    you extend the road.

22        Q.    Okay.  Did he communicate that to

23    you or did Mr. Ingram communicate that to you?

11

1       A.      He communicated that to me --

2   Stewart did.

3       Q.      Did you talk to anybody else at

4   the City about that?

5       A.      I don't recall at this point.

6       Q.      When you revised the plat did you

7   extend, what I'm going to call a service road,

8   to the property line?

9       A.      Yes.

10      Q.      Tell me, if you will, this

11  property, if I understand it correctly, this

12  property was located on the north side of

13  Chantilly Parkway; is that correct?

14      A.      That's correct.

15      Q.      And this road that you had to·

16  extend, did it run parallel to Chantilly

17  Parkway?

18      A.      Yes.

19      Q.      At the front of the property?

20      A.      Yes.

21      Q.      After you revised it, was it

22  extended again parallel to Chantilly Parkway to

23  the property line?

1    A.    Yes.

2    Q.    But you don't know why it had to

3  be done?

4    A.    I just stated that.  When we were

5  required to extend the sewer, then Stewart

6  Manson comes back and says if you are going to

7  extend the sewer you need to extend the street,

8  and that's the only reasoning that they gave me.

9    Q.    Did you talk to anybody else with

10  the City about it?

11    A.    Like I said, I don't recall.

12    Q.    Did you talk to anybody at the

13  planning commission about it?

14    A.    No, this was a call that was made

15  by the individual departments.

16    Q.    When you received word from

17  Stewart Manson that this needed to be done, or

18  ought to be done, however you understood it, did

19  you then communicate to Merrill Ingram that this

20  needed to be done?

21    A.    I communicated to Mr. Ingram that

22  I was being required to extend the road, yes.

23    Q.    And after you submitted the plat

```
1   No. 9.   Is this something that you had any input

2   in?

3                      (WHEREUPON, a document was marked

4                      as Defendant's Exhibit No. 9 and

5                      is attached to the original

6                      transcript.)

7        A.      Yes.

8        Q.      And it shows the cost of extending

9   the sewer line another, what, 140 feet?

10       A.      No.   These first two pages are an

11  estimate that gets you from Emma Court to the

12  point where the extension began in the first

13  one.  Now the third page is the estimate from

14  where he originally had the roadway stop and we

15  had to extend the road, the remaining portion,

16  to the end of the property line.

17       Q.      Doesn't it show the sewer line to

18  be about 140 feet, requiring an additional

19  extension?

20       A.      Yes.

21       Q.      That's about, what, $5,290 to

22  extend that 140 feet?

23       A.      That's correct.
```

```
1              C E R T I F I C A T E

2

3    STATE OF ALABAMA    )

4    MONTGOMERY COUNTY   )

5           I hereby certify that the above and

6    foregoing deposition was taken down by me in

7    stenotype, and the questions and answers thereto

8    were transcribed by means of computer-aided

9    transcription, and that the foregoing represents

10   a true and correct transcript of the deposition

11   given by said witness upon said hearing.

12           I further certify that I am neither of

13   counsel nor of kin to the parties to the action,

14   nor am I in anywise interested in the result of

15   said cause.

16                          COPY

17

18                     SELAH M. DRYER, CCR

19                     ACCR#: 393

20

21   My Commission Expires

22   June 30, 2010

23
```

## BEGINNING OF EMMA LANE
## TO START OF EXTENSION
## ESTIMATE OF QUANTITIES
### January 28, 2008

| Item # | Item Description | Quantity | Units | Unit Cost | Total |
|---|---|---|---|---|---|
| 1 | Clearing & Grubbing(2 ACRES) | 1 | LS | $ 1,500.00 | $ 1,500.00 |
| 2 | Unclassified Excavation | 300 | CY | $ 2.85 | $ 855.00 |
| *3 | Borrow Excavation (Truck Bed Measure) | 3,000 | CY | $ 10.25 | $ 30,750.00 |
| *4 | Muck Excavation | 1,000 | CY | $ 5.00 | $ 5,000.00 |
| *5 | Topsoil from Stockpile | 750 | CY | $ 3.00 | $ 2,250.00 |
| 6 | Super Pave Bituminous Wearing Surface (1" THICK) (ALDOT 429A-200) | 3,400 | SY | $ 2.70 | $ 9,180.00 |
| 7 | Tack Coat (ALDOT) | 3,400 | SY | $ 0.10 | $ 340.00 |
| 8 | Bituminous Treatment Type A (Prime Coat) (ALDOT 401-A) | 3,400 | SY | $ 0.76 | $ 2,584.00 |
| 9 | Super Pave Bituminous Concrete Binder Layer (6" THICK) (ALDOT 429B-207) | 3,400 | SY | $ 13.00 | $ 44,200.00 |
| 10 | 24" Combination Curb and Gutter | 1,875 | LF | $ 9.15 | $ 17,156.25 |
| 11 | 18" R. C. Pipe (Class 3) | 46 | LF | $ 21.00 | $ 966.00 |
| 12 | 36" R.C. Pipe (Class 4) | 39 | LF | $ 54.00 | $ 2,106.00 |
| 13 | 36" R.C. Pipe (Class 3) | 33 | LF | $ 48.50 | $ 1,600.50 |
| 14 | 13"X22" Arch R.C. Pipe | 36 | LF | $ 35.00 | $ 1,260.00 |
| 15 | S Inlet (Double Wing) | 4 | EA | $ 1,700.00 | $ 6,800.00 |
| 16 | Junction Box | 1 | EA | $ 1,400.00 | $ 1,400.00 |
| 17 | Slope Paving (Includes Headwalls) | 5 | CY | $ 220.00 | $ 1,100.00 |
| 18 | 8" Sanitary Sewer Main (0'-6') | 315 | LF | $ 20.00 | $ 6,300.00 |
| 19 | 8" Sanitary Sewer Main (6'-8') | 559 | LF | $ 21.00 | $ 11,739.00 |
| 20 | 8" Sanitary Sewer Main (8'-10') | 152 | LF | $ 25.00 | $ 3,800.00 |
| 21 | 8" Sanitary Sewer Main (10'-12') | 53 | LF | $ 28.00 | $ 1,484.00 |
| 22 | Sanitary Sewer Manholes (6'-8') | 2 | EA | $ 1,850.00 | $ 3,700.00 |
| 23 | Sanitary Sewer Laterals | 3 | EA | $ 465.00 | $ 1,395.00 |
| 24 | Connect to Existing Manhole | 1 | EA | $ 500.00 | $ 500.00 |
| 25 | Replace Existing Sanitary Sewer Main With 1 Joint of Ductile Iron | 1 | LS | $ 800.00 | $ 800.00 |
| 26 | Fire Hydrant w/Valve, Valve Box and Marker | 1 | EA | $ 2,400.00 | $ 2,400.00 |
| 27 | 8"X16" Tapping Sleeve and Valve | 1 | EA | $ 5,400.00 | $ 5,400.00 |
| 28 | 16" Steel Encasement Pipe (0.25" Thick)(Open Cut Installation) (Split Encasement) | 20 | LF | $ 38.00 | $ 760.00 |

DEFENDANT'S
EXHIBIT
9-

DX-9

1/28/2008

**BEGINNING OF EMMA LANE**
**TO START OF EXTENSION**
**ESTIMATE OF QUANTITIES**
**January 28, 2008**

| Item # | Item Description | Quantity | Units | Unit Cost | Total |
|--------|-----------------|----------|-------|-----------|-------|
| 29 | 30" Steel Encasement Pipe (0.3125" Thick)(Open Cut Installation) (Split Encasement) | 20 | LF | $ 54.00 | $ 1,080.00 |
| 30 | Valve Adjustment | 1 | EA | $ 400.00 | $ 400.00 |
| 31 | Air Relief Valve Manhole Adjustment | 2 | EA | $ 800.00 | $ 1,600.00 |
| 32 | Concrete Sidewalk (7" thick) | 750 | SY | $ 17.00 | $ 12,750.00 |
| 33 | Stop Signs w/ Street Signs | 1 | EA | $ 360.00 | $ 360.00 |
| 34 | Street Sign | 1 | EA | $ 360.00 | $ 360.00 |
| *35 | 6" Underdrain (Includes Gravel and Filter Fabric) | 500 | LF | $ 10.50 | $ 5,250.00 |
| *36 | Hay Bales | 50 | EA | $ 5.00 | $ 250.00 |
| *37 | Silt Fence | 750 | LF | $ 2.50 | $ 1,875.00 |
| *38 | Rip Rap w/ Filter Fabric (18" Thick) | 35 | SY | $ 26.00 | $ 910.00 |
| *39 | Seeding and Mulching | 2 | AC | $ 1,200.00 | $ 2,400.00 |
| | **TOTAL** | | | | $ **194,560.75** |

* Contingency Item to be used on an as needed basis as directed by the Engineer

**Engineering(10%)**                                          19,456.08

                                    **Sub-Total**          19,456.08
                                    **Grand Total**    $   **214,016.83**

Job #13043

1/28/2008

# CHANTILLY PLACE EAST PLAT NO. 1
## ESTIMATE OF QUANTITIES
### TO EXTEND ACCESS ROAD
#### 11/30/2006

| Item # | Item Description | Quantity | Units | Unit Cost | Total |
|---|---|---|---|---|---|
| **ROADWAY ITEMS** | | | | | |
| 1 | UNCLASSIFIED EXCAVATION | 612 | CY | $ 2.85 | $ 1,744.20 |
| 2 | BORROW EXCAVATION (SELECT MATERIAL) | 996 | CY | $ 10.25 | $ 10,209.00 |
| 3 | SUPERPAVE BITUMINOUS WEARING SURFACE (1" THICK) (ALDOT 429A-200) | 568 | SY | $ 2.70 | $ 1,533.60 |
| 4 | BITUMINOUS CONCRETE BINDER LAYER (6" THICK) (ALDOT429B-207) | 568 | SY | $ 15.00 | $ 8,520.00 |
| 5 | BITUMINOUS TREATMENT, TYPE "A" (PRIME)(ALDOT 401-A) | 568 | SY | $ 0.76 | $ 431.68 |
| 6 | TACK COAT (ALDOT) | 568 | SY | $ 0.10 | $ 56.80 |
| 7 | PAINT STRIPPING | 1 | LS | $ 500.00 | $ 500.00 |
| 8 | 24" COMBINATION CURB & GUTTER | 330 | LF | $ 9.15 | $ 3,019.50 |
| 9 | CONCRETE SIDEWALK | 129 | SY | $ 17.00 | $ 2,193.00 |
| 10 | CONCRETE HEADER | 31 | LF | $ 10.00 | $ 310.00 |
| 11 | REQ'D STREET SIGN | 1 | EA | $ 360.00 | $ 360.00 |
| 12 | REQ'D STOP SIGN | 1 | EA | $ 360.00 | $ 360.00 |
| | | | | **TOTAL** | **$ 29,237.78** |

| STORM ITEMS | | | | | |
|---|---|---|---|---|---|
| 1 | 18" R.C. PIPE (CLASS III) | 350 | LF | $ 22.00 | $ 7,700.00 |
| 2 | S INLET (SINGLE WING) | 2 | EA | $ 1,500.00 | $ 3,000.00 |
| | | | | **TOTAL** | **$ 10,700.00** |

| SEWER ITEMS | | | | | |
|---|---|---|---|---|---|
| 1 | SANITARY SEWER MANHOLE (6'-8') | 1 | EA | $ 1,850.00 | $ 1,850.00 |
| 2 | 8" SANITARY SEWER MAIN (6'-8') | 140 | LF | $ 21.00 | $ 2,940.00 |
| 3 | CONNECT TO EXISTING MANHOLE | 1 | LF | $ 500.00 | $ 500.00 |
| | | | | **TOTAL** | **$ 5,290.00** |

| | | |
|---|---|---|
| ENGINEERING (10%) | $ | 4,522.78 |
| **GRAND TOTAL** | **$** | **49,750.56** |

* CONTINGENCY ITEM TO BE USED ON AN AS NEEDED BASES AS DIRECTED BY THE ENGINEER AND APPROVAL BY MANAGER OF FORREST GLEN, L.L.C.

1          IN THE UNITED STATES DISTRICT COURT FOR

2              THE MIDDLE DISTRICT OF ALABAMA,

3                    NORTHERN DIVISION

4

5    CIVIL ACTION NUMBER

6    2:07-CV-836

7

8    FOREST GLEN, LLC AND TIMBER CREEK, LLC,

9          Plaintiff(s),

10   vs.

11   CITY OF MONTGOMERY, AND THE

12   WATER WORKS AND SANITARY SEWER

13   BOARD FOR THE CITY OF MONTGOMERY,

14         Defendant(s).

15

16

17              DEPOSITION TESTIMONY OF:

18                 MERRILL INGRAM

19

20   March 12, 2008

21   12:24 PM

22   SELAH M. DRYER, CCR

23   ACCR #: 393



18

1    Chantilly Place East Plat No. 1.

2         A.    Then I'm sure it was, if that's

3    what he said.

4         Q.    If you don't remember if it was

5    submitted, you wouldn't remember when the plat

6    got filed, would you?

7         A.    I would not.

8         Q.    Would you remember if there were

9    any problems during the platting process?

10        A.    I don't think so, but I'm not

11   sure.  Because I mean, I just don't remember it

12   being called Plat 1 East.

13        Q.    I'm going to assume some things

14   for purposes of this question, but I think I

15   need to ask it to go any further.  You've

16   alleged in your complaint that the City of

17   Montgomery required you to build some extra

18   roads.

19        A.    That's true.

20        Q.    What do you believe to be the

21   reason for them to require you to do that?

22        A.    To make this access road that I'd

23   build, or service road, to be continuous all the

19

1    way to Vaughn Road.

2         Q.     Through what mechanism would they

3    require you to do it?

4         A.     Through the traffic plan that they

5    had set up with the group out of Birmingham and

6    that's what they told me.  That everyone was

7    going to have to follow the same criteria as far

8    as what they turn-ins and turn-outs, and that

9    that road would be continuous all the way to

10   Vaughn Road is what I was told.

11        Q.     You are alleging that at some

12   point that it came to your attention the City

13   wanted you to build this road, correct?

14        A.     Yeah.

15        Q.     How did that information come to

16   you, how did you find that out?

17        A.     I sold property to a man -- thirty

18   days later he comes back to me and tells me that

19   he can't get his development plans approved

20   unless he builds a road to the end of that

21   property and water line, and that he felt like

22   contractually I was obligated to buy it back.

23        Q.     Who was this man?

1          A.      Allen Bush.

2          Q.      What did Allen Bush tell you?  Did

3    he tell you that he had tried to get a

4    development plan approved?

5          A.      He did.

6          Q.      What did he tell you was the

7    result of that attempt?

8          A.      He told me that they wouldn't

9    approve it unless the road was continued to the

10   end of the property line and made available so

11   it could be continuous all the way through,

12   which is what I told him to start with.  I mean,

13   that's what I figured.  I told everyone that was

14   involved that the City made me build a service

15   road, which I didn't even think had any merit to

16   it, by them making me have to build it.

17   Everyone else is getting turn-ins and turn-outs

18   off of there -- off of the Chantilly Parkway.

19   Now, whether or not he recalls it the way I did,

20   I don't know.  But I know it cost me $100,000

21   more than I paid for it to buy the property

22   back, because I always do what I say I'm going

23   to do.  I don't cheat nobody.

```
 1    was going to have to continue that road -- I

 2    don't know if he and I had that conversation or

 3    not, but I just can't imagine us not having it.

 4    We talked about so many different things at the

 5    time and had a lot of stuff going on.

 6         Q.    From what I'm gathering, it's your

 7    impression that the first you heard that you

 8    were going to build this road came from Allen

 9    Bush?

10         A.    No.  I mean, I'd already built the

11    service road, Mr. Mills.  They were trying to

12    tell me that I had to extend it on to the end of

13    the property.  This is after I sold the

14    property.  I didn't know I was going to have to

15    continue it on until after I sold it.

16         Q.    When did you find out you were

17    going to have to continue it?

18         A.    I mean, I can't tell you what day.

19         Q.    I'm not looking for a date.  I

20    mean in relative terms of when you sold it or --

21         A.    Well, I think it was when Greg

22    called me and told me that they wouldn't approve

23    Mr. Bush's development plan.  And I asked if we
```

1   could meet with the city traffic and the city

2   engineer and county district engineer -- and we

3   all met out there and talked about that, and I

4   told them my feelings on it.  I didn't feel like

5   it was justified that I had to put in that road.

6        Q.    Who from the City came out there

7   to that meeting you're talking about?

8        A.    Stewart Manson, Cecil Court, Mark

9   Waits, I think he was the assistant at the time,

10   his boss maybe, John Carroll, I think was his

11   name.

12        Q.    Mark Waits works for the State,

13   right?

14        A.    Correct.

15        Q.    Who else do you remember being

16   there?

17        A.    Me and I think that's it.

18            MR. MOOTY:  Me.

19            THE DEPONENT:  This was prior

20   to that when you came.

21        Q.    (Mr. Mills)  Do you remember them

22   explaining to you at all why they wanted you --

23        A.    Yeah, because they had an access

1    management plan that they wanted to -- everyone

2    was going to have to adhere to.  That road,

3    there was no doubt, was going to go all the way

4    to Vaughn Road.  I asked them about the railroad

5    tracks, and they said that that made no

6    difference.  The road was still going to be

7    built all the way to Vaughn Road.

8        Q.    Did you ever get a copy of the

9    access management plan?

10       A.    I did.  I've tried to find it, and

11   I cannot find it.  It was done by a group out of

12   Birmingham named Skipper and Associates.

13       Q.    I'm going to show you a document

14   that I'm going to mark as Defendant's Exhibit

15   No. 10 and ask you if you recognize that?

16                 (WHEREUPON, a document was marked

17                 as Defendant's Exhibit No. 10 and

18                 is attached to the original

19                 transcript.)

20       A.    I think that's a copy of what I

21   saw for Taylor Road and Chantilly Parkway, yes.

22       Q.    Is that what you understood to be

23   the access management plan?

1          A.      I understood that there was going

2     to be where it is.   It was also told that there

3     was going to be one right here, but I don't

4     know.   I'm not sure about if it's even exactly

5     parallel with that or not.   It's just right

6     there.   I think it's very close, though.   I know

7     you can only make a right turn coming from the

8     east.

9          Q.      In your complaint you allege that

10    the defendants' requirements, being either the

11    City or the Water Board, of you or your

12    companies, are or were inconsistent and in

13    contravention of the traffic access management

14    plan, this document.   Can you tell me how you

15    believe that to be the case?   How do you believe

16    it was inconsistent?

17         A.      Well, what I believe is, is that

18    they made me carry this road to the end of this

19    property line.   That's why they wouldn't approve

20    his development plan so that this could be

21    continuous, and they wouldn't have any expense

22    on moving it to the end of the property line.

23    That's what I believe.   And then they up and put

1    a billboard right there, right next to where the

2    road would have to go through, so that's why I

3    thought that was a bunch of hogwash.  I was

4    under the impression that they were going to

5    build this road all the way through and...

6         Q.    Are you now saying that that is

7    not the case --

8         A.    I don't know that it is or not.

9    That ain't why I'm upset.  I'm upset because you

10   cost me $100,000 because they wouldn't approve

11   his development plan.  I had to turn around and

12   buy all of the property back from him -- that's

13   why I'm upset.

14        Q.    So is it just that you had to buy

15   the property back, or also that you had to build

16   the road?

17        A.    Both.

18        Q.    I'm going to show you Defendant's

19   Exhibit No. 1, and Mr. Bush testified earlier

20   that this was the agreement by which he

21   purchased from Forest Glen, LLC that Lot 1.

22   Would you agree with that?  Take your time if

23   you want to look at it.

83

```
 1              C E R T I F I C A T E

 2

 3    STATE OF ALABAMA   )

 4    MONTGOMERY COUNTY )

 5         I hereby certify that the above and

 6    foregoing deposition was taken down by me in

 7    stenotype, and the questions and answers thereto

 8    were transcribed by means of computer-aided

 9    transcription, and that the foregoing represents

10    a true and correct transcript of the deposition

11    given by said witness upon said hearing.

12         I further certify that I am neither of

13    counsel nor of kin to the parties to the action,

14    nor am I in anywise interested in the result of

15    said cause.

16                         COPY

17

18                    SELAH M. DRYER, CCR

19                    ACCR#: 393

20

21    My Commission Expires

22    June 30, 2010

23
```